**AT&T CORPORATION,**
**Plaintiff/Counterclaim**
**Defendant,**

v.

**AVENTURE COMMUNICATION TECHNOLOGY, LLC; and Future-phone.com, LLC, Defendants/Counterclaim Plaintiffs.**

No. 4:07-cv-00043–JEG

United States District Court, S.D. Iowa, Central Division.

Signed September 19, 2016

James F. Bendernagel, Jr, Michael J. Hunseder, Sidley Austin LLP, Washington, DC, Richard W. Lozier, Jr., Belin McCormick, P.C., Des Moines, IA, Brian A. McAleenan, David W. Carpenter, Sidley Austin LLP, Chicago, IL, for Plaintiff/Counterclaim Defendant.

Gary M. Joye, Maxwell M. Blecher, Blecher Collins Pepperman & Joye, P.C., Los Angeles, CA, Paul D. Lundberg, Lundberg Law Firm P.L.C., Sioux City, IA, Jonathan E. Canis, Arent Fox LLP, Washington, DC, Thomas George Fisher, Jr., Des Moines City Attorney, Des Moines, IA, for Defendants/Counterclaim Plaintiffs.

## ORDER

JAMES E. GRITZNER, Senior Judge, U.S. DISTRICT COURT

### TABLE OF CONTENTS

I. INTRODUCTION...966

II. JURISDICTION...967

III. GENERAL BACKGROUND...967

A. Telecommunication Regulatory Backdrop...967

1. Communications Act of 1934...968

2. Antitrust Litigation ...968

3. Telecommunications Act of 1996...969

4. The Act: IXCs, ILECs, and CLECs...970

5. Relevant Provisions of the Act...971

B. "Traffic Pumping" Litigation...973

1. Farmers v. Qwest...974

a. FCC: Farmers I...974

b. FCC: Farmers Reconsideration I...975

c. FCC: Farmers II...976

d. FCC: Farmers Reconsideration II...979

e. D.C. Circuit: Farmers & Merchants v. FCC...979

2. FCC: All American Telephone Co. v. AT&T Corp....980

a. FCC: All American I...980

b. FCC: All American Reconsideration I...982

c. FCC: All American II.......982

d. FCC: All American Reconsideration II...986

e. FCC: All American Damages Order...986

3. FCC: AT&T v. YMax...988

4. Northern Valley Cases...990

a. FCC: Qwest v. N. Valley (N. Valley I)...990

b. FCC: N. Valley Reconsideration I...992

c. FCC: Sprint v. N. Valley (N. Valley II)...994

d. FCC: N. Valley Reconsideration II...994

e. D.C. Circuit: N. Valley v. FCC...994

5. Sancom and Splitrock Cases...995

a. FCC: Qwest v. Sancom (Sancom I)...996

b. FCC: Sancom Reconsideration I...999

c. Sancom v. Qwest v. Free Conferencing...999

6. Tekstar Cases...1000

7. Connect America Order...1000

IV. BACKGROUND OF THE CASE...1004

A. Procedural History...1004

B. Factual Background...1006

1. Factual Allegations in AT&T's Amended Complaint...1006

2. Factual Allegations in Aventure's Amended Counterclaims...1012

3. Factual Allegations in Futurephone's Counterclaims...1012

V. DISCUSSION...1015

A. Standards for Motions to Dismiss and for Judgment on the Pleadings...1015

B. Aventure's Motion to Dismiss AT&T's Counts One, Two, Six, Seven, and Nine...1016

1. AT&T's § 201(b) Traffic Pumping Claim...1016

2. AT&T's § 203(c) Traffic Pumping Claim...1018

3. AT&T's Fraudulent and Negligent Misrepresentation Claim...1019

4. AT&T's Unjust Enrichment Claim...1022

5. AT&T's Declaratory Ruling Claim...1022

C. AT&T's Motion to Dismiss Futurephone's Counterclaims...1023

1. Futurephone's Communications Act Counterclaims...1023

2. Futurephone's Tortious Interference Counterclaim...1025

3. Futurephone's Quantum Meruit Counterclaim...1027

4. Futurephone's Iowa Code § 476.5 Counterclaim...1029

5. Futurephone's Abuse of Process Counterclaim...1031

D. AT&T's Motion for Judgment on the Pleadings...1033

1. Aventure's Communications Act Claim...1033

2. Aventure's Unjust Enrichment/Quantum Meruit Counterclaims...1035

VI. CONCLUSION...1037

## I. INTRODUCTION

Before the Court and addressed in this Order is a Motion to Dismiss filed by Defendant/Counterclaim Plaintiff Aventure Communication Technology, LLC (Aventure) against Plaintiff/Counterclaim Defendant AT&T Corp. (AT&T). Also before the Court and addressed in this Order is a Motion to Dismiss by AT&T against Defendant/Counterclaim Plaintiff Futurephone.com LLC (Futurephone) and a Motion for Judgment on the Pleadings filed by AT&T against Aventure.

On July 23 and 24, 2014, the Court conducted omnibus hearings on AT&T's motion to dismiss, motion for judgment on the pleadings, and motions for summary judgment, ECF Nos. 162, 197, 243, and 246, respectively, and on Aventure's motions to dismiss and for summary judgment, ECF Nos. 222 and 251, respectively.[1] Representing AT&T were Attorneys

---

1. The Court also heard oral arguments on motions to dismiss, for judgment on the pleadings, and for summary judgment in related cases <u>Qwest Communications Co. LLC (Qwest) v. Aventure et al.</u>, 4:07–cv–00078 (S.D.Iowa), <u>Sprint Communications Co., L.P. (Sprint) v. Aventure et al.</u>, 4:07-cv-00194 (S.D. Iowa), <u>Aventure v. Sprint et al.</u>, 4:08-cv-00005 (S.D. Iowa), and <u>MCI Communications Corp. (MCI) v. Futurephone.com LLC (Futurephone)</u>, 5:07-cv-0409: (N.D. Iowa).

Michael Hunseder and Richard Lozier. Representing Aventure were Attorneys Paul Lundberg and Gary Joye. Representing Futurephone was Attorney Gary Joye. This order addresses Aventure's motion to dismiss and AT&T's motions to dismiss and for judgment on the pleadings, which are fully submitted and ready for disposition.[2]

Although discussed in greater detail below, a snapshot of the scope of this access stimulation litigation is warranted at the outset of this order. Like this Court, other district courts have experienced long delays in similar access stimulation cases. See discussion infra Part III.B. For example, in the District of Minnesota, the Qwest v. Free Conferencing Corp., 0:10–cv–00490 (D.Minn) case, which was filed almost seven years ago, has been punctuated with stays, questions to the Federal Communications Commission (FCC), settlements between several parties, and discovery disputes. That court recently conducted a nine-day bench trial over just one claim, which took over nine months to complete, and now awaits the district court's decision. Similarly, in the District of South Dakota, the Qwest v. Free Conferencing, 4:07–cv–04147 (D.S.D.) case, which was filed nine years ago, was stayed due to referral to the FCC. As with the case in Minnesota, during the stay, several parties settled and when the stay lifted, two parties remained. That court conducted a six-day bench trial over three state law claims. The appellate decision in that case was just filed by the Eighth Circuit Court of Appeals on September 15, 2016. See Qwest Cornmc'ns Corp. v. Free Conferencing Corp., 837 F.3d 889, No. 15–2406, 2016 WL 4896397 (8th Cir. Sept. 15, 2016). Another nine-year-old case out of the Southern District of New York, AH Am. Tel. Co. v. AT&T, 1:07-cv-00861-WHP (S.D.N.Y.), was stayed for referral to the FCC more than seven years ago and remains stayed as the FCC's damages decision is on review before the Court of Appeals for the District of Columbia Circuit, see Am. Tel. Co. v. FCC, 15-1354 (D.C. Cir. filed Oct. 16, 2015). With this glimpse of the course of this litigation, the Court now considers the motions before it.

## II. JURISDICTION

AT&T alleges claims against Aventure that arise under the Telecommunications Act of 1996, 47 U.S.C. § 201 et seq. (Telecommunications Act, the Communications Act, or the Act), and alleges claims that arise under Iowa state law against Aventure and Futurephone. Aventure and Futurephone raise counterclaims that arise both under the Act and Iowa law. This Court has original jurisdiction over the federal question claims, see 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims, see id § 1367.

## III. GENERAL BACKGROUND [3]

### A. Telecommunication Regulatory Backdrop

The Communications Act of 1934, 47 U.S.C. § 151 et seq., is the comprehensive act that codified telecommunication regulations and created the Federal Communications Commission (FCC or Commission) to

---

**2.** The disposition of AT&T's motion to dismiss resolves AT&T's motion for summary judgment against Futurephone.

**3.** Parts III. A. and III.B. of this Order are updated versions of corresponding sections included in this Court's Orders of February 17, 2015, filed in Qwest v. Aventure, 4:07–cv– 00078 (S.D.Iowa), ECF No. 793; of March 19, 2015, filed in Aventure v. Sprint et al., 4:08-cv-00005 (S.D. Iowa), ECF No. 270; of April 8, 2015, in Sprint v. Aventure et al., 4:07-cv-00194 (S.D. Iowa), ECF No. 528; and of August 29, 2016, in MCI v. Futurephone, 5:07-cv-04095 (N.D. Iowa), ECF No. 275.

oversee and regulate the telecommunications industry.[4]

## 1. Communications Act of 1934

The stated purpose of the Communications Act of 1934 was

regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States,[5] a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission" [FCC], which shall be con-

stituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

47 U.S.C. § 151 (1934).

The Communications Act of 1934 required telecommunications carriers to file tariffed rates with the FCC and to provide notice to the FCC and to the public when they changed their tariffs, see § 203(c), but it did nothing to regulate or protect equipment sellers or competitors, see Essential Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co., 610 F.2d 1114, 1120 (3d Cir.1979). Thus, American Telephone and Telegraph (AT&T), the parent company of the Bell System, continued to dominate the telecommunication industry. See id.

## 2. Antitrust Litigation

In the 1980s, fifty years after the passage of the Communications Act of 1934, and following decades of litigation between the U.S. Department of Justice (DOJ) and AT&T, the telecommunication industry confronted a massive corporate reorganization.[6] As part of a consent decree in the second of two cases between the DOJ and

---

4. Telephone companies have been required "to provide service on request at just and reasonable rates, without unjust discrimination or undue preference," since 1910 when they were added to the list of "common carriers" subject to regulation by the Interstate Commerce Commission (ICC). Essential Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co., 610 F.2d 1114, 1117 (3d Cir.979) (citing Mann-Elkins Act of 1910, ss 7, 12, ch. 309, 36 Stat. 539). Legislation exclusive to telecommunications, however, did not occur until Congress passed the Communications Act of 1934 to address the ICC's minimal oversight of the telecommunications industry and the Bell System's virtual monopoly over all interstate and international telephone communications. See generally In re: Policy & Rules Concerning Rates for Competitive Common Carrier Servs. & Facilities Authorizations Therefor, 84 F.C.C. 2d 445, 459-61 (1981).

5. The 1996 Amendments to the Act added, "without discrimination on the basis of race, color, religion, national origin, or sex."

6. In 1949, with the telecommunication industry still largely regulated by state regulatory agencies and AT&T's monopoly generally intact, the U.S. Department of Justice (DOJ) filed an antitrust lawsuit in the U.S. District Court for the District of New Jersey (Civil Action No. 17–49) against AT&T for violations of the Sherman Act, 15 U.S.C. §§ 1-3. See Am. Tel. & Tel. Co., 552 F.Supp. at 135–36. The case, which resolved in 1956 by consent decree, was followed in 1975 by a second DOJ antitrust action filed in the U.S. District Court for the District of Columbia, Civil Action No. 74–1698, against AT&T and its subsidiaries, seeking to, inter alia, divest AT&T of the Bell Operating Companies (BOCs). Am. Tel. & Tel. Co., 552 F.Supp. at 139. The second case also resulted in a consent decree in 1982 that required AT&T's divestiture of the BOCs, equal access to interconnection facilities, and division of assets between the corporation and the divested companies. Id. at 139–233; see generally Joseph D. Kearney, From the Fall of the Bell System to the Telecommunications Act: Regulation of Telecom-

AT&T, United States v. Am. Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C.1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), AT&T was divested of the local arms of the Bell System—the Bell Operating Companies (BOCs)—which were reorganized into seven Regional BOCs (RBOCs). United States v. W. Elec. Co., 569 F.Supp. 990, 993–94 & n. 11 (D.D.C. 1983). The Bell System territories were divided into 164 local access and transport areas (LATAs) that "mark[ed] the boundaries beyond which a Bell Operating Company [could] not carry telephone calls." Id. The BOCs (1) performed exchange telecommunications, that is, transported traffic between telephones located within a LATA; and (2) provided exchange access within a LATA, that is, linked a subscriber's telephone to their long distance carrier's nearest transmission facility, but only to and from telephones located within the same LATA (intra-LATA traffic). Id. Because BOCs held local monopoly positions, they could not carry calls between different LATAs (inter-LATA traffic); only AT&T and its competitors, such as MCI and Sprint, could carry telecommunications traffic that originated in one LATA and terminated in another. Id.

Predictable obstacles and pervasive changes in technology compounded judicial oversight of the consent decree and resulted in more than a decade of subsequent litigation. See generally SBC Commc'ns, Inc. v. FCC, 154 F.3d 226, 231 (5th Cir. 1998) ("[The consent decree]'s enforcement and alteration in the light of technological progress and changing market circumstances ultimately required substantial monitoring on the part of the district court, and the extensive judicial tinkering that resulted prompted many pundits to dub District Judge Greene the country's 'telecommunication's czar.' "). "Congress—

munications Under Judge Greene, 50 Has-

responding, in part, to the argument that competition in the huge telecommunications industry should no longer be governed by an antitrust consent decree administered by a single federal district judge, see S. Rep. No.104-23, at 5, 9 (1995)—set forth a new legislative framework, the Telecommunications Act of 1996 ...." SBC Commc'ns Inc. v. FCC, 138 F.3d 410, 412 (D.C.Cir.1998).

**3. Telecommunications Act of 1996**

The Senate Report on the Telecommunications Act of 1996 cited several reasons for the legislation.

The 1934 Act has not been rewritten since its original passage. Its provisions are no longer adequate in a world of competition for telephone services and increasing diversity of media. Further, much of current communications policy is being set by a single Federal district court enforcing the [consent decree]. Reducing regulation of the telecommunications industry will spur the development of new technologies and increase investment in these industries, which will create jobs and greater choices for consumers. The United States telecommunications industry is competitive worldwide. By reducing regulation and barriers to competition, the bill will help ensure the future growth of these industries domestically and internationally.

S. Rep. 104-23, at 9-10 (1995).

The preamble of the Act declares it is, "an Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub. L. No. 104-104, § 652, 110 Stat. 56 (codified as amended in scattered sections of Title 47 of the United States Code).

tings L.J. 1395, 1419 (1999).

#### 4. The Act: IXCs, ILECs, and CLECs

The Act "revis[ed] the regulatory scheme under which local exchange carriers (LECs) assess costs to long-distance (IXCs) and other carriers for use of the LECs' local telephone networks to complete interstate telephone calls." Sw. Bell Tel. Co. v. FCC, 153 F.3d 523, 535 (8th Cir.1998). The Act subdivided the LECs into the former local telephone companies—incumbent local exchange carriers (ILECs)—and the new emergents to the local exchange arena—competitive local exchange carriers (CLECs). Id. at 536. Under § 203 of the Act, ILECs "are required to file and maintain tariffs with the Commission." In re: Establishing Just & Reasonable Rates for Local Exch. Carriers (Access Stimulation NPRM), 22 FCC Rcd. 17989, 17990 (2007). CLECs, on the other hand, are allowed "to tariff interstate access charges if the charges are no higher than the rate charged for such services by the competing incumbent LEC (the benchmarking rule)." Id. at 17994 (citing 47 C.F.R. § 61.26 (Rule 61.26); In re: Access Charge Reform, Reform of Access Charges Imposed by Competitive Local Exchange Carriers, Seventh Report and Order and Further Notice of Proposed Rulemaking (Seventh Report and Order), 16 FCC Rcd. 9923, 9925 (2001)). CLECs "may not tariff rates that are higher than [the benchmark], but may negotiate any such higher charges with interexchange carriers (IXCs)." Id.

At issue in this litigation are commercial arrangements LECs formed with conference calling services (FCSCs) who advertise free services, such as conference bridge lines, chat rooms, international calling, podcasts, and pornographic and other adult calling. Under these arrangements, the FCSCs' equipment is installed at locations controlled by the LECs, the LECs assign telephone numbers to the FCSCs, and when a consumer calls the phone number provided by the FCSC, the respective IXC is required to deliver the call to the LEC's exchange area, or in some cases, outside that area. The LEC then bills the respective IXC for the switched access service. When the LEC receives payment from the IXC, the LEC sends the FCSC an agreed upon portion of the access revenues. These arrangements, referred to as access stimulation or traffic pumping, resulted in dramatic increases in the volume of long distance calls the IXCs delivered to the LECs and for which the IXCs were billed at the LECs' higher tariffed rates.[7]

7. In All Am. Tel. Co. v. AT&T Corp. (All Am. Recons. I), 28 FCC Rcd. 3469, 3479 (2013), see discussion infra Part III.B.2.b., the Commission provided the following description of the ILECs' and CLECs' rate structures:

The Commission regulates access charges that LECs apply to interstate calls. As a general matter, ILECs must file and maintain tariffs with the Commission for interstate switched access services. Commission rules provide rate-of-return LECs ... with alternate means for filing individual interstate access tariffs. One option is to participate in the traffic-sensitive pool managed by the National Exchange Carrier Association (NECA) and in the traffic-sensitive tariff filed annually by NECA. The rates in the traffic-sensitive tariff are set based on the projected aggregate costs (or average schedule settlements) and demand of all pool members and are targeted to achieve an 11.25 percent return. Each participating carrier historically received a settlement from the pool based on its costs plus a pro rata share of the profits, or based on its settlement pursuant to the average schedule formulas. Stated differently, all NECA pool members share revenues in excess of costs. Alternatively, a rate-of-return carrier that has 50,000 or fewer access lines in a study area may elect to file its access tariffs in accordance with Section 61.39 of the Commission's rules, which the Commission adopted in the Small Carrier Tariff Order. A carrier choosing to proceed under this rule (Section 61.39 Carrier) must file access tariffs in odd numbered years to be effective for a two-year period. Section 61.39 Carri-

The IXCs disputed these charges arguing the services provided were not tariffed services, and therefore the LECs could not bill the IXCs under the tariff for those services. The IXCs eventually stopped paying the LECs' billed charges. The IXCs and the LECs filed actions against one another with the FCC, state utility boards and commissions, as well as in federal and state court, alleging causes of action under the Act, state communications law, and common law.

## 5. Relevant Provisions of the Act

The IXCs allege that consequent to the LECs' arrangements with the FCSCs, the LECs violated provisions of the Act in various ways, including by billing the IXCs switched access charges for services not covered by the LECs' tariffs. Contrariwise, the LECs allege the IXCs violated the Act by refusing to pay the switched access charges.

The sections of the Act relevant to these claims and discussed in this order are 47 U.S.C. §§ 201(a), (b); 203(c); 206; 207; 223(a)(1); and 254(k).

Section 201(a) (Service):

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

Section 201(b) (Charges):

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, ... That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest

ers base their initial rates on historical costs (or average schedule settlements) and associated demand for the preceding year. They base their subsequent rates on their costs and traffic volumes for the prior two year period. Section 61.39 Carriers do not pool their costs and revenues with any other carrier. Thus, if demand increases, Section 61.39 Carriers retain the revenues to the extent they exceed any cost increases. The Commission considers CLECs ... to be nondominant carriers subject to minimal rate regulation.... [Historically,] CLECs had two means by which to provide and charge IXCs for functionally equivalent interstate access services. A CLEC generally may tariff interstate access charges if the charges are no higher than the rate charged for such services by the competing ILEC (the benchmarking rule). Alternatively, a CLEC must negotiate and enter into agreements with IXCs to charge rates higher than those permitted under the benchmarking rule.

to carry out the provisions of this chapter.

Section 203(c) (Overcharges and rebates):

(c) No carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

Section 203(e) (Penalty for violations):

In case of failure or refusal on the part of any carrier to comply with the provisions of this section or of any regulation or order made by the Commission thereunder, such carrier shall forfeit to the United States the sum of $6,000 for each such offense, and $300 for each and every day of the continuance of such offense.

Section 206 (Carrier's liability for damages):

In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

Section 207 (Recovery of damages):

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

Section 223(a)(1) (Obscene or harassing telephone calls . . . .):

(a) Prohibited acts generally. (1) Whoever—in interstate or foreign communications—(A) by means of a telecommunication device knowingly—(i) makes, creates, or solicits, and (ii) initiates the transmission of, any comment, request, suggestion, proposal, image, or other communication which is obscene or child pornography, with intent to abuse, threaten, or harass another person . . .

Section 254(k) (Universal service—Subsidy of competitive services prohibited):

(k) A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.

## B. "Traffic Pumping" Litigation

Around the same time traffic pumping cases were filed in this Court, similar cases were filed in other federal district courts. In many, if not all, of the cases filed in other federal district courts, the district court stayed the litigation and referred questions to the FCC.[8] Recognizing that the tariffs and the arrangements between the LECs and the FCSCs in the cases before this Court were essentially indistinguishable from those already referred to the FCC, this Court determined that referral would be duplicative and cause unnecessary expense, and therefore stayed the cases to await the FCC's rulings. This procedure was also intended to retain some control over the resumption of activity in what promised to be a long litigation process.

As will be discussed, see discussion infra Parts III.B. 1—III.B.6, in all but one of the cases detailed in this order that referred questioned to the FCC, the IXCs and the LECs settled their claims during the pendency of the referral. Accordingly, the referring district courts never ruled on the merits of the dispositive motions between the LECs and the IXCs.[9] With three exceptions, the IXCs and the FCSCs also settled their claims, see discussion infra Parts III.B.2, III.B.5.c, and III.B.6. Due to those settlements, the referring district courts had no reason to consider dispositive motions on the claims between the LECs and the IXCs in light of the FCC's decisions. Thus, in consideration of the motions before it, having stayed these cases in anticipation of guidance from the FCC, and to reflect the complexity of the analysis, this Court finds it essential and unavoidable to provide a comprehensive discussion of the background and dispositions of the traffic pumping cases referred to the FCC as this long-term litigation has necessarily and gradually evolved.[10]

---

**8.** More precisely, when a court "refers" a question to an agency, such as the FCC, the agency will direct the party to file an administrative complaint setting forth the issues to be considered. Reiter v. Cooper, 507 U.S. 258, 269 n. 3, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) ("'Referral' is sometimes loosely described as a process whereby a court refers an issue to an agency. But [most statutes] contain[] no mechanism whereby a court can on its own authority demand or request a determination from the agency; that is left to the adversary system, the court [is] merely staying its proceedings while the [party] files an administrative complaint under [the agency's enabling statute] .... Mitchell Coal [& Coke Co. v. Perm. Railroad Co., 230 U.S. 247[, 267], 33 S.Ct. 916, 57 L.Ed. 1472 (1913)], spelled out the actual procedure contemplated, holding that further action by the district court should 'be stayed so as to give the plaintiff a reasonable opportunity within which to apply to the Commission for a ruling as to the reasonableness of the practice.'" (internal citations omitted)); accord Telecom Int'l Am., Ltd. v. AT&T Corp., 67 F.Supp.2d 189, 219 (S.D.N.Y.1999) ("'Referral' by the District Court is technically a misnomer. The District Courts do not actually refer matters to the FCC. The proper procedure is for the District Court to stay the matter, and one of the parties to the litigation files a complaint with the FCC" (citing Reiter, 507 U.S. at 268, 113 S.Ct. 1213)).

**9.** In the All-American Telephone Company, et al. v. AT&T Corp., 1:07-cv-00861-WHP (S.D.N.Y.), the district court stayed the case pending referral to the FCC. Although the FCC has filed orders on the referred issues (most recently, a damages order in favor of the IXC) the case remains stayed in the district court pending review of the FCC's damages decision by the D.C. Circuit. See discussion infra, Part III.B.2.

**10.** The cases and decisions discussed in this section do not purport to be an exhaustive accounting of traffic pumping litigation. Rather, this section includes those cases relied upon and cited extensively by the parties, which the Court consequently deems significant to its analysis.

### 1. Farmers v. Qwest

Farmers and Merchants Mutual Telephone Company of Wayland, Iowa (Farmers), an ILEC that served approximately 800 access lines for local residents, provided access services that Qwest purchased to terminate calls to customers located in Farmers' exchange. See Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co. (Farmers I), 22 FCC Rcd. 17973, 17974 (2007). In June 2005, Farmers left the National Exchange Carrier Association (NECA) tariff pool and filed a tariff (the Kiesling Tariff) that contained Farmers' switched access rates. Id.

At the same time Farmers left the NECA pool, it entered into multiple commercial arrangements with several FCSCs as a method of increasing interstate switched access traffic and revenues, also referred to as traffic pumping. Id. at 17976. Under the terms of the arrangements, Farmers was to pay the FCSCs, and as a result of these arrangements, the number of minutes delivered to Farmers' exchange increased exponentially and those minutes of use (MOUs) were directly attributable to the traffic delivered to the FCSCs and not due to an increase in the number of lines Farmers serviced. Id. In June 2007, instead of revising its tariff as required by Commission Rule § 61.39 to reflect this tremendous increase in traffic over the prior two years, Farmers elected to reenter the NECA pool. Id. Suspect of the skyrocketing monthly access charges, Qwest stopped paying the full amount of Farmers' invoices. Id. at 17973.

### a. FCC: Farmers I

On May 7, 2007, Qwest filed a complaint with the FCC against Farmers alleging, inter alia, violations of federal tariffs.[11] Qwest asserted that beginning July 1, 2005, Farmers earned a rate of return far in excess of the prescribed maximum and that thus those rates were unjust and unreasonable in violation of § 201 (b). As a result, Qwest argued, Farmer's rates were not entitled to deemed lawful status or protection because Farmers' acts were a deliberate, bad-faith plan to dramatically increase Farmers' access revenues and earn a rate of return in gross excess of the Commission's precepts. Id. at 17976–77. Qwest asked the Commission to declare Farmers' rates void ab initio and to hold Farmers liable for retrospective damages. Id. at 17977. In the alternative, Qwest contended that the traffic at issue was not terminating access traffic under Farmers' tariff, and therefore Farmers violated §§ 203(c) and 201(b) of the Act by applying charges inconsistent with its tariff Id.

In its decision dated October 2, 2007, the Commission rejected Farmers' argument that its tariffs deemed lawful status insulated Farmers prospectively from overcharge claims. The Commission explained that "[s]ection 204(a)(3) does not mean that tariff provisions that are deemed lawful when they take effect may not be found unlawful subsequently" because "the Commission retains its ability to find under section 208 that a rate will be unlawful if charged in the future." Id. at 17980 (internal quotation marks and citations omitted).

---

**11.** On February 20, 2007, Qwest Communications Company filed a similar complaint with the Iowa Utilities Board (IUB) against several LECs, including Farmers, alleging violations of Iowa state tariffs. See Qwest Commc'ns v. Superior Tel. Coop. (IUB I), Docket No. FCU–07–2, 2009 WL 3052208 (Iowa Uti Bd. Sept. 21, 2009), recons. granted in part, (IUB Recons. I), 2009 WL 4571832 (Iowa Util. Bd. Dec. 3, 2009), further recons. denied, 2011 WL 459685, (IUB Recons. II) (Iowa Uti Bd. Feb. 4, 2011), aff'd sub nom. Farmers & Merchs. Mut. Tel. Co. of Wayland v. IUB, 829 N.W.2d 190 (Iowa Ct.App.2013) (unpublished table decision). On April 24, 2013, the Iowa Supreme Court issued an order denying further review of the IUB's decision.

In determining the lawfulness of Farmers' rate of return, the Commission applied the NECA average schedule formula, noting that Farmers chose not to produce its actual cost data. The Commission concluded Farmers' revenues increased manyfold without a concomitant increase in costs and that Farmers vastly exceeded the prescribed rate of return. Id. at 17982–83. Although the Commission agreed with Qwest that Farmers earned an unlawful rate of return, the Commission declined to either rule that Farmers' tariff was void ab initio or award Qwest damages, reasoning that to do so would be a departure from the Commission's prohibition against awarding retrospective relief in conjunction with "deemed lawful" tariffs. Id. at 17983. The Commission reasoned that while "Farmers manipulated the Commission's rules to achieve a result unintended by the rules," Qwest had neither identified the use of any improper accounting techniques nor alleged that Farmers' revenue-sharing arrangements with the FCSCs constituted a per se violation of § 201(b). Id. at 17984.

The Commission denied Farmers' request to rule that Qwest's withholding partial payment of Farmers' tariffed charges was unlawful self-help in violation of §§ 203(c) and 201(b), stating that the request was akin to a cross-complaint prohibited under Commission's rules and that any complaint Farmers might file to recover fees would constitute a collection action, which the Commission would not consider. Id. at 17984–85.

The Commission next rejected Qwest's allegation that Farmers violated §§ 201(b) and 203 by imposing terminating access charges on traffic bound for FCSCs that did not terminate in Farmers' exchange but merely passed through and terminated elsewhere. Id. at 17985. The Commission agreed with Farmers' characterization that calls using FCSC numbers were connected and then terminated at the conference bridge.[12] Id. at 17985–86. Referring to the record before it, the Commission found that under the terms of Farmers' tariff, the FCSCs were customers and end users because the FCSCs subscribed to a service. Id. at 17987.

### b. FCC: Farmers Reconsideration I

Qwest filed a petition for partial reconsideration of Farmers I identifying evidence that Farmers withheld critical facts regarding Farmers' relationship with the FCSCs that should have been produced in the initial underlying proceeding. Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co. (Farmers Recons. I), 23 FCC Rcd. 1615, 1615 (2008). Qwest identified statements by Farmers after the Commission released Farmers I that indicated certain contract amendments and bills were not contemporaneously created with the delivery of traffic to the FCSCs; statements contained in the April 13, 2007, affidavit of Farmers' counsel, which indicated Farmers back-billed the FCSCs to ensure compliance with its tariff; and back-dated bills and contracts Farmers delivered even after the complaint proceeding began. Id. at 1616.

In granting the petition for reconsideration, the Commission explained that in Farmers I, it made the key determination that the FCSCs were end users who subscribed to services offered under Farmers' tariff, in reliance upon Farmers' representation that the FCSCs purchased interstate End User Access Service and paid federal subscriber line charges—a repre-

---

**12.** "Newton's [Telecom Dictionary] describes a conference bridge as '[a] telecommunications facility or service which permits callers from several diverse locations to be connected together for a conference call.'" Farmers I, 22 FCC Rcd. at 17986 n. 112 (quoting H. Newton, Newton's Telecom Dictionary 260 (2006)).

sentation that was brought into question by evidence that purportedly showed Farmers' invoices and agreements with the FCSCs were backdated. Id. at 1617–18. The Commission initiated additional proceedings to allow review of the newly discovered evidence and ordered Farmers to produce all discovery documents submitted in discovery in the Iowa Utilities Board (IUB) proceeding. Id. at 1617. The Commission rejected Farmers' assertion that the protective order issued in the IUB proceeding insulated the documents from being produced, explaining that the Commission had the authority to order a party to produce that party's documents in a proceeding before it irrespective of whether those same documents were produced and subject to a protective order in a different proceeding. Id. at 1619.[13]

### c. FCC: Farmers II

On November 25, 2009, the Commission released its order on reconsideration, finding the evidence Qwest presented after the release of Farmers I warranted a change of that ruling. The Commission concluded that Farmers had violated §§ 203(c) and 201(b) of the Act and was liable to Qwest for damages suffered. Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co. (Farmers II), 24 FCC Rcd. 14801, 14801 (2009).

The Commission clarified that in Farmers I, it found the FCSCs were customers and thus end users based upon Farmers' representations that the FCSCs purchased tariffed access service and paid federal subscriber line charges (SLC), however, new evidence called those representations into question. Id. at 14803. The Commission found that evidence presented on reconsideration demonstrated that the FCSCs had never taken tariffed services, and that after Farmers' activities came under legal scrutiny, Farmers "undertook to fabricate evidence of a tariffed customer-carrier relationship that did not in fact exist, sending backdated bills to the [FCSCs] and executing contract 'addenda' purporting to have taken effect months or years earlier," and then selectively submitted some of the documents in the earlier proceeding without disclosing that those documents had not been issued contemporaneously with the service provided. Id. at 14804 (internal quotation marks and citations omitted).

---

13. References made in this Order to the IUB's proceedings and findings are included as part of the review of access stimulation proceedings that impact the cases before this Court, as well as to address arguments (made at the time these motions were filed) that the IUB's proceedings were still in the review process and were not binding because a final order had not been entered. Given the procedural posture of the motions addressed in this Order, the Court looks to the allegations made in the complaints/counterclaims and does not rely upon or adopt the IUB's findings in resolving the present motions. Nevertheless, the Court acknowledges that the IUB's proceedings, as well as various FCC decisions, are now final and conclusive. The Court distinguishes, however, that in the Court's subsequent orders on motions for summary judgment, the Court may consider the relevance of the IUB's findings. See, e.g., In re: Request for Review by Aventure Commc'n Tech., LLC, of A Decision of the Universal Serv. Adm'r, 29 FCC Rcd. 9536, 9538 (2014) ("Aventure objects to relying on the Iowa Utilities Board Decision, arguing that the Iowa Utilities Board Decision is based on inapplicable state law. That argument misses the point: even if we were to agree with Aventure's contention that the legal conclusions reached in the Iowa Utilities Board Decision are based on inapplicable state law, *we can still find persuasive the findings of fact made by the Iowa Utilities Board from its investigation into Aventure's practices*." (emphasis added) (citing All Am. Tel. Co. v. AT&T (All American II), 28 FCC Rcd. 3477, 3495 (2013) (discussing the relevance of the state regulatory board's findings, reasoning that the board had "conducted extensive proceedings into [the LEC]'s operations, and its findings [were] credible and independently supported by the record"))).

Revisiting its Farmers I end user determination in light of the new evidence, the Commission noted that Farmers' tariff defined that (1) "[s]witched access service allows a customer to originate calls from an *end user's* premises to a customer designated premises and to terminate calls from a customer designated premises to an *end user's* premises," (2) "[a]n *end user* is any *customer* of an interstate or foreign telecommunications service that is not a carrier," and (3) "[a] *customer* is any entity that subscribes to the *services offered under this tariff.*" Id. at 14805 (internal quotation marks and citations omitted). The Commission reasoned that to be an end user, an entity must also be a customer, and to be a customer, the entity must subscribe to the services offered under the tariff. Because the FCSCs did not subscribe to a services offered under Farmers' tariff, the FCSCs were not customers and thus could not be end users. Id. The Commission noted that the evidence showed "Farmers expressly structured their telecommunications service contracts *to avoid* strict adherence to the terms of Farmers' filed tariff." Id. Based upon these determinations, the Commission concluded "Tanners was not entitled to charge Qwest switched access charges under the terms of Farmers' tariff." Id.

In examining the contracts between the FCSCs and Farmers, the Commission found that the FCSCs received a free service accessed by way of toll calls placed over long-distance networks that were delivered to the FCSCs over Farmers' network, and that in exchange, Farmers provided support services to the FCSCs and paid the FCSCs a per-minute fee for the traffic generated through this relationship. Id. at 14806. Notably, the Commission found that unlike ordinary end user customers under the tariff, nothing in the Farmers–FCSCs' contracts suggested the FCSCs subscribed to any Farmers' tariffed service or paid Farmers for connect-ing the FCSCs to the interexchange network. Id.

The Commission also noted that Farmers provided the FCSCs connections that differed from those provided to customers of Farmers' tariffed services, including high-capacity DS3 trunks that fed into a new soft switch that Farmers purchased specifically to handle traffic bound for the FCSCs rather than the standard circuit switch used to serve all of its other customers. Id.

Another difference the Commission observed was that the Farmers–FCSCs agreements did not resemble traditional tariffed switched access service agreements, noting that (1) the Farmers—FCSCs agreements included provisions prohibiting Farmers from providing services to the respective FCSC's competitors, which were antithetical to the nondiscriminatory notion of tariffed services; (2) the agreements contained terms not available under Farmers' tariff, which reinforced the conclusion the parties did not establish tariffed-defined carrier/customer relationships; and (3) various terms, such as the per minute fee paid, volume of traffic generated, duration of the agreement, and terms of cancellation, varied between the agreements. Id. The Commission found it telling that "the parties in no way behaved as if they were operating under tariff until *after* Farmers became embroiled in litigation over the traffic stimulation plan." Id. Because Farmers never entered FCSCs' account information into its customer billing systems, had no business records of FCSCs having purchased end user services under Farmers' tariff, did not contemporaneously bill FCSCs for any services, and did not take any steps to bill FCSCs until shortly before discovery began in the underlying proceeding, the Commission concluded that Farmers had never intended to treat

the FCSCs as tariff service customers. Id. at 14808. The Commission found unpersuasive Farmers' argument that backdating was standard practice given Farmers' conduct throughout its business relationships with the FCSCs, which was inconsistent with provision of tariffed services. Id. The Commission concluded that "[t]he evidence overwhelmingly demonstrates that Farmers willingly incurred all of the expenses associated with providing the underlying services to the conference calling companies, including the payment of a fee to these companies, in exchange for these companies directing the free service they offered to the public to Farmers' exchange." Id. at 14809 (internal quotation marks omitted).

The Commission squarely rejected Farmers' assertion that the filed rate doctrine compelled a finding that the services it provided were pursuant to its tariff, and that customer status therefore should be imputed to the FCSCs even though the services they were provided were outside the scope of the tariff. Id. at 14810. The Commission reasoned that "[t]he purpose of the filed rate doctrine is to prevent unreasonable and unjust discrimination among similarly-situated customers of a particular common carrier's service, and to ensure that carriers impose like charges for like services," but that the overwhelming evidence developed on reconsideration demonstrated "a purposeful deviation from the tariff's terms that allowed the conference calling companies to reap benefits from a free service offered only to them, which thereby enabled Farmers to dramatically increase its access charge billing to Qwest," making it abundantly clear that Farmers intentionally avoided a customer relationship under the tariff. Id. Accordingly, the Commission found Farmers did not provide Qwest switched access service for the FCSCs' calls, and therefore the filed rate doctrine did not require Farmers to charge Qwest its tariffed switched access charges or require Qwest to pay such charges for terminating the FCSCs' calls. Id. at 14811.

Next, the Commission rejected Farmers' argument that the voluminous tariff provisions had to be construed as a whole to determine exchange access, explaining that each of the provisions Farmers relied upon were subsections of section 6.1 of the NECA tariff, which limits the scope of the tariff to traffic transmitted to end users. Id. at 14811–12 (distinguishing that under the well-established rules of construction, a service that does not constitute switched access under a section cannot constitute switched access under a subordinate section). The Commission found that neither the Act nor Commission rules bolstered Farmers' theory of what constitutes switched access because "the relevant tariff defines switched access service as providing a communications path to an end user" and "[w]hether or not this definition is narrower than that used for purposes of the Act and Commission rules, it is nonetheless the definition to which Farmers is bound for purposes of determining whether its charges are in compliance with its tariff." Id. at 14812.

The Commission summarized the factors it found to be very strong evidence that Farmers did not believe it was providing, or intend to provide, the FCSCs tariffed services, and thus supported its conclusion that the FCSCs were not end users within the meaning of the tariff provisions: (1) Farmers organized its relationships with the FCSCs through individualized contracts that involved an exchange of services and business relationship quite distinct from Farmers' tariffed switched access service; (2) Farmers did not offer the same terms of service to others that requested it; (3) the parties' actual course of dealing demonstrated no tariffed services were purchased; (4) there was no ex-

planation why the FCSCs were not entered into Farmers' customer systems or why, over its two year relationship with the FCSCs, Farmers failed to bill and collect payment from the FCSCs as required under its tariff; and (5) Farmers sent bills to the FCSCs only after the first round of discovery and then sent no further bills until additional discovery was ordered. Id. at 14812–13. The Commission thus concluded "that Farmers' practice of charging Qwest tariffed switched access rates for its termination of traffic from the conference calling companies is unjust and unreasonable in violation of section 201(b) of the Act." Id. at 14813.

### d. FCC: Farmers Reconsideration II

Farmers filed a petition for reconsideration of Farmers II, which the Commission denied on March 17, 2010. Qwest Commc'ns Corp. v. Merchs. Mut. Tel. Co. (Farmers Recons. II), 25 FCC Rcd. 3422, 3422 (2010). Farmers argued the FCC's Farmers II decision was arbitrary and capricious, contrary to law, and that the Commission lacked jurisdiction to issue it because it was not issued within ninety days of the filing of the petition as required under § 405(b)(1). Id. The Commission dispensed with Farmers' jurisdiction argument, clarifying that the ninety-day requirement found in § 405(b)(1) refers to the grant or denial of a petition. The Commission noted that it had complied with § 405(b)(1) by granting Qwest's petition for reconsideration within ninety days of the date Qwest filed that petition and therein ordered additional proceedings. Id. at 3424. The Commission furthermore explained that failure to rule on a petition for reconsideration within ninety days would not have deprived the Commission of jurisdiction to consider the petition. Id. at 3425.

The Commission also rejected Farmers' assertion that the Commission should not have altered its end user finding in Farmers I without additional evidence. Id. at 3426. The Commission remarked its findings in Farmers I were based on Farmers' contemporaneous representations that the FCSCs purchased interstate end user services and paid federal subscriber line charges. Upon reconsideration, the landscape shifted dramatically as the new evidence Farmers previously withheld made clear the FCSCs never paid subscriber line charges or made any other payments to Farmers. Id. The Commission concluded that leaving intact Farmers I regarding count one of Qwest's complaint did not render Farmers II arbitrary and capricious, explaining that its finding in Farmers I that Farmers received an excessive rate of return was an alternative basis of liability. Id. at 3427.

### e. D.C. Circuit: Farmers & Merchants v. FCC

Farmers appealed the Farmers decisions to the U.S. Court of Appeals for the District of Columbia Circuit arguing the Commission ignored jurisdictional requirements, misread the tariff, and failed to adhere to its own precedent and rules. Farmers & Merchs. Mut. Tel. Co. of Wayland v. FCC, 668 F.3d 714 (D.C.Cir.2011). The D.C. Circuit rejected each of Farmers' arguments, holding (1) the Commission complied with § 405(b)(1) in granting Qwest's petition for reconsideration within ninety days; (2) the Commission's determination that Farmers' services were not tariffed service and Qwest was not required to pay Farmers' tariff, did not deprive the Commission of jurisdiction to consider Qwest's complaint because § 208(a) provides the Commission the authority to adjudicate acts and omissions of common carriers; (3) the Commission properly interpreted the tariff in finding the FCSCs were not end users; (4) Farmers' tariff rates were "deemed lawful" until the Commission determined otherwise, which it did in reviewing the new evidence; (5) the Commission found two alternate

bases for § 201(b) liability: (a) Farmers did not provide switched access under its tariff making Farmers' practice of charging Qwest for such services unjust and unreasonable under § 201(b), and (b) even if traffic Farmers carried from Qwest to the FCSCs could be considered switched access service, Farmers violated § 201(b) by earning an excessive rate of return; (6) the Commission's finding that the FCSCs were not end users did not contravene prior precedent set in AT&T Corp. v. Jefferson Telephone Co., 16 FCC Rcd. 16130 (2001), because in Jefferson Telephone, end user status was assumed; and (7) the Commission properly concluded the FCSCs were not end users under the tariff, and therefore the filed rate doctrine did not apply. Farmers v. FCC, 668 F.3d at 718–24.

### 2. FCC: All American Telephone Co. v. AT&T Corp.

On February 5, 2007, All American Telephone Co. (All American), e-Pinnacle Communications, Inc., and ChaseCom (collectively referred to as "the CLECs" or "All American"), CLECs located in Utah and Nevada, filed a lawsuit against AT&T in the U.S. District Court for the Southern District of New York, 1:07-cv-00861-WHP (S.D.N.Y.). In the lawsuit, All American asserted claims for collection of amounts AT&T allegedly owed for interstate tariff access services, violation of § 201(b) by invoking self-help and failing to pay tariffed access services, violation of § 203(c) by failing to pay tariffed services, and compensation under the theories of quantum meruit for telecommunications services allegedly provided. See All Am. Tel. Co. v. AT&T (All American I), 26 FCC Rcd. 723, 725 (2011). AT&T filed counterclaims against the CLECs for violations of §§ 201(b) and 203(c) of the Act, state law fraud, civil conspiracy, and unjust enrichment alleging the CLECs did not provide AT&T switched access service as defined by the terms of their tariffs, and that even

if the services were pursuant to the tariffs, the CLECs committed unreasonable practices by using sham arrangements to inflating access charges. See id. On February 5, 2010, the district court stayed the case and referred two issues to the FCC: (1) whether AT&T violated §§ 201(b) or 203(c), or any other provision of the Act, by refusing to pay the billed charges; and (2) whether AT&T violated any provision of the Act by refusing to pay the billed charges and not filing a rate complaint with the FCC. See id.

#### a. FCC: All American I

On May 7, 2010, the CLECs filed a formal complaint with the FCC against AT&T, alleging that AT&T violated §§ 201(b) and 203(c) by engaging in unlawful self-help by not paying the CLECs for use of their local networks services to complete long distance calls and that AT&T violated § 201(b) by not filing a rate complaint against the CLECs. Id. at 726.

Addressing whether AT&T violated any provision of the Act by refusing to pay the CLECs' billed charges, the Commission found that the CLECs failed to state a claim. The Commission reasoned that it only had authority to adjudicate claims that a carrier has violated the Act, and that a carrier's allegations that its customer's refusal to pay charges failed to give rise to a claim with the FCC under § 208 or in court under § 206. Id. at 727. The Commission remarked that "[t]his long-standing commission precedent that 'collection actions' fail to state a claim for violation of the Act has been acknowledged and followed by courts." Id. at 727 (footnote omitted). The Commission rejected the CLECs' argument that the allegations of AT&T's failure to pay was not a collection action because the action had been filed in district court, and the district court, not the Commission, would determine any damages: "the CLECs fail to recognize that the reason the Commission

does not hear collection actions is that *a failure to pay tariffed access charges does not constitute a violation of the Act,*" and therefore, "*the CLECs have no claim in a court or at the Commission that AT&T violated the Act in its role as a customer.*" Id. at 728 (second emphasis added). The Commission also rejected the CLECs' assertion that the Seventh Report and Order stood for the proposition that an IXC's failure to pay a CLEC's access charges constituted a violation of the Act, reiterating that while the Seventh Report and Order did observe that failures to pay *tariffed rates* may constitute *breaches of the tariff* actionable in the appropriate federal court, it went on to say that "our tariff rules were historically intended to protect purchasers of service from monopoly providers, not to protect sellers from monopsony purchasing power." Id. at 729 (quoting the Seventh Report and Order, 26 FCC Rcd. at 9957). The Commission noted the irony in the CLECs' reliance on the Seventh Report and Order given that the focus of the Seventh Report and Order was "to eliminate regulatory arbitrage opportunities that previously [had] existed with respect to tariffed CLEC access charges." Id. at 729–30 (quoting the Seventh Report and Order, 16 FCC Rcd. at 9925). The Commission also noted that the remark in the Seventh Report and Order that "the Act and the Commission rules require IXCs to pay *tariffed* CLEC access charges ... merely reinforce[d] the undisputed notion that tariffs govern carrier-customer relationships and that parties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed." Id. at 730 n. 47 (emphasis added) (internal citations and quotation marks omitted).

The Commission next found misplaced the CLECs' comparison to, and reliance upon, Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc., 550 U.S. 45, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007), in which the U.S. Supreme Court held a carrier's failure to pay charges for payphone usage was a violation of the Act. The Commission explained that at issue in Global Crossing was the Act's requirement that the Commission adopt rules to ensure payphone service providers received compensation for completed calls originating from their payphones, and thus, as the Commission found in subsequent cases, a carrier's failure to pay those charges was a violation of the Act. Id. at 730. The Commission distinguished that "[b]y stark contrast, the provisions of the Act and the Commission's rules apply only to the provider of the service, not to the customer; and they govern only what a provider may charge, not what the customer must pay." Id.

The Commission also dispelled the CLECs' notion that footnote 96 in Farmers II stood for the proposition that a carrier is always entitled to at least some compensation for a service rendered, whether or not that service is covered by the tariff, and that if a carrier is always entitled to some compensation for service rendered, AT&T's failure to pay any compensation must be a violation of the Act. Id. at 731 (citing Farmers II, 24 FCC Rcd. at 14812 n. 96). The Commission explained that Farmers II did not hold that a carrier is *always* entitled to compensation for a service rendered; rather, *depending upon the totality of the circumstances*, a carrier *may* be entitled to some compensation for non-tariffed services. Id.[14]

14. Non-party Aventure filed a petition with the Commission for reconsideration of the All American I decision, and Qwest filed a petition seeking permission to file an opposition to Aventure's petition All Am. Tel. Co. v.

AT&T Corp., 26 FCC Rcd. 15016 (2011). The Commission denied Aventure's petition, reasoning that Aventure's assertion that All American I was "vague" and "subject to mul-

### b. FCC: All American Reconsideration I

The CLECs filed a petition for reconsideration, which the Commission denied, finding all the CLECs' arguments had either been fully considered and rejected in All American I or could have been raised during the underlying proceeding. All Am. Tel. Co. v. AT&T Corp. (All Am. Recons. I), 28 FCC Rcd. 3469, 3471–72 (2013). The Commission noted, for example, that the CLECs "persist in relying on the same out-of context snippets from old Commission orders" that the Commission already distinguished in All American I. Id. The Commission remarked that it was perplexed by the CLECs' request to (1) reverse the All American I decision, (2) find the Commission lacked jurisdiction to hear the questions referred by the district court, and (3) dismiss the complaint without prejudice, given that it was the CLECs, over AT&T's objection, who requested the referral from the district court and now asserted they knew all along that the Commission was precluded from ruling on the merits of the complaint because it was a collection action. Id. at 3472–73. Significantly, the Commission rejected the CLECs' argument that a claim against an IXC for failure to pay purportedly tariffed access charges was cognizable in a court proceeding, even though the very same conduct did not constitute a cognizable claim in a § 208 Commission proceeding, reasoning that "[u]nder the plain language of sections 206-208 of the Act, both the Commission and courts *can award relief only upon finding a violation of the Act.*"

---

tiple interpretations" did not meet the "adversely affected" criteria for a non-party to seek reconsideration. Id. at 15017 (internal quotation marks and citations omitted). The Commission explained that "the mere precedential value of an adjudicatory order in a section 208 complaint proceeding cannot 'adversely affect' a non-party to the adjudication within the meaning of section 405(a) of the

Id. at 3473 (emphasis added) (footnote omitted). The Commission clarified that a "federal court *can* adjudicate a local exchange carrier's claim seeking to enforce an IXC's access charge payment obligations *under a federal tariff* whereas the Commission cannot under the long-standing precedent that 'collection actions' fail to state a claim for violation of the Act." Id. (second emphasis added).

### c. FCC: All American II

On April 30, 2010, AT&T filed a formal complaint with the FCC, alleging the CLECs violated §§ 203 and 201(b) of the Act by billing AT&T for access services that were not pursuant to a valid tariff, and violated § 201(b) of the Act by participating in a traffic pumping scheme to inflate billed access charges to AT&T and other IXCs. All Am. Tel. Co. v. AT&T (All American II), 28 FCC Rcd. 3477, 3477 (2013). The Commission granted AT&T's complaint, concluding the evidence showed that the CLECs participated in a traffic pumping scheme "designed to collect in excess of eleven million dollars of improper terminating access charges." Id.

The Commission described the revenue-sharing agreement between the LECs Beehive Telephone Co., Nevada, and Beehive Telephone Co., Utah (collectively, Beehive); FCSC Joy Enterprises, Inc. (Joy); and CHR Solutions (CHR), a telecommunications consulting company that provided services to Beehive (and the subsequently-created CLECs) and drafted the tariffs at issue. Id. at 3478–79.

---

Act and section 1.106 of the Commission's rules." Id. at 15018 (internal quotation marks) (citing AT&T Corp. v. Bus. Telecom, Inc., Order on Reconsideration, 16 FCC Rcd. 21750, 21754 (2001)). The Commission similarly denied Qwest's petition for reconsideration as being tantamount to a petition to intervene and that Qwest failed to satisfy the requirements for intervention. Id. at 15019.

In 1994, Beehive withdrew from the NECA pool and became a § 61.39 carrier, which meant Beehive did not have to share revenues with other ILECs in the pool. Id. at 3480. At about the same time, Beehive and Joy entered into an access revenue-sharing agreement, under which Beehive would pay Joy a portion of the access charges for the long distance traffic routed to Joy's assigned numbers. Id. As a result of this arrangement, Beehive's interstate local switched access MOUs grew exponentially from 3.6 million minutes in 1994 to 313.5 million minutes in 2005. Id. Due to the significant increase in traffic between 2001 and 2005, Beehive was required to reduce its rates from 4.59 to 1.02 cents per minute, but instead of continuing to provide terminating access service, and consequently having to further reduce its rates, Beehive reentered the NECA pool in mid-2007. Id. at 3480–81.

Beehive then created CLECs All American, ePinnacle, and ChaseCom (the CLEC defendants) to assume the role of terminating access carrier and continue the traffic pumping scheme. Id. at 3481. Because they were CLECs rather than ILECs, their rates were not subject to reductions due to the large increases in traffic volume. Id. The CLEC defendants were providing the termination service, while Beehive continued charging the IXCs for tandem switching and transport of the traffic. Id.

The CLEC defendants applied for certification to operate as CLECs in Utah, representing to Utah's public service commission (the PSC) that they did not intend to operate or provide services in Beehive's territory. Id. at 3482. Beehive supported and assisted the CLEC defendants in filings it made with the PSC. Id. Although the certification issued to the CLEC defendants by the PSC precluded the CLEC defendants from competing in Beehive's territory, the CLEC defendants filed switched access tariffs in Utah benchmarked for access service against Beehive's tariffed rates in Utah. Id. Beehive helped the CLEC defendants establish initial operations and set up locations to maximize the transport mileage they could charge. Id. at 3483. The Commission observed that Beehive (1) installed and maintained CLEC defendants' equipment, which was located at Beehive's facility; (2) coordinated and managed the CLEC defendants' billing and collections; (3) assigned its equipment to CLEC defendants and allowed them to continue using it at no cost; (4) advised CHR when to revise the CLEC defendants' tariffs after Beehive had increased its own rate; (5) advanced money to, and became co-lessees with, the CLEC defendants; and (6) decided whether the CLEC defendants could relocate their equipment. Id. In addition, the CLEC defendants' operations were designed and engineered exclusively to provide service to FCSCs, and the CLEC defendants did not market local exchange services. Id. at 3484.

Joy and All American had common directors, officers, and ownership, and shared the same business address. Id. at 3479. All American's operations only provided services to the chat line and conferencing services of its affiliate, Joy; in fact, All American never had its own operating switch, and traffic to All American's telephone numbers terminated to Joy's equipment at Beehive's facilities. Id. at 3484. ChaseCom and e-Pinnacle, likewise, served a total of five FCSCs, and the only equipment either owned was conference bridge equipment; they did not own any of the equipment typically used to provide competitive LEC services to the public. Id. All three CLEC defendants later ceased operation without complying with Commission discontinuation of service rules. Id. at 3485.

On April 26, 2010, the PSC characterized All American as a mere shell company that lacked technical, financial, and managerial resources to serve customers as it had represented it would; found that All American never intended to comply with its state authorization; revoked All American's authorization; and ordered All American to withdraw from the state. Id. PCS' revocation order depicted collusion between All American and Beehive and determined Beehive was party to All American's scheme and aided All American in its illegal operation. Id. at 3486. The PSC revoked All American's authorization, concluding All American did not merit the privileges obtained therein, which included the right to levy access charges. Id.

Turning to the complaint AT&T filed with the FCC against the CLEC defendants, the Commission concluded that the extensive record in the case overwhelmingly supported the conclusion that the CLEC defendants were sham CLECs "created to capture access revenues that could not otherwise be obtained by lawful tariffs"; and therefore billing AT&T for access charges in furtherance of this scheme constituted an unjust and unreasonable practice in violation of § 201(b). Id. at 3487–88 (internal quotation marks omitted). Agreeing with the PSC's findings, the Commission held that the CLEC defendants never intended to be bona fide CLECs but instead intended to provide prohibited service in Beehive's service areas. The Commission found that Beehive masterminded the sham that allowed the traffic pumping arrangements to continue at rates that would have been unsustainable if Beehive had remained a § 61.39 carrier, and further that Beehive created the CLEC defendants who were not subject to NECA's requirements and thus could benchmark their rates. Id. at 3489. The Commission observed that even after the CLEC defendants servicing the calls, the callers still used the same telephone numbers used

when Beehive carried the traffic, the calls were routed through the same facilities, Beehive still charged the IXCs for transporting the calls, and Beehive still made money off the traffic. Id.

The Commission rejected the CLEC defendants' argument that they were lawfully billing AT&T at benchmarked rates compliant with Rule 61.26(b)(1), reasoning the CLEC defendants were not competing with Beehive; rather, Beehive and CLEC defendants were collaborating to circumvent the Commission's CLEC access charges and tariff rules, compliance with which would have ended the traffic pumping scheme. Id. at 3491. The Commission emphasized the narrowness of its holding in Jefferson Telephone, upon which the CLEC defendants relied, stating that although the Commission held that the IXC at issue had not demonstrated the revenue sharing arrangement violated § 201, the Commission expressed no view as to whether a different record could have demonstrated the revenue sharing arrangement did, in fact, violate sections of the Act. Id. at 3491–92 (citing Jefferson Telephone, 16 FCC Rcd. at 16137). The Commission next rejected the CLEC defendants' contention that AT&T was attacking non-party Beehive's rates, clarifying that the gravamen of AT&T's complaint was that the CLEC defendants were operating sham entities to purposefully inflate access charges IXCs had to pay. Thus, it was the CLEC defendants' conduct, not Beehive's rates, that was at issue. Id. at 3492.

The Commission also granted count two of AT&T's complaint, finding the CLEC defendants violated §§ 203 and 201(b) by billing AT&T for services not provided pursuant to a valid and applicable tariff. The Commission reasoned that neither the traffic nor the billing complied with the terms of the filed tariffs. Id. The Commis-

sion rejected the CLEC defendants' contention that as CLECs, they had unfettered ability to provide interstate services nationwide without regard to tariff limitations.

CLECs have blanket Section 214 authority under Section 63.01 of our rules to provide domestic, interstate communications services, but the blanket authority extends only to entry certification requirements for initial operating authority; it does not impact CLECs' obligations under any other section of the Act or Commission rules. Accordingly, until a CLEC files valid interstate tariffs under Section 203 of the Act or enters into contracts with IXCs for the access services it intends to provide, it lacks authority to bill for those services. In addition, Defendants' assertion that the geographic scope of their tariffs is merely "illustrative" and "not binding if the carrier actually provides the service in territory not identified in its interstate tariff" is inconsistent with Section 203 and the "filed tariff" doctrine. Finally, contrary to Defendants' characterization, the geographic limitations in their tariffs were not mere "technical defects" or "ministerial errors." Rather, they are terms fundamental to whether the access tariffs apply at all. *Defendants have offered no justification for deviating from Section 203 and the filed tariff doctrine, and they may not simply pick and choose the provisions of their Tariffs with which they will comply.*

Id. at 3493–94 (emphasis added) (footnotes omitted).

The Commission next reasoned that the CLEC defendants did not terminate calls within the meaning of their tariffs and therefore could not bill for access services thereunder. Id. at 3494. The Commission explained that although the tariffs defined switched access service as calls originating from, or terminating to, end users on the CLEC defendants' networks, and defined end users as users of local telecommunications carriers' service who are not carriers, the CLEC "[d]efendants were sham entities that did not provide local telecommunications services or terminate calls to any "user" of local telecommunications services." Id. The Commission noted that the CLEC defendants (1) admitted they had no written agreements for, nor provided any local services to, any customers pursuant to the tariffs; (2) never registered the FCSCs accounts into their billing, accounting, and ordering systems; and (3) never billed the FCSCs for local telecommunications services, charged subscriber line, universal service, or carrier common line fees, nor did the FCSCs ever order local telecommunications services or pay for such services from the CLEC defendants. Id. at 3494–95.

In rejecting the CLEC defendants' contention that the PSC's findings were irrelevant to its analysis, the Commission reasoned that the PSC conducted extensive proceedings into All American's operations and its findings were credible and independently supported by the record. Id. at 3495. The Commission also found no "factual basis for concluding that All American's Nevada operations or ChaseCom's and e-Pinnacle's Utah operations differed in any material respect from All American's Utah operations." Id.

The Commission dismissed the CLEC defendants' assertion that the Farmers decisions had no bearing on the case, reasoning parties had to comply with the terms of their respective tariffs and under the CLEC defendants' tariffs, the FCSCs were not users of local telecommunications services provided by the CLEC defendants. Id.

Having found in AT&T's favor on liability, the Commission authorized AT&T to file a supplemental complaint for damages. Id. at 3477 n. 4.

#### d. FCC: All American Reconsideration II

The CLEC defendants filed a petition for reconsideration of All American II, which the Commission denied on procedural grounds, finding the issues raised in the petition had either been considered and rejected in All American II or should have been raised before the release of All American II. AT&T Corp. v. All Am. Tel. (All Am. Recons. II), 29 FCC Rcd. 6393 (2014). On the merits of the petition, the Commission rejected the CLEC defendants' procedural, discovery, and jurisdictional challenges as baseless. Id. at 6394. The Commission specifically rejected the CLEC defendants' challenge that the Commission did not have jurisdiction to consider what, or if, AT&T must pay for services provided by the CLEC defendants, clarifying that while All Am. Recons. I stated that a customer-carrier's failure to pay another carrier's tariffed charges was a collection action that did not give rise to a § 208 claim, it said nothing about a customer's claims against carriers concerning the carriers' unjust and unreasonable conduct. Id.

The Commission also disposed of the CLEC defendants' allegation that the Commission was biased, noting that aside from a series of orders adverse to the CLEC defendants' interests, the CLEC defendants provided no evidence of bias. Id. at 6394–96. Finally, the Commission dismissed the CLEC defendants' suggestion that All American II contravened the Commission's findings in In re: Connect Am. Fund—Transformation Order (Connect America Order), 26 FCC Rcd. 17663, 17667 (2011), aff'd sub nom. In re: FCC, 753 F.3d 1015 (10th Cir.2014), emphasizing

that the Connect America Order took steps to restrict "wasteful arbitrage schemes" and identified access stimulation as "one of the 'most prevalent arbitrage activities.'" All Am. Recons. II, 29 FCC Rcd. at 6400 (quoting Connect America Order, 26 FCC Rcd. at 17873). The Commission reasoned that contrary to the CLEC defendants' assertions, the Connect America Order did not "'expressly legitimize' access stimulation in every instance," nor did it insulate the CLEC "[d]efendants from the consequences of a finding that their conduct was unjust, unreasonable, and unlawful, in violation of the Act and the Commission's rules." Id. at 6401.[15] The CLEC Defendants did not seek judicial review of All American II or All American Recons. II, and therefore "those decisions are final and constitute the law of the case." AT&T Corp. v. All Am. Tel. Co., 30 FCC Rcd. 8958, 8958 n. 1 (2015).

#### e. FCC: All American Damages Order

On October 24, 2014, AT&T filed a supplemental complaint with the Commission, seeking damages against the CLEC defendants. On August 21, 2015, the FCC released its decision, granting the supplemental complaint in part and awarding AT&T damages of $252,496.37. See AT&T Corp. v. AH Am. Tel. Co. (All Am. Damages Order), 30 FCC Rcd. 8958 (2015). The Commission reasoned that because the CLEC "[d]efendants may charge only for services they actually provide, it would be unjust to allow them to retain the amounts AT&T paid." Id.

In reaching this conclusion, the Commission rejected the CLEC defendant's argument that § 207 of the Act precluded the Commission from deciding AT&T's dam-

---

**15.** The Commission also dismissed a petition for reconsideration filed by Beehive, holding (1) Beehive did not satisfy the requirements of non-party petitioner, (2) Beehive had not been deprived of the opportunity of having the is-

sues regarding its tariffed heard before a neutral-decision maker, and (3) Beehive offered no credible justification for not seeking to intervene earlier in the proceeding. All Am. Recons. II, 29 FCC Rcd. at 6401–05.

ages in the context of a primary jurisdiction referral Id. at 8960. The Commission pointed out that § 207 did not apply in the context of a primary jurisdiction referraL but rather provides that those injured by a common carrier may file a complaint at the Commission or a damages lawsuit in district court, but cannot recover both remedies. Id. The Commission noted that the district court had not entered a final order on the issue, and nothing precluded it from seeking guidance from the Commission on AT&T's damages claims. Id.

Disposing of the CLEC defendants' argument that the Commission lacked jurisdiction over the damages complaint under § 208, the Commission reasoned that "Section 208 of the Act vests the Commission with jurisdiction to adjudicate complaints regarding anything done or omitted to be done by any common carrier in violation of the Act." Id. The Commission added the CLEC defendants met the definition of a common carrier since they: (1) obtained state certificates, filed tariffs for their interstate services, and billed under their operating company numbers for those services; (2) held themselves out as performing the service as a common carrier and operated with nationwide authority under § 208 of the Act; and (3) sued AT&T in federal court in their own names alleging AT&T owed them the billed amounts for interstate services and then asked the district court to refer numerous issues to the Commission. Id. at 8960–61. As in Farmers II, the Commission reiterated that finding the CLEC defendants operated as sham entities in order to circumvent the Commission's CLEC access charge and tariff rules did not diminish the Commission's regulatory authority over them. Id. Moreover, the Commission dispelled the CLEC defendants' contention that because the liability order *found* they were not common carriers, they were free to pursue equitable claims as unregulated billing/sales agents against AT&T for the services it

received. Id. The Commission reminded that the CLEC defendants presented themselves as common carriers to the public, and they were therefore subject to § 208. Id.

The Commission reasoned AT&T had substantiated the amount of its direct damages and was entitled to a refund from the CLEC defendant. Id. at 8962. In response to the CLEC defendants' argument that it was Beehive, not they, who provided the access services, the Commission noted that the CLEC defendants nonetheless billed AT&T for those services, and that any dispute between the CLEC defendants and Beehive over their respective roles in the scheme was beyond the scope of the proceeding. Id.

The Commission also rejected the CLEC defendants' contention that AT&T would be unjustly enriched by receiving an award of damages remarking that even if the CLEC defendants were allowed to raise equitable defenses in a § 208 proceeding, they "failed to establish the necessary elements for unjust enrichment, because they did not provide a service to, or confer a benefit on, AT&T." Id. The Commission also rejected the CLEC defendants' judicial estoppel argument, reasoning (1) the CLEC defendants "failed to show that AT&T's statements are clearly inconsistent with an earlier position" since "AT&T has consistently maintained that Defendants did not provide any services to AT&T"; (2) the CLEC defendants "have not demonstrated that, in prior cases, AT&T successfully persuaded the Commission to take a position that is clearly inconsistent with its argument here that equitable relief is pre-empted by the Commission's regulatory regime"; and (3) there was no reason "to believe that AT&T would derive an unfair advantage if not estopped." Id. at 8964.

Finally, the Commission disposed of the CLEC defendants' argument that awarding AT&T damages constituted an uncompensated taking under the Fifth Amendment. Id. at 8965. The Commission recounted that All American had several opportunities to file tariff revisions to remove the rejected material and had been encouraged to work with its carrier customers to resolve concerns before filing a new tariff but it chose to do neither. Id. The Commission accordingly reasoned that "enforcement of its access charge and tariffing rules does not constitute a taking." Id.

The CLEC defendants did not petition the Commission for reconsideration of the damages order. Instead, they filed a petition for review with the U.S. Court of Appeals for the District of Columbia Circuit, which remains pending. See All Am. Tel. Co. v. FCC, 15-1354 (D.C. Cir. filed Oct. 16, 2015). The district court continued its stay awaiting the D.C. Circuit's decision. All Am. Tel. Co. v. AT&T, 1:07-cv-00861-WHP (S.D.N.Y.), ECF No. 139.

### 3. FCC: AT&T v. YMax

On September 14, 2010, YMax Communications Corp. (YMax), a nationwide CLEC, filed a complaint against AT&T in the U.S. District Court for the Northern District of California for failure to pay charges for switched access services it purportedly provided to AT&T. See YMax Commc'ns, Corp. v. AT&T & Bellsouth Long Distance, Inc., 4:10-cv-04115 (N.D. Cal.), ECF No. 1. On October 26, 2010, AT&T answered the complaint and filed six counterclaims against YMax, including claims for violations of §§ 203(c) and 201(b) of the Act. Id., ECF No. 15.

On November 9, 2010, AT&T filed a fourteen-count formal complaint with the FCC under § 208 of the Act against YMax alleging, inter alia, YMax violated §§ 203(c) and 201(b) of the Act by assessing AT&T interstate switched access charges that were not authorized under YMax's tariff AT&T Corp. v. YMax Commc'ns Corp., 26 FCC Rcd. 5742, 5742 (2011). On January 14, 2011, the U.S. District Court for the Northern District of California stayed YMax's case pending the outcome of the FCC proceeding. YMax Commc'ns, 4:10-cv-04115 (N.D. Cal.), ECF No. 66.

In its decision, the Commission detailed that YMax, a certificated CLEC, lacked typical local exchange carrier characteristics: YMax did not provide a physical transmission facility connecting YMax to the premises of any carrier or non-ISP entity; YMax had no customers that purchased local exchange service from YMax's state tariffs; YMax did not access or collect universal service fund USF or end user common line (EUCL) fees; and YMax did not have the capacity to effectuate the selection of preferred IXC (PIC) and therefore did not assess or collect any PIC charges. YMax, 26 FCC Rcd. at 5743–44. Instead, YMax could only participate in the transmission of calls at issue by way of its working relationship with Magic Jack, L.P. (Magic Jack), which marketed and sold a device, the magicJack (the MJ device), that enabled use of the Internet to make and receive calls throughout North America. Id. at 5744. The MJ device had a USB "dongle" that plugged into a computer's USB port, and a telephone jack that could be plugged into an ordinary landline telephone. Id. Magic Jack relied on YMax to obtain telephone numbers and interconnection to the public switched network (PSTN) for purchasers of the MJ device; all the calls at issue in the case involved use of the MJ device. Id.

Purchasers of the MJ device had to register the device on Magic Jack's website by signing a terms of service click agreement that required the purchaser to separately procure high speed internet access service

through a third-party ISP. Id. at 5745. The agreement stated that it constituted "the entire agreement between *you and magicJack and YMAX* . . . and governs your use of the magicJack device . . . and Software and items and/or services which may be provided by YMAX, [and] it trumps any prior agreements between you and magicJack . . . and/or YMAX." Id. (alterations in original) (emphasis added).

In dispute were two types of calls for which YMax billed AT&T originating/terminating switched access charges: calls initiated by an AT&T long distance customer to a called party and calls received from a calling party to an AT&T toll-free long distance customer. Id. A call initiated by an AT&T long distance customer would be delivered by a LEC to AT&T's point-of-presence (POP) in the LATA where the initiating caller was located; and AT&T would transport the call and hand it off to the LEC that serviced the called party, which would then deliver the call to one of YMax's points of interconnection (POIs). Id. at 5745–46. However, most of YMax's POIs existed only on paper and had no physical presence; YMax had no equipment of its own and did not lease any space at these "empty POIs." Instead, at these locations, AT&T exclusively provided YMax the equipment, facilities, configurations, and interconnections. Id. at 5746. Once at the empty POIs, the call was picked up by a private digital signal 1 (DS-1) line provided to YMax by AT&T, and then transported to Dallas, Texas, where YMax's equipment was collocated in an AT&T facility. Id. YMax's equipment (an access gateway, servers, and a router) converted the call from a time-division multiplexing (TDM) to an IP format, and then under AT&T's managed Internet service contract, the call was sent back to AT&T's Dallas facility over a single, high-capacity line, from which AT&T sent the call over the Internet to one or more ISPs, the last of which delivered the call to the called party's MJ device. Id.

YMax billed AT&T, purportedly pursuant to YMax tariff, terminating switched access charges for calls routed to, and from, the MJ devices. Id. at 5747. After unsuccessfully disputing these charges, AT&T filed a formal complaint with the FCC alleging, inter alia, that YMax did not provide switched access services as defined in its tariff and therefore violated §§ 203(c) and 201(b) of the Act by billing for services not provided pursuant to its tariff. Id.

In determining whether YMax provided AT&T switched access services, the Commission noted that under the terms of YMax's tariff, switched access was available to IXCs for use in furnishing services to end users through a two-point communication path between the IXC's premises and the end users premises, which YMax's tariff defined as "[t]he premises specified by the Customer or *End User* for termination of access services at the *End User's* physical location." Id. at 5749 (alteration in original). Based upon this definition, the Commission reasoned that "the term, 'End User' is integral to the meaning of 'Switched Access Service,'" and that "YMax provides Switched Access Service under its Tariff if—and only if—a call involves an 'End User' as defined in the Tariff." Id. The Commission concluded that YMax did not provide switched access service, stating,

> YMax may assess Switched Access Service charges on AT&T pursuant to its Tariff only if YMax provided Switched Access Services to AT&T as described in the Tariff. YMax's Tariff describes Switched Access Service as a service involving originating and terminating calls to an "End User." An "End User," in turn, is defined as a person or entity who "uses" a YMax service "under the

terms and conditions of [its] tariff." No such End User exists here because: (i) no Called/Calling Party uses YMax's End User Access service under section 5 of the Tariff; and (ii) no Called/Calling Party uses Switched Access Service under section 3 of the Tariff, because under the terms of the Tariff, Switched Access Service is available only to IXCs, not to any Called/Calling Party. Thus, YMax did not provide Switched Access Service to AT&T within the meaning of the Tariff because YMax did not originate calls from, or terminate calls to, an End User. YMax's charges to AT&T for such Service therefore violate sections 203(c) and 201(b) of the Act.

Id. at 5755 (alterations in original) (footnote omitted).

The Commission went on to find that, apart from the absence of end users under the tariff, YMax's charges for end office switching rate elements and switched transport rate elements were likewise not authorized by YMax's tariff. Id. at 5755–59. In concluding YMax had not provided switched access service within the meaning of the tariff, the Commission rejected YMax's construction of various terms in the tariff as "contrary to the common meaning of these terms in the telecommunications industry," and concluding that "even if YMax's construction of these terms were plausible—and it is not—it would, at best, merely show that their meaning is ambiguous and ... [the Commission] would be bound to resolve the ambiguities against YMax, the drafter." Id. at 5759. Thus, the Commission granted AT&T's complaint as to counts three and four and authorized AT&T to file a supplemental complaint for damages. Id. at 5743 & n. 6.

YMax timely filed a petition for reconsideration, AT&T Corp. v. YMax Commc'ns Corp., 28 FCC Rcd. 10011, 10012 (2013); however, while the petition was pending, AT&T and YMax informed the Commission that they had settled their disputes, YMax withdrew its petition for reconsideration, AT&T informed the Commission it would not file a supplemental complaint for damages, and AT&T withdrew its informal complaint. Id. The parties also filed a stipulation of dismissal in the district court proceeding. See YMax Commc'ns, 4:10-cv-04115 (N.D. Cal.), ECF No. 130.

### 4. Northern Valley Cases

Northern Valley Communications, LLC (Northern Valley), a South Dakota CLEC, filed lawsuits in the U.S. District Court for the District of South Dakota against four IXCs: N. Valley v. MCI, 1:07-cv-01016-KES (D.S.D.); N. Valley v. Sprint, 1:08-cv-01003-KES (D.S.D.); N. Valley v. AT&T, 1:09-cv-01003-CBK; and N. Valley v. Qwest, 1:09-cv-01004-CBK, to recover amounts the respective IXCs allegedly owed Northern Valley for unpaid originating and terminating access charges. Northern Valley asserted claims for breach of contract, breach of implied contract, violations of §§ 201 and 203 of the Act, collection actions pursuant to South Dakota tariffs, and unjust enrichment. The IXCs filed counterclaims against Northern Valley and various FCSCs for violations of §§ 201, 203, and 254 of the Act and South Dakota's tariff law, as well as claims for common law unfair competition, breach of contract, civil conspiracy, unjust enrichment, and declaratory judgment, alleging the CLECs and the FCSCs engaged in traffic pumping schemes.

The district court considered various motions in each of the cases and thereafter referred questions to the FCC and stayed three cases; the fourth case, N. Valley v. MCI, 1:07-cv-01016, settled.

### a. FCC: Qwest v. N. Valley (N. Valley I)

Qwest's formal complaint with the FCC alleged that Northern Valley's interstate

access service tariff violated § 201(b) and requested that the Commission order Northern Valley to withdraw its tariff. Qwest Commc'ns Co. LLC v. N. Valley Commc'ns, LLC (N. Valley I), 26 FCC Rcd. 8332, 8332 (2011).

In considering Qwest's complaint, the Commission first distinguished ILEC and CLEC tariff regimes, distinguishing that "ILECs are required to publish the rates, terms, and conditions applicable to their access service in tariffs filed with the Commission." Id. at 8334. The Commission noted that since their promulgation, Commission rules have defined "end user" as "any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier," and that the Commission "also has *required* that ILEC access tariffs define 'end user' as 'any customer of an interstate or foreign telecommunications service that is not a carrier." Id. (noting the rules were promulgated in ,1983 in anticipation of the AT&T divestiture). The Commission compared that although CLECs had the ability to "impose interstate access charges either through tariffs or contracts negotiated with IXCs," by 2001, CLEC rates were found on average to be well above the ILECs' rates for similar service. Id. at 8335. Thus, from that point on, the Commission prohibited "CLECs from tariffing switched access rates that were higher than the switched access rates of the ILEC serving the same geographic area in which the CLEC was located," that is, CLEC switched access rates were to be "benchmarked" against ILEC rates. Id. (citing Seventh Report and Order, 16 FCC Rcd. at 9931). The Commission noted that a CLEC could, however, impose higher switched access rates by negotiating with the respective IXCs. Id. The Commission reiterated its prior holding in the Seventh Report and Order that "a CLEC may assess tariffed switched access charges at the appropriate benchmark rate only for calls to or from the CLEC's own end users." Id.

The Commission then addressed Northern Valley's tariff, which originally defined an end user as "any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier," and which was amended in 2010 to add the sentence, "An End User need not purchase any service provided by [Northern Valley]." Id. (alteration in original). The Commission deemed the tariff unlawful, reasoning Commission "rules and orders establish that a CLEC may tariff access charges only if those charges are for transporting calls to or from an individual or entity to whom the CLEC offers service *for a fee*." Id. at 8336. The Commission explained that the Seventh Report and Order promulgated rules, including Rule 61.26(a)(3), which states that "[i]nterstate switched exchange access services shall include the functional equivalent of the ILEC interstate exchange access services typically associated with the . . . rate elements [found in ILEC access service tariffs]," which thus requires that "tariffed CLEC charges for 'interstate switched exchange access services' be for services that are 'the functional equivalent' of ILEC interstate switched exchange access services." Id. (second and third alteration in original) (quoting Rule 61.26(a)(3)). The Commission reiterated that a CLEC provides "the 'functional equivalent' of an ILEC's access services only if the CLEC transmits the call to its own end user" and that clearly, "when a CLEC is *not* transporting traffic to or from its own end user, the CLEC is *not* providing the functional equivalent of ILEC access services and thus not entitled to charge the full tariffed benchmark rate." Id. The Commission emphasized that "[a] CLEC's 'own end-users' do not include entities that receive free services from the CLEC," rather, as repeatedly stated, " 'end user' has been defined by the Commission's ILEC access

charge rules and orders for more than 25 years as a 'customer of an interstate or foreign *telecommunications service*,'" id. at 8337 (quoting 47 C.F.R. § 69.2(m)), and that "[t]he Act, in turn, defines 'telecommunications service' as 'the offering of telecommunications *for a fee*,'" id. (quoting 47 U.S.C. § 153(53)). The Commission concluded that because Northern Valley's tariff "purports to permit Northern Valley to charge IXCs for calls to or from entities to whom Northern Valley offers its services free of charge, ... the Tariff violates the Commission's CLEC access charge rules ..., and consequently also violates section 201(b) of the Act." Id.

The Commission rejected Northern Valley's argument that the dictionary definition of "customer" is not only a person who buys, but may also be "a person with whom one has dealings," remarking that in the context relevant to this dispute, "customer clearly means a *paying* customer." Id. (internal quotation marks omitted). The Commission also dismissed Northern Valley's assertion that its tariff was lawful, even if Northern Valley did not provide the "functional equivalent" of ILEC exchange access, because the Act's "exchange access" definition imposes no requirement that a LEC receive payment from the individual or entity placing or receiving the call. Id. at 8338. The Commission reasoned that Northern Valley must not only comply with the Act, but with the Commission's rules and orders, too. Id. Thus, the Commission announced that "if Northern Valley wishes to charge IXCs for terminating calls to entities that pay no fees, it must do so through a negotiated contract." Id.

Northern Valley also contended that there was no authority requiring tariff definitions to mimic the definitions in the Commission's rules, and that the Commission should analyze the complaint by referencing the tariff's terms as occurred in

Farmers I. Id. at 8339. The Commission noted that at issue in Farmers I was whether Farmers had complied with an otherwise valid tariff; there was no contention as to the lawfulness of the tariff as in the present case. Id.

The Commission also rejected Northern Valley's defense that the failure to act on Qwest's petition to reject, or suspend and investigate Northern Valley's tariff precluded Qwest's § 208 complaint, noting that the rejection or suspension of a CLEC tariff was more demanding than the burden in a § 208 complaint proceeding. Id. at 8340. Finally, the Commission rejected Northern Valley's assertion that Qwest violated Commission Rule 1.721(a)(8) by not paying the disputed charges as set forth in the dispute resolution provisions of Northern Valley's tariff, reasoning that compliance with a tariff's dispute resolution provision is not the standard for determining satisfaction of Commission Rule 1.721(a)(8). Id.

### b. FCC: N. Valley Reconsideration I

Northern Valley filed a petition for reconsideration of Northern Valley I. The Commission dismissed the petition as procedurally defective, noting Northern Valley repeated many of the same arguments addressed and rejected in Northern Valley I and that Northern Valley also raised new arguments that could have been raised earlier. Qwest Commc'ns Co. LLC v. N. Valley Commc'ns, LLC (N. Valley Recons. I), 26 FCC Rcd. 14520, 14522 (2011). Nonetheless, the Commission considered the merits of Northern Valley's new argument that the Seventh Report and Order, specifically Rule 61.26, did not require a CLEC's tariffed access charges to be for providing telecommunication services for a fee. Id. at 14523. Rejecting the argument, the Commission reasoned that precedent and rules of statutory construction require "end user," as used in Rule 61.26, to be con-

strued as having the same meaning as when it is used in different but related Commission rules, which, for 25 years, have defined end user to mean "an individual or entity to whom telecommunications are offered for a fee." Id. at 14524. The Commission further noted that Rule 61.26 requires "tariffed CLEC access charges be for services that are the 'functional equivalent' of ILEC access services" and because the Seventh Report and Order specified that a CLEC provides the "functional equivalent" of ILEC access charges if it provides access to its end user, "a CLEC's access service is 'functionally equivalent' only if the CLEC provides access to its end user, or *paying customer*." Id. at 14524. The Commission also rejected Northern Valley's argument that because the Seventh Report and Order did not consider or discuss whether a CLEC providing free access service to an entity provides functionally equivalent service, the order had no bearing on the issue. The Commission noted that Northern Valley's argument failed to explain why the Seventh Report and Order did not, therefore, specifically redefine end user, and that it defied logic to conclude the Commission "would have used 'end user' differently from how that term was used in the very rule it was clarifying." Id. at 14525. The Commission further noted that its "long-standing policy that users of the local telephone network for interstate calls should be responsible for a reasonable portion of the costs that they cause," and therefore, "construing 'end user' to mean a customer of a telecommunications services [sic] offered for a fee [was] consistent with the Commission's goal of ensuring that neither IXCs nor end users are charged an unfair share of the LEC's costs in transporting interstate. calls." Id. The Commission disposed of Northern Valley's contention that its holding in N. Valley I was inconsistent with the Commission's long-standing precedent of not regulating the CLEC-end user relationship, explaining that CLECs are free to offer their services for any fee or no fee at all, but that if a CLEC "chooses to assess access charges upon IXCs by *tariff*, the individuals or entities to whom Northern Valley provides access must be 'end users' (i.e., paying customers)." Id.

The Commission also dispelled Northern Valley's contention that N. Valley I was inconsistent with the Commission's Farmers decisions that pronounced that a LEC could provide a free subscription to its local customers as long as the tariff so provided. Id. The Commission pointed out that Farmers I was predicated upon the understanding that the FCSCs were obligated to pay for service and for subscriber line charges, whereas Northern Valley's tariff had no requirement that the FCSCs pay at all for services. Id. at 14526. Furthermore, upon reconsideration of Farmers I, the Commission held that the flow of money between Farmers and the FCSCs was essential to its analysis; thus, because the facts newly revealed upon reconsideration demonstrated that the FCSCs did not subscribe to any tariffed service, Farmers' reliance on the free subscription characterization was unavailing. Id. The Commission, once again, dismissed the argument that the Commission's order on reconsideration of Farmers I had no effect because it was not issued within 90 days, as a misstatement of § 405(b)(2). The Commission stated that even if it had not met the statutory 90-day provision, the subsequent order would still be effective because § 405(b)(2) says nothing about losing jurisdiction if the Commission does not act within 90 days. Id. Nor did Commission Rule 1.106(n) require the Commission to suspend the effectiveness of Farmers I in order to retain authority to reconsider that decision. Rather, Rule 1.106(n) requires regulated entities to comply with an order that is subject to a pending petition for reconsideration unless the Commission

specifically suspends the effectiveness of the order. Id.

Non-party Aventure also filed a petition for reconsideration, which the Commission dismissed (as it had done with Aventure's petition for reconsideration of All American I), reasoning Aventure had shown neither of the two requirements of a non-party seeking reconsideration, that is, (1) that its interests had been adversely affected by the order, nor (2) that it had good reason for not participating in the earlier stages of the proceeding. Id. at 14527.

### c. FCC: Sprint v. N.Valley (N. Valley II)

Sprint's formal complaint with the FCC similarly alleged that Northern Valley's interstate access service tariff violated § 201(b). Sprint also requested that the Commission declare Northern Valley's tariff void ab initio, or in the alternative, find Northern Valley's tariff access rates were unreasonable, and therefore unlawful. Sprint Commc'ns Co. LP v. N. Valley Commc'ns, LLC (N. Valley II), 26 FCC Rcd. 10780, 10780 (2011).

The Commission reiterated its holding in N. Valley I that Northern Valley's tariff violated Rule 61.26 as clarified by the Seventh Report and Order and § 201(b), most significantly with respect to the tariff's definition of end user. Id. at 10783–84. The Commission also found the jurisdictional reporting requirements, deposits, billing disputes, and attorney fees provisions of Northern Valley's tariff were unreasonably vague and violated § 201(b), but that the late payment fee provision was not. Id. at 10786–87. The Commission denied Sprint's request to find the tariff void ab initio reasoning Sprint had not established that Northern Valley engaged in furtive concealment; instead, the Commission ordered Northern Valley to revise its tariff. As it had in N. Valley I, the Commission found Northern Valley's affirmative defense of

unclean hands lacked merit, reasoning that even if such a defense were available in a § 208 proceeding, Northern Valley had not established that Sprint refused to pay amounts invoiced pursuant to the tariff. Id. at 10790. The Commission also found meritless Northern Valley's assertion that Sprint failed to negotiate in good faith, explaining that Sprint's pre-complaint letter informed Northern Valley no complaint would be filed if Northern Valley withdrew its tariff and that Sprint also communicated to Northern Valley a willingness to listen and to entertain other ideas to resolve the issues. Id.

### d. FCC: N. Valley Reconsideration II

The Commission summarily denied Northern Valley's petition for reconsideration, Sprint Commc'ns Co. L.P. v. Northern Valley Commc'ns, LLC (N. Valley Recon II), 26 FCC Rcd. 16549, 16549 (2011), explaining that it had addressed the same issue and made the same findings in N. Valley I and N. Valley Recons. I, and thus had incorporated by reference the holding and discussion in those decisions.

### e. D.C. Circuit: N. Valley v. FCC

Northern Valley sought judicial review of N. Valley I, N. Valley II, N. Valley Recon I, and N. Valley Recon II orders before the U.S. Court of Appeals for the District of Columbia Circuit. Northern Valley contended that the N. Valley decisions contradicted Farmers I and II, the FCC violated its own precedent by directly regulating the relationship between the CLEC and the end user, and the FCC impermissibly interpreted the Act as precluding Northern Valley's tariff provision requiring the IXC to dispute a charge in writing within ninety days. N. Valley v. FCC, 717 F.3d 1017, 1019 (D.C.Cir.2013). The court reviewed Northern Valley's challenges and denied the petitions for review, reasoning: (1) the Commission's decisions did not contradict Farmers I or

Farmers II because in those decisions, the Commission construed only the tariff at issue and did not address FCC regulations, as it did in the N. Valley I and N. Valley II; (2) the Commission's N. Valley decisions resulted in the FCC regulating only the relationship between the CLEC and the IXC, and not the relationship between the CLEC and the end user; and (3) the Commission properly concluded that Northern Valley's tariff provision requiring any dispute to be presented in writing within ninety days conflicted with the two-year statute of limitations contained in § 415(b), reasoning that although contracts may shorten statutes of limitation, CLECs' tariffs are unilaterally imposed and thus contract principles that permit the shortening of a statute of limitations do not apply. Id. at 1019–20 (citing MCI Worldcom Network Servs., Inc. v. Paetec Commc'ns, Inc., 204 Fed.Appx. 271, 272 (4th Cir.2006) (unpublished per curiam)).

During the pendency of the referrals to the FCC and the petition for review to the U.S. Court of Appeals for the District of Columbia Circuit, the claims between the IXCs and Northern Valley settled in all cases before the U.S. District Court for the District of South Dakota. The IXCs also settled claims between the FCSCs in all cases, with the exception of claims between Qwest and FCSC Global Conferencing Partners, in case number 1:09-cv-01004 (D.S.D.), which were stayed on June 28, 2013, when GCP filed a notice of bankruptcy.

### 5. Sancom and Splitrock Cases

During the same general time frame as the N. Valley cases were filed, another South Dakota CLEC, Sancom, Inc. (Sancom), filed similar lawsuits in the U.S. District Court for the District of South Dakota against MCI, Sprint, AT&T, and Qwest: Sancom v. MCI, 4:07-cv-04106-KES (D.S.D.); Sancom v. Sprint, 4:07-cv-04107-KES (D.S.D.); Sancom v. AT&T, 4:08-cv-04211-KES (D.S.D.); and Sancom v. Qwest, 4:07-cv-04147-KES (D.S.D.), respectively. A South Dakota ILEC, Splitrock Properties, Inc. (Splitrock), filed similar lawsuits against Qwest and Sprint: Splitrock v. Qwest, 4:08-cv-04172-KES (D.S.D.), and Splitrock v. Sprint, 4:09-cv-04075-KES (D.S.D.), respectively.

In the cases Sancom brought against them, IXCs Sprint, AT&T, and Qwest filed counterclaims against Sancom; in their respective cases, Sprint and Qwest also filed third-party claims against various FCSCs. The cases were eventually stayed for referral of questions to the FCC.[16] For efficiency in considering similar issues then pending before the FCC, the FCC's Market Disputes Resolution Division determined that one IXC, Qwest, would file a complaint against Sancom, while the remaining IXCs would file informal complaints and participate in the proceedings through amicus briefs.[17] See Sancom v. Qwest, 4:07-cv-04147-KES (D.S.D.), Status Report of June 11, 2010, ECF No. 254. While the referral questions were pending before the FCC, Sancom settled its cases against AT&T and Sprint. Sprint also set-

16. Sancom's case against MCI, 4:07-cv-04106-KES (D.S.D.), was consolidated with Northern Valley's case against MCI in the same district, 1:07-cv-01016-KES (D.S.D.). MCI amended its counterclaims and added three FCSCs as counterclaim defendants. See 1:07-cv-01016-KES (D.S.D.), ECF No. 36. In 2009, MCI settled its claims by and against Northern Valley, Id., ECF No. 131, and San-

com, Id., ECF No. 142, and therefore the district court did not refer questions in that consolidated case to the FCC. MCI eventually settled its counterclaims against all FCSCs. Id., ECF Nos. 120, 182, and 238.

17. The FCC also bifurcated the referred issues.

tled its third-party claims against the FCSCs. The Sancom case against Qwest, including counterclaims and third-party claims, remained.

In the Splitrock cases, IXCs Sprint and Qwest filed counterclaims against Splitrock. Qwest also filed third-party claims against a South Dakota ILEC, Alliance Communications Cooperative, Inc. (Alliance), and a FCSC, Free Conferencing Corporation (Free Conferencing). The district court referred questions to the FCC in both cases, but Splitrock and Sprint filed a stipulation of dismissal not long after their case was referred. Splitrock v. Sprint, 4:09-cv-04075-KES (D.S.D.), ECF No. 49.

In the Splitrock v. Qwest case, the parties submitted a joint status report to the district court indicating they agreed to await the Commission's decision in the Qwest v. Sancom case, expecting that resolution of issues in that case would allow for a narrowing of the issues in their case. 4:08-cv-04172-KES (D.S.D.), Status Report of Jan. 21, 2011, ECF No. 82. Almost three years later, the parties submitted a status report, informing the district court that the Commission had filed the Qwest v. Sancom decision and that the parties were evaluating that decision. Id., ECF No. 93. Thereafter, periodic status reports advised the district court the parties were negotiating settlement. Id., ECF Nos. 96, 101–104, 106. In November 2015, the district court lifted the stay and retracted the FCC referral. Id., ECF No. 109. On December 30, 2015, Splitrock, Qwest, Alliance, and Free Conferencing filed a joint stipulation of dismissal. Id., ECF No. 115.

### a. FCC: Qwest v. Sancom (Sancom I)

On March 5, 2013, the Commission issued its order on the first consolidated referral question. Qwest Commc'ns Co., LLC v. Sancom, Inc., 28 FCC Rcd. 1982 (2013). The Commission found, with regard to the traffic at issue, Sancom's interstate switched access charges were unlawful because "Sancom did not have 'end users' that were billed or paid for service, as required by [Sancom's] [t]ariff." Id. at 1982–83.

The Commission described that Sancom and FCSCs Free Conferencing and Ocean Bay Marketing (Ocean Bay) entered into agreements under the terms of which Sancom and the FCSCs would split access charge revenue that was the result of high volume originating and terminating interexchange traffic. Id. The Commission detailed that under Free Conferencing's agreement with Sancom, Free Conferencing had a bridge at Sancom's central office, Sancom assigned telephone numbers for Free Conferencing to use, and Sancom provided various circuitry, equipment, and switching function. Id. at 1983–84. In turn, Free Conferencing would provide Sancom MOUs, for which Sancom would pay Free Conferencing a per-minute fee once Qwest paid Sancom's related switched access charges. Id. Free Conferencing did not pay Sancom any telecommunications fees, USCs, or taxes. Id. at 1984.

Ocean Bay provided advertising services to third parties by dialing 8YY calls and playing automated messages. Id. Sancom's agreement with Ocean Bay similarly involved Sancom providing a location for Ocean Bay's dialing equipment, suppling various circuitry and equipment, and switched functions. Id. at 1984–85. In turn, Ocean Bay provided a minimum MOUs, for which Sancom agreed to pay Ocean Bay a per-minute fee after Qwest paid Sancom's related switched access charges. Id.

Sancom's tariff during the relevant period defined switched access as follows:

Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path

between a customer designated premises and an end user's premises, ... provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA where it is provided .... Id. at 1985. "End user" was defined as "any customer of an interstate or foreign telecommunications service that is not a carrier" and "customer" was defined as "any individual partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this [T]ariff including both [IXCs] and End Users." Id. (alterations in original) (footnotes omitted). The tariff additionally provided that "that Sancom *shall bill* on a current basis all charges incurred by and credits due to the customer under this tariff and that Sancom will establish a bill day *each month* for each customer account or advise the customer in writing of an alternate billing schedule." Id. (internal quotation marks omitted). The tariff also required Sancom to apply USCs each month to billed charges for interstate access services provided to end users. Id. The Commission noted that neither of Sancom's agreements with the FCSCs described monthly charges the FCSCs were to pay Sancom for telecommunications services; rather, the only rates set forth in the agreements were those fees Sancom would pay to the FCSCs. Id.

The Commission recapped the district court case Sancom filed against Qwest for its refusal to pay the switched access charges, which included claims for unjust enrichment, tortious interference with business relations, violation of South Dakota Deceptive Trade Practices and Consumer Protection Act, and civil conspiracy. Id. The Commission noted that the district court granted Qwest's motion to dismiss those claims finding they were barred by the filed rate doctrine. Id. The district court then granted Sancom's motion to stay and referred three questions to the FCC. Id.

The Commission, addressing the first question in Qwest's formal complaint—whether the traffic billed to Qwest falls within the terms of Sancom's Tariff—reasoned its prior decision in Farmers II controlled because the definitions of "end user" and "customer" used in Farmers' tariff were identical to those in Sancom's tariff. Id. at 1987. Summarizing Farmers II, the Commission noted that in determining that the FCSCs were not end users within the meaning of Farmers' tariff, it considered six factors: (1) the parties' contracts did not contemplate that the conference calling companies would pay for service, nor did the parties pay for service; (2) Farmers never treated the FCSCs like other customers in that Farmers never entered the FCSCs into billing systems, Farmers' regular business records did not indicate the FCSCs purchased tariff end user service, and Farmers did not bill or collect payment from the FCSCs; (3) the agreements contained exclusivity clauses and Farmers refused to offer its deals with the FCSCs to other similar parties; (4) Farmers handled the FCSCs' traffic differently than traffic to tariffed customers; (5) the agreements had unique terms that did not resemble traditional agreements for tariffed services—Farmers agreed to pay the FCSCs for terminated traffic, Farmers' deals included differing minimum usage commitments, duration of the agreements varied, termination notice periods varied, Farmers' board of directors approved each FCSCs' agreement, and the provisions of the agreements were kept confidential; and (6) Farmers did not timely report revenues from those services or submit universal service contributions. Id. at 1988. The Commission reiterated its conclusion that neither Farmers nor the

FCSCs intended to operate within Farmers' tariff and had "purposefully avoided a customer relationship with Farmers' tariff." Id. (internal quotation marks omitted). Because the FCSCs were not customers or end users within Farmers' tariff, the Commission found Farmers was not entitled to charge Qwest switched access charges under the tariff. Id. The Commission pointed out that Farmers II was upheld by the U.S. Court of Appeals for the District of Columbia Circuit. Id. at 1989.

The Commission noted that under § 203(c) of the Act, a carrier is required "to provide communications services in strict accordance with the terms and conditions of its tariff," and Sancom's tariff required calls to originate or terminate with an "end user," that is, "a customer that subscribes to the services offered under the [t]arif." Id. The Commission concluded that the FCSCs were not end users because Sancom did not bill the FCSCs for, nor did the FCSCs pay, switched access services. Id. at 1989–90. The Commission noted that Sancom had not established any sort of genuine billing relationship with the FCSCs, did not adhere to established practices regarding transmission of monthly bills, billing system and collection efforts, and did not send monthly bills to the FCSCs. Id. The Commission rejected Sancom's argument that it invoiced the FCSCs, stating that the record only contains a handful of invoices, and those were not even for monthly tariffed charges. Id. at 1990. The Commission found the record "flatly contradict[ed]" Sancom's assertion that a netting process occurred by which the FCSCs generated revenue for Sancom sufficient to pay for Sancom's access charge. Id. It similarly refuted Sancom's argument that the access charge revenues it received from IXCs justified not charging the FCSCs a monthly rate, explaining that such rationale "is plainly inconsistent with the Tariff's monthly rates and billing provisions," notwithstanding that the record lacked evidence the parties established any alternative payment arrangement. Id.

The Commission next found that Sancom and the FCSCs "behaved in a manner inconsistent with a tariffed carrier/customer relationship," noting Sancom's relationship with the FCSCs resembled those of business partners more than local exchange customers. Id. at 1991. The Commission considered that Sancom did not require the FCSCs to complete standardized forms other customers were required to complete, avoided similar arrangements with other entities, and had an exclusivity clause with the FCSCs—all of which undermined Sancom's contention that it evaluated potential customers on a case by case basis, but instead demonstrated that Sancom evaluated potential customers by whether they would compete with the FCSCs. Id. at 1992.

The Commission also rejected Sancom's attempt to classify its agreements with the FCSCs as Individual Case Basis (ICB) arrangements as defined in the tariff, noting that while the ICB defined in the tariff denoted a condition that developed based on the circumstances in each case, Sancom's agreements with the FCSCs bore no indications that they pertained to the services offered under the tariff. Id. at 1993. Rather, the "agreements contain[ed] provisions that not only [were] inconsistent with the Tariff, but that appear[ed] to be *purposefully structured to avoid a traditional tariffed offering*"; that is, the agreements contained minimum usage requirements, required the FCSCs to renegotiate the agreements if Sancom was unable to collect access stimulation revenues from IXCs, and contained a choice of law provision, none of which were found in the tariff. Id. (emphasis added). Acknowledging that while Sancom was not obligat-

ed to post its arrangements with the FCSCs, the Commission was reviewing Sancom's compliance with its *filed* tariff, and the fact that Sancom had confidential agreements with FCSCs served to bolster the Commission's conclusion "that Sancom was not acting as a common carrier indiscriminately serving End Users as defined by the [t]ariff." Id. at 1993. The Commission was equally unpersuaded by Sancom's argument that Qwest had unclean hands because it failed to first pay the amounts it owed Sancom under the tariff, reasoning that even if such a defense were available in a § 208 proceeding, it would have failed because Sancom unlawfully charged Qwest for tariffed switched access services. Id. at 1994. Therefore, Qwest's failure to pay the charges before disputing them could not have violated any equitable principle. Id.

Thus, the Commission concluded that the FCSCs "were not end users under the [t]ariff," "Sancom was not entitled to charge Qwest for switched access under the [t]ariff," and in doing so, Sancom violated §§ 203(c) and 201(b) of the Act. Id.

### b. FCC: Sancom Reconsideration I

On April 4, 2013, Sancom filed a petition for reconsideration of Sancom I. Qwest Commc'ns Co., LLC v. Sancom, Inc., 28 FCC Rcd. 8310 (2013). However, on May 31, 2013, with the petition for reconsideration still pending, the parties filed a joint motion to dismiss informing the FCC they had resolved their dispute. The FCC granted their request to dismiss the pending claims with prejudice.

### c. Sancom v. Qwest v. Free Conferencing

On July 19, 2013, Qwest and Sancom filed with the district court a motion for dismissal of claims against each other, indicating the petition for reconsideration before the FCC had been dismissed. 4:07-cv-04147-KES (D.S.D.), ECF Nos. 280 & 283. The motion informed, however, that Qwest's claims against Free Conferencing

remained. Id. On August 12, 2013, the district court granted Qwest and Sancom's joint motion to dismiss all claims and counterclaims against one another. Id., ECF No. 284.

Qwest's claims against Free Conferencing for unfair competition based on inducement of regulatory violations and tortious interference with a business relationship, civil conspiracy, and unjust enrichment, proceeded to a six-day bench trial in May 2014. Id., ECF No. 381. The district court entered its trial order on November 6, 2014, finding in favor of Free Conferencing on all three claims. Id., ECF No. 407 (Qwest Commc'ns Corp. v. Free Conferencing Corp., No. CIV. 07–4147–KES, 2014 WL 5782543 (D.S.D. Nov. 6, 2014)). Qwest appealed the decision on all but the civil conspiracy claim.

In an opinion filed on September 15, 2016, a divided panel of the Eighth Circuit affirmed the district court in finding in favor of Free Conferencing on Qwest's claims for unfair competition based on inducement of regulatory violations and intentional interference, but reversed and remanded on the unjust enrichment claim. See Qwest Commc'ns Corp. v. Free Conferencing Corp., 837 F.3d 889, No. 15–2406, 2016 WL 4896397 (8th Cir. Sept. 15, 2016). The majority held that the district court considered two irrelevant factors in concluding Free Conferencing had not been unjustly enriched: (1) that Free Conferencing had merely relied on a loophole and had done nothing illegal, and (2) that Sancom had already made settlement payments to Qwest. Id. at 899, 2016 WL 4896397, at *7. The court reasoned that "[t]he phrase loophole implies that the Sancom-[Free Conferencing] contract was legal prior to the FCC's decision in Farmers II. But that is not the case." Id. Citing Farmers II, 24 FCC Rcd. at 14813, the court reasoned that the FCC's holding that

the LEC violated the Act "by billing IXCs for calls that terminated at conference call bridges when the conference calling company did not subscribe to the LEC's service .... was not merely prospective ... but retrospective as well ... [and] [s]ince these billing practices were never legal, no loophole ever existed." Id. Regarding the district court's consideration of Sancom's settlement payments to Qwest, the court reasoned that "the focus should have been the amount of money [Free Conferencing] inequitably received, not the amount of money Qwest has already recovered from Sancom." Id. The court remanded the case for reconsideration of Qwest's unjust enrichment claim based on the full record. Id. at 900–01, 2016 WL 4896397, at *8.

### 6. Tekstar Cases

In the U.S. District Court for the District of Minnesota, AT&T and Qwest filed traffic pumping cases against Minnesota CLEC Tekstar Communications (Tekstar) and various FCSCs: AT&T v. Tekstar, 0:07-cv-02563-ADM-JSM (D. Minn.); and Qwest v. Tekstar, 0:10-cv-00490-MJD-SER (D. Minn.). Tekstar also filed a case against Sprint: Tekstar v. Sprint, 0:08-cv-01130-MJD-SER (D. Minn.). The district court stayed each of the cases and referred questions to the FCC. As in the Sancom case, the FCC's Market Disputes Resolution Division determined that one of the IXCs, Sprint, would file a complaint against the LEC and Qwest and AT&T would file informal complaints against the LEC and participate in the proceedings through amicus briefs. During the pendency of the referrals, however, Tekstar settled with the IXC in each of the cases. The formal complaint Sprint filed with the FCC was dismissed with prejudice. Sprint Commc'ns Co. L.P. v. Tekstar Commc'ns Inc., 27 FCC Rcd. 10123 (2012). Thereafter, AT&T settled its claims with the FCSCs and that case—0:07-cv-02563-ADM-JSM (D. Minn.)—was dismissed with prejudice. In the Qwest case—0:10-cv-

00490-MJD-SER (D. Minn.)—Qwest and the FCSCs did not settle their claims. Qwest's claim for tortious interference against the FCSCs proceeded to 9-day bench trial that began on December 8, 2015, and following various continuances, concluded on August 2, 2016. As of the date of this Order, the court had not yet filed its order following the bench trial.

### 7. Connect America Order

In 2011, responding to the need to bring "robust, affordable broadband to all Americans," the FCC acknowledged that its universal service fund (USF) rules and intercarrier compensation (ICC) procedures had been "designed for 20th century networks and market dynamics" and had "not been comprehensively reassessed in more than a decade." In re: Connect Am. Fund—Notice of Proposed Rulemaking, 26 FCC Rcd. 4554, 4557, 4559 (2011). The FCC "propose[d] to fundamentally modernize the Commission's USF and intercarrier compensation (ICC) system.... by eliminating waste and inefficiency and reorienting USF and ICC to meet the nation's broadband availability challenge, transforming a 20th century program into an integrated program tailored for 21st century needs and opportunities." Id. at 4557.

The Commission acknowledged that inefficient ICC rules create[d] incentives for wasteful arbitrage. In particular, because rates that local carriers receive[d] to deliver a call var[ied] widely depending on where the call originated and the classification and type of service providers involved, the carriers paying such charges may mask the origination of voice traffic to reduce or avoid payments, creating "phantom traffic." In addition, regulations allowing some carriers to assess above-cost rates for delivering traffic to their subscribers create[d] incentives for local carri-

ers to artificially inflate their traffic volumes, thereby increasing the payments they receive[d], a practice referred to as "access stimulation" or "traffic pumping." Practices like these and the disputes surrounding them cost hundreds of millions of dollars annually that could be used for investment and more productive endeavors—costs that are ultimately borne by consumers.

Id. at 4559.

Thus, on November 18, 2011, the FCC adopted landmark reforms to modernize universal service for the 21st century. Connect America Order, 26 FCC Rcd. at 17667. In Section XI of the Connect America Order, the Commission "adopt[ed] revisions to our interstate switched access charge rules to address access stimulation." Id. at 17874.

Therein, the Commission described the nature of access stimulation.

Access stimulation occurs when a LEC with high switched access rates enters into an arrangement with a provider of high call volume operations such as chat lines, adult entertainment calls, and "free" conference calls. The arrangement inflates or stimulates the access minutes terminated to the LEC, and the LEC then shares a portion of the increased access revenues resulting from the increased demand with the "free" service provider, or offers some other benefit to the "free" service provider. The shared revenues received by the service provider cover its costs, and it therefore may not need to, and typically does not, assess a separate charge for the service it is offering. Meanwhile, the wireless and interexchange carriers (collectively IXCs) paying the increased access charges are forced to recover these costs from all their customers, even though many of those customers do not use the services stimulating the access demand.

Access stimulation schemes work because when LECs enter traffic-inflating revenue-sharing agreements, they are currently not required to reduce their access rates to reflect their increased volume of minutes. The combination of significant increases in switched access traffic with unchanged access rates results in a jump in revenues and thus inflated profits that almost uniformly make the LEC's interstate switched access rates unjust and unreasonable under section 201(b) of the Act. . . .

Id. (footnotes omitted).

The order noted that the record before the Commission reflected "the need for prompt Commission action to address the adverse effects of access stimulation and to help ensure that interstate switched access rates remain just and reasonable, as required by section 201(b) of the Act," and that "access stimulating LECs realize significant revenue increases and thus inflated profits that almost uniformly make their interstate switched access rates unjust and unreasonable." Id. at 17875. The order further noted that access stimulation typically occurred in locations with higher than average access charges, which increases the average cost of long distance calling, but because § 254(g) of the Act prohibits long-distance carriers from passing the higher access costs directly to the customers making the calls to the access stimulating entities, all customers of long distance providers bear the costs, despite the fact that many do not use the services provided by the access stimulator. Id. at 17876. The order noted, too, that harm was incurred by conferencing services that recover the costs of the conferencing/chat services from the user of those services, rather than spreading those costs across the universe of long-distance subscribers, which thus allowed "free" conferencing providers to leverage arbitrage opportunities and put companies that recover the

cost of services from their customers at a distinct competitive disadvantage. Id. Refuting the notion that access stimulation offered economic benefits by, inter alia, expanding broadband services to rural communities, the Commission explained that "how access revenues are used is not relevant in determining whether switched access rates are just and reasonable in accordance with section 201(b)," and furthermore, "excess revenues that [were] shared in access stimulation schemes provide[d] additional proof that the LEC's rates [were] above cost." Id. at 17876–77 (footnote omitted).

Having established the need for reform, the Commission promulgated a rule that requires carriers entering into revenue sharing arrangements "to refile their interstate switched access tariffs to reflect a rate more consistent with their volume of traffic." Id. at 17875. Thus, for rate-of-return LECs, i.e., ILECs, "the rate would be adjusted to account for new demand and any increase in costs," whereas, "[f]or competitive LECs, that rate would be benchmarked to that of the BOC in the state, . . . or to the largest incumbent LEC in the state." Id.

To identify when access stimulating LECs were required to refile their interstate access tariffs, the Commission defined access stimulation as occurring when two conditions were met: (1) the LEC enters into an access revenue sharing agreement (as also defined in the order), and (2) where the LEC had a terminating-to-originating traffic ratio of three-to-one interstate in a calendar month or a greater than 100 percent increase in interstate originating and/or terminating switched access MOUs in a month compared to the same month in the preceding year. Id. at 17877. The revenue sharing agreement definition is met if an ILEC or a CLEC has an agreement "that, over the course of the agreement, would directly or indirectly result in a net payment to the other party (including affiliates) to the agreement, in which payment by the [ILEC] or [CLEC] is based on the billing or collection of access charges from interexchange carriers or wireless carriers." Id. at 17878. The Commission clarified that the "rule focuses on revenue sharing that would result in a net payment to the other entity over the course of the agreement arising from the sharing of access revenues" and "does not encompass typical, widely available, retail discounts offered by LECs through, for example, bundled service offerings." Id. (footnotes omitted). The Commission declined to "declare revenue sharing to be a per se violation of section 201(b) of the Act," noting that such a ban could be overly broad, but that the rules adopted were part of a comprehensive intercarrier compensation reform, and that as the transition unfolded, the Commission would "address remaining incentives to engage in access stimulation." Id. at 17879. The Commission refuted the contention that it had explicitly approved revenue sharing in CLEC Access Charge Reconsideration Order, where it found that commission payments from CLECs to toll-free traffic generators, "such as hotels and universities, did not create any incentives for the individuals who use those facilities to place excessive or fraudulent calls." Id. (footnote omitted) (citing CLEC Access Charge Reconsideration Order, 19 FCC Rcd. 9108, 9142–43, para. 70 (2004)). The Commission reasoned that case was inapposite because the Commission was responding to the IXC's assertions regarding incentives to artificially inflate 8YY calling. Id. The Commission found "that it did not appear that the payments would affect calling patterns because the commissions did not create any incentive for those actually placing the calls to artificially inflate their 8YY traffic," whereas, "when access traffic is being stimulated, the party receiving the

shared revenues has an economic incentive to increase call volumes by advertising the stimulating services widely." Id. (footnotes omitted).

The Commission also declined to address the possibility that instead of making contracts with third parties, LECs may try to evade the access stimulation prohibition by integrating high call volume operations within the same corporate entity, thereby enabling the characterization of the arrangement as other than revenue sharing. Id. at 17880. The Commission noted that the rules it was adopting pursuant to §§ 201 and 202 of the Act addressed conferencing services provided by a third party, whether or not affiliated with the LEC, and that § 254(k) applies "to a LEC's operation of an access stimulation plan within its own corporate organization," in which case terminating access would be a monopoly service. Id. The Commission reasoned that in contrast, the conferencing activity as portrayed by access stimulating parties would be a competitive service, and therefore "the use of non-competitive terminating access revenues to support competitive conferencing service within the LEC operating entity would violate section 254(k) . . . ." Id. Validating the addition of a traffic measurement component to the access stimulation definition, the Commission noted that such a component created "a bright-line rule that responds to record concerns about using access revenue sharing alone," and concluded "that these measurements of switched access traffic of all carriers exchanging traffic with the LEC reflect the significant growth in traffic volumes that would generally be observed in cases where access stimulation is occurring and thus should make detection and enforcement easier." Id.

Under the Connect America Order, LECs that meet both conditions of access stimulation definition must file a revised tariff: an ILEC "must file its own cost-based tariff under section 61.38 of the Commission's rules and may not file based on historical costs under section 61.39 of the Commission's rules or participate in the NECA traffic-sensitive tariff"; and a CLEC "must benchmark its tariffed access rates to the rates of the price cap LEC with the lowest interstate switched access rates in the state, rather than to the rates of the BOC or the largest incumbent LEC in the state." Id. at 17882. Addressing the deemed lawful status of § 204(a)(3), the Commission "proposed that LECs that meet the revenue sharing definition be required to file revised tariffs on not less than 16 days' notice" and that failure to comply with the tariffing requirements would result in the Commission finding "such a practice to be an effort to conceal its noncompliance with the substantive rules that would disqualify the tariff from deemed lawful treatment." Id. at 17888. The Commission further proposed that ILECs "would be subject to refund liability for earnings over the maximum allowable rate-of-return," and CLECs "would be subject to refund liability for the difference between the rates charged and the rate that would have been charged if the carrier had used the prevailing BOC rate, or the rate of the independent LEC with the largest number of access lines in the state if there is no BOC." Id. (footnotes omitted). Regarding compliance, the Commission concluded "that a LEC's failure to comply with the requirement that it file a revised tariff if the trigger is met constitutes a violation of the Commission's rules, which is sanctionable under section 503 of the Act" and "that such a failure would constitute 'furtive concealment,'" thus putting the parties "on notice that if we find in a complaint proceeding under sections 206–209 of the Act, that such 'furtive concealment' has occurred, that finding will be applicable to the tariff as of the date on which the revised tariff was required to be

filed and any refund liability will be applied as of such date." Id. at 17888–89 (footnotes omitted). The Commission declined to address a CLEC's request for a declaratory ruling "that commercial agreements involving the sharing of access revenues between LECs and 'free' service providers did not violate the Communications Act," reasoning that the rules adopted in the order defined access revenue sharing agreement and prescribed the conditions under which a LEC that met that definition must file revised tariffs. Id.

Finally, regarding enforcement of the rules adopted, the Commission unequivocally noted that "[b]ecause the rules we adopt are prospective, they will have no binding effect on pending complaints." Id. at 17889 n. 1182.

## IV. BACKGROUND OF THE CASE

### A. Procedural History

On January 29, 2007, AT&T filed its original Complaint in this Court against multiple rural Iowa LECs (Aventure; Superior Telephone Cooperative; the Farmers Telephone Company of Riceville, Iowa; Interstate 35 Telephone Company d/b/a Interstate Communications Company; Great Lakes Communication Corp.; and Does 1-10), and certain similarly implicated FCSCs (Futurephone.com LLC; Future Fone Services, Inc.; Free Call Planet LLC; and Roes 1-10). Similar "tariff actions" were contemporaneously filed in this Court by other IXCs against several LECs and FCSCs: Qwest—4:07-cv-00078; and Sprint—4:07-cv-00194. Cases were also fled in the U.S. District Court for the Northern District of Iowa by LEC Aventure against Qwest and Sprint—5:07-cv-04094 (N.D. Iowa)—and against MCI—5:07-cv-04095 (N.D. Iowa). Aventure's "collection action" against Qwest and Sprint, 5:07-cv-04094 (N. D. Iowa), was transferred to this Court and given a new case number: 4:08-cv-00005.

The LECs in these related cases filed motions to dismiss or, in the alternative, to stay and refer questions to the FCC. While those motions were pending, the FCC released Farmers I. This Court, recognizing the potential impact Farmers I had on the issues in the cases before it, stayed the proceedings until the FCC ruled on Qwest's petition for reconsideration of Farmers I. After the FCC granted Qwest's petition for reconsideration, the Court continued the stay awaiting the FCC's reconsideration order. During the stay, more than a dozen collection actions were filed in the U.S. District Courts for the Northern and Southern Districts of Iowa by various LECs against the four IXCs for collection of unpaid switched access charges. Upon joint motions of the parties, several collection actions were consolidated with the associated tariff actions. The Court also lifted the stay, in part, to allow, inter alia, the filing of counterclaims. During the Court's stay, AT&T's claims against all LECs, except Aventure, and all FCSCs, except Futurephone, were dismissed by stipulation of the parties.

In September 2009, the IUB issued its decision in Qwest v. Superior, and in November 2009, the FCC issued its order on reconsideration—Farmers II. Farmers' petition for reconsideration—Farmers Recons. II—was denied on March 2010. On July 26, 2010, after affording the parties the opportunity to state their respective positions on the need to amend or supplement pleadings and pending motions in light of the agencies' decisions, this Court denied without prejudice those motions that had been filed prior to November 2009, preserving the parties' rights to file renewed or substituted motions, reasoning those pleadings and motions had been significantly impacted or mooted by recent developments.

Following the Court's July 26, 2010 Order, AT&T filed an amended complaint against Aventure and Futurephone, Aventure filed amended counterclaims against AT&T, and Futurephone answered AT&T's amended complaint and indicated that its counterclaims remained as previously filed. AT&T filed a motion to dismiss all Futurephone's counterclaims against AT&T and a motion for judgment on the pleadings to dismiss counts one, three, and four of Aventure's counterclaims against AT&T. Aventure filed a motion to dismiss counts one, two, six, seven, and nine of AT&T's amended complaint. AT&T and Aventure also filed motions for summary judgment. Futurephone did not file any dispositive motions.

In the same general time frame, the district courts in the All American, N. Valley, Sancom, and Tekstar cases stayed those cases and referred questions to the FCC, see discussion supra Part III.B.2-III.B.6. On April 26, 2011, this Court held a hearing on the motions to refer questions to the FCC, during which the LECs acknowledged that the questions referred in Sancom, N. Valley, All American, and Tekstar were the same questions proffered in their respective motions for referral, see, e.g., 4:08-cv-00005 (S.D. Iowa), Aventure's Mot. Ref to FCC, ECF No. 19, including whether the revenue sharing agreements between CLECs and the FCSCs were per se illegal and, more generally, whether CLECs were entitled to collect federal tariffed charges from IXCs for switched access services to/from numbers the CLECs assigned to FCSCs in connection with those revenue sharing agreements. (Essentially, these questions boiled down to whether the Farmers decisions applied to CLECs, since Farmers involved arrangements between an ILEC and FCSCs.)

Shortly after the April 26, 2011, hearing, while the motions for referral were still pending, the Commission released N. Valley I and N. Valley II, see discussion supra Part III.B.4.

On November 18, 2011, Aventure withdrew its various motions to stay and for referral of questions to the FCC; the same day, the Commission issued the Connect America Order, see discussion supra Part III.B.7. On December 30, 2011, the U.S. Court of Appeals for the District of Columbia Circuit issued its order in Farmers v. FCC, denying Farmers' petition and affirming the FCC.

The Court held a status conference on June 14, 2012, to discuss the various notices and motions to supplement the record filed in the related cases regarding the Connect America Order. Based upon the information presented at that status conference, the Court entered an order on June 15, 2012, lifted the previously imposed stays in their entireties, and directed each party to advise the Court of which motions the party was prosecuting, withdrawing, and/or resisting.

Over the course of the next several months, scheduling orders and discovery orders were filed. In addition to their then-pending motions to dismiss and for judgment on the pleadings, Aventure and AT&T filed motions for summary judgment.

In the latter half of 2013, while the parties briefed the various motions, the Commission issued decisions in the Sancom and All American cases and the U.S. Court of Appeals for the District of Columbia Circuit filed N. Valley v. FCC, affirming the Commission's N. Valley I and N. Valley II decisions, see discussion supra Part III.B.4. In addition, on April 24, 2013, the Iowa Supreme Court issued an order denying further review of the IUB's decision. By the end of 2013, in related case Qwest v. Aventure, 4:07-cv-00078 (S.D. Iowa), after joint motions for voluntary

dismissal had been filed between Qwest and various LECs, only Aventure and two other LECs remained in that case. In that case, following the issuance of the Court's February 2015 order on Qwest's motion for judgment on the pleadings and Aventure's motion to dismiss, Qwest and one additional LEC filed a joint motion for voluntary dismissal. In the related case, Sprint v. Aventure et aL., 4:07-cv-00194 (S.D. Iowa), Sprint and various LECs similarly filed joint motions for voluntary dismissal, leaving Aventure as the only LEC remaining in that action.

On April 14, 2014, the Court conducted a status conference in this case and in the related cases in the Southern District of Iowa. The parties informed the Court that while many of the parties originally named in these related cases had settled their claims against one another, the parties that remained in each of five related cases were not actively pursuing settlement.[18] Following the status conference, the Court set the pending motions for omnibus hearings, which were held on Jury 23 and 24, 2014.

### B. Factual Background
#### 1. Factual Allegations in AT&T's Amended Complaint

As described above, see discussion supra Part III.A.4, telephone calls are divided into local calls that originate and terminate in the same local exchange and long distance calls that are carried by a long distance carrier (an IXC) to or from one local calling area to another local calling area. At issue in this litigation are long distance calls that either originated on equipment and/or facilities owned by the LEC serving the end-user customer who made the call (originating switched access) or terminated over equipment and/or facilities owned by the LEC serving the end-user customer who received the call (terminating switched access). The IXC's customer, not the IXC, chooses the LEC that provides either the originating or terminating access service. Thus, providers of terminating switched access services are the exclusive providers of such service to the customers they serve in their local calling areas; AT&T has no choice as to the entity from whom it obtains terminating switched access service.

AT&T asserts Aventure has undertaken an arrangement with one or more FCSCs designed to exploit Aventure's exclusive control over access to certain telephone numbers. AT&T points to the IUB's findings, see IUB I, 2009 WL 3052208, noting that, during the relevant time period, Aventure served only FCSCs, had no customers that were not FCSCs, and did not even purport to serve any ordinary telecommunications customers until January 2008 (over two years after it began operations and after the original complaint in this action had been filed against Aventure). AT&T alleges it is therefore clear that Aventure's purpose and function was to engage in traffic pumping schemes with FCSCs.

AT&T further alleges Aventure entered into revenue sharing agreements with one or more FCSCs that promote, over the Internet and other media, a variety of free calling services, which include pornograph-

---

**18.** More than twenty access stimulation and/or collection actions were initially filed in this Court; some cases were consolidated, and the majority of the cases eventually settled. The Qwest case, 4:07-cv-00078 (S.D. Iowa), initially involved over fifteen defendants; only four remain. (The case as between Qwest and two FCSCs remains stayed due to bankrupt-cy.) The Sprint case, 4:07-cv-00194 (S.D. Iowa), initially involved more than sixteen defendants; only two remain. The MCI case, 5:07-cv-04095 (N.D. Iowa), initially involved four defendants; only two remain. As previously noted, this case initially involved over ten defendants; only two remain.

ic and other chat lines, conference calling, and international calling. The focus of AT&T's complaint is the international, conferencing, and chat room services offered by the FCSCs.

Under the procedures, the FCSCs instructed callers to dial telephone numbers Aventure assigned to the FCSCs. Those calls were routed to equipment located in local exchange areas in Iowa. Once they were routed, however, the calls would not connect to actual residents of the communities served by the local exchange. Instead, the calls were routed to equipment owned by Aventure or the FCSCs. Free chat or conferencing service calls were connected via a bridge to other calls. The destinations of international calling service calls were not to residents in Iowa or even in the United States, but to residents of foreign countries. Aventure billed AT&T for terminating access services for each MOU of the free calling services as if they were for actual residents of Aventure's local exchanges. Pursuant to these revenue sharing arrangements, Aventure would pay a portion of the access revenues that it collected from AT&T as a kickback to the FCSCs.

AT&T further alleges that the number of minutes of long distance calls routed to Aventure as a result of this traffic pumping scheme far exceeded the volume of calls normally routed to the sparsely populated communities served by Aventure. Consequently, the switched access bills Aventure sent to AT&T far exceeded the bills for switched access in comparable sized communities.

In summary, AT&T alleges that the FCSCs stimulated long distance calls by offering various calling services to the public free of charge. When a call was made to a FCSC, Aventure (1) routed the call to or through equipment owned by the FCSC or provided by Aventure, (2) charged AT&T terminating switched access charges for

that call, and then (3) kicked back a portion of the revenues from those charges to the FCSC. AT&T urges that as a result, the call was not free; instead, the access revenues collected from AT&T subsidized those services and provided Aventure and the FCSCs with windfall profits at the expense of IXCs and their customers. AT&T asserts that Aventure's actions were designed to exploit the higher access rates that smaller, rural carriers were entitled to charge IXCs by increasing call volumes, and thus Aventure's access revenues, without any material increase in Aventure's costs. AT&T adds that FCSC Futurephone engaged in the very same schemes with several different Iowa LECs.

Pointing to the IUB proceedings, and noting that Aventure was a party to those proceedings, AT&T contends that Aventure did not actually provided terminating switched access services to AT&T for most, if not all, of the calls for which it billed AT&T. According to AT&T, the other LECs with which Futurephone conspired did not provide terminating switched access to AT&T either. AT&T urges that Futurephone was therefore complicit in, and a financial beneficiary of, those LECs' unlawful activities.

AT&T notes that section 3.1.1 of Aventure's tariff defines switched access service as follows:

> Switched Access Service, which is available to [IXC] Customers for their use in furnishing their services to End Users, provides a two-point communications path between a Customer's Premises and an End User's Premises. It provides for the use of common terminating, switching and trunking facilities, and for the use of common subscriber plant of the Company. Switched Access Service provides for the ability to originate calls from an End User's Premises to a Cus-

tomer's Premises and to terminate calls from a Customer's Premises to an End User's Premises in the LATA where it is provided.

AT&T reasons that "Customer's Premises" is the IXC's point-of-presence (POP), and that therefore, to qualify as terminating switched access service under Aventure's tariffs, a long distance call carried by AT&T must terminate from AT&T's POP to an end user at an end user's premises over common facilities within the local exchange where Aventure operates. AT&T asserts that a majority of the calls billed by Aventure to AT&T were routed to FCSCs and that the services provided by those FCSCs included international calling, free conferencing services, and free chat line services.

AT&T argues the IUB in its proceedings and the FCC in Farmers II, analyzed tariff language substantially similar to that contained in Aventure's tariff and held that, under such language, the service Aventure purports to provide is not switched access service. Furthermore, the IUB found, under substantially similar tariff language, that the following minimum requirements must all be met to establish that a service is switched access service: (1) calls must be delivered to an end user of the LEC's services; (2) calls must terminate at the end user's premises; and (3) calls must terminate in the LEC's certificated local exchange area. See IUB I, 2009 WL 3052208. The failure to meet any one of these requirements disqualifies the service as switched access service. Likewise, in Farmers II, 24 FCC Rcd. at 14804, 14811, the FCC determined that a FCSC must be an end user under the tariff in order for a LEC to provide switched access service to the IXC, and that an end user is a customer of the LEC that subscribes to the LEC's service.

AT&T argues Aventure's FCSCs do not qualify as end users under the tariff. Aventure's tariff defines end user as: "[a]ny person, firm, partnership, corporation or other entity which uses the service of the Company under the terms and conditions of this tariff." AT&T Am. Compl. ¶ 35, ECF No. 156. Those using Aventure's services under its tariff are supposed to be charged end user common line (EUCL) fees and obtain local exchange service from Aventure. AT&T contends that the FCSCs did not obtain any local exchange services from Aventure, as evidenced by the facts that the FCSCs did not order local exchange services; were not entered into Aventure's ordering, billing, or accounting systems; and were not billed or invoiced by Aventure for local exchange. Pointing again to the IUB's findings, AT&T asserts that in order to create the appearance that FCSCs were genuine end users of Aventure's services, Aventure created illegitimate bills for FCSCs that were never sent, and that Aventure never expected to be paid. Nor, according to AT&T, did Aventure impose any EUCL fees on the FCSCs, which Aventure is required to impose on all end users under its tariff.

AT&T summarizes that the FCSCs associated with Aventure are not end users within the meaning of Aventure's tariff. In fact, under substantially similar tariff language, both the FCC and the IUB have held that switched access service can only be provided for calls made to end users. For this reason, asserts AT&T, Aventure has not provided AT&T with switched access services under its tariffs and cannot properly bill for the same.

AT&T continues, arguing that, as noted by the IUB, the term "end user premises" generally denotes a building or buildings that is owned, leased, or otherwise controlled by end user, and, likewise, Aventure's tariff defines end user premises by reference to the end user's

distinct physical location: "End User Premises ... [are] [t]he premises specified by the Customer or End User for termination of access services at the End User's physical location." "Premises," in turn, is defined as "[a] building, portion of a building in a multi-tenant building, or buildings on continuous property not separated by a highway." AT&T asserts that Aventure's arrangements with the FCSCs did not satisfy the end user premises requirement and that traffic routed to the FCSCs did not terminate to a building owned, leased, controlled or otherwise associated with FCSCs. Instead, it was routed to equipment housed in buildings owned or controlled by Aventure or some other LEC. Accordingly, the calls did not terminate at the FCSCs' physical locations, and thus did not constitute switched access service.

As for the final requirement, quoting the IUB's decision, AT&T contends that the termination point is determined using the FCC's end-to-end analysis, which requires that "termination occurs in the geographic location of the called party and does not depend on the intermediate route or intermediate events that occur in the process of the call going to its final destination." IUB I, 2009 WL 3052208. AT&T alleges some of the calls at issue were delivered to equipment that was located outside Aventure's certificated local exchange areas, and thus did not terminate within Aventure's certificated local exchange areas. AT&T also alleges that with respect to international calling services, the calls were not terminated by Aventure at all, but rather forwarded to a foreign carrier and terminated at the called party in another country.

Referring to the FCC's and the IUB's findings, AT&T asserts that those agencies dealt with similar circumstances under similar tariff language as in this case. Thus, AT&T asserts Aventure did not provide AT&T with terminating switched access services, as that term is defined in its federal tariff, for the calls associated with the free services offered by the FCSCs, and that Aventure's bills to AT&T, which include such charges, were inconsistent with its federal tariff and unlawful. AT&T further contends that Aventure's traffic associated with the FCSCs was not routed to the FCSCs using common facilities as required under Aventure's tariff.

For these same reasons, AT&T asserts Futurephone was not an end user under the tariffs of the LECs with whom it was participating in traffic pumping schemes; schemes that were virtually identical to those in which Aventure was engaged. The LECs used either the NECA Tariff No. 5, which was the language considered by the FCC and the IUB, or a substantially similar tariff, and therefore, the imposition of access charges on calls to Futurephone was also improper under those tariffs. Futurephone's agreements to share in the associated unlawful access charge revenues from such calls was improper as well.

AT&T next contends Aventure unlawfully attempted to inflate access charges for all long distance calls by charging for over one hundred miles of local transport that Aventure does not actually provide. AT&T explains that in 1988, Iowa's rural LECs created a centralized equal access provider, Iowa Network Systems (INS), so that participating Iowa LECs had a more efficient and cost-effective way to exchange traffic with IXCs. IXCs connect to INS's optic ring at a central access tandem in Des Moines, which is, in turn, connected to many rural Iowa LECs at one of sixteen points of interconnection around the state. The FCC authorized INS to construct this statewide fiber ring to lower costs by concentrating the Iowa LEC members' traffic at a single, centralized, equal access tan-

dem switch, and thus facilitate competition in rural areas.

For an interstate long distance call to a customer of an INS member-LEC, AT&T hands the call off to INS in Des Moines, INS transports the call around its fiber ring and hands it off to the terminating member LEC at a point of interconnection near the LEC's service area, and the LEC transports the call over its local network to the called party. Under its federal tariff, INS charged AT&T a flat fee for switching and carrying the call on its fiber ring to the point of interconnection, and the rural LEC separately charged AT&T a local transport charge, typically including a per-mile component. (The extent of the charge is determined by the distance the call is transported.)

Aventure, instead of designating its point of interconnection with INS near Sioux City, Iowa, where Aventure was headquartered, designated Des Moines as the point at which its own local transport service begins—a point more than 100 miles from Sioux City and Aventure's service areas. Consequently, Aventure billed AT&T for purportedly transporting calls over 100 miles when it only needed to transport them a very short distance from its Sioux City point of interconnection with INS. AT&T alleges that the manner in which INS or Aventure physically routed or carried such calls could not justify Aventure's inflated mileage charges and that at the time AT&T filed its amended complaint, AT&T was still handing the calls off to INS in Des Moines, which INS transported and handed to Aventure at the Sioux City point of interconnection for termination on Aventure's local network.

Based on this information, AT&T alleges Aventure entered into a sham "leasing" arrangement with INS, in which it purports to be leasing INS's fiber facilities between Des Moines and its point of interconnection in Sioux City. According to

AT&T, these are purely paper arrangements that claim Aventure transports the calls from AT&T all the way from Des Moines to its interconnection point in Sioux City and then on to its local exchanges. These facilities Aventure purportedly leased, however, were the very same facilities INS used to transport this very same traffic from Des Moines to Sioux City absent the purported lease arrangement, and which INS still operated, maintained, controlled, and was responsible. Further, AT&T continued to pay INS the very same flat rate for such transport that it would have paid absent the purported lease arrangement.

AT&T contends that (1) Aventure charged AT&T for additional miles of local transport on the INS ring that AT&T already obtained from INS, resulting in inflated access charges; (2) Aventure's lease arrangement provided no benefit to end-user customers or IXCs, no increased service choices, and were supported by no legitimate operational, engineering, or other rationale; and (3) the sole purpose of this arrangement was to inflate access charges assessed on IXCs. AT&T asserts Aventure's designation of Des Moines as its point of interconnection with INS violates the FCC's rule against unreasonably designating points of interconnection in a centralized equal access arrangement.

AT&T further alleges the INS tariff, which constitutes Aventure's contract with INS, requires that for a proper point of interconnection, Aventure must have responsibility and control of the traffic and facilities between its network and the designated point of interconnection, but the purported lease arrangement between Aventure and INS does not give Aventure the necessary responsibility and control over the subject facilities to establish that Aventure's point of interconnection with INS is in fact in Des Moines. As a purely

paper transaction, Aventure's sham lease arrangement leaves responsibility for, and control of, the subject traffic in the hands of INS, which remains responsible for actually delivering the traffic from Des Moines to Sioux City and maintaining those facilities.

AT&T also alleges Aventure has violated Rule 61.26 [19] by invoking the rural exemption AT&T argues Aventure does not qualify for the rural exemption because it serves at least one customer in a non-rural area; that is, a population area with 50,000 or more residents. AT&T states that the FCC's rules provide that a CLEC shall not file a tariff for switched access services containing rates that exceed the rates of the ILEC with which the CLEC competes in the same service area. Rule 61.26(e), however, provides a rural exemption that allows a rural CLEC to charge the rates set forth in the NEC A tariff, which are intended for small, rural ILEC's and are generally higher rates than the rates for ILECs that serve larger or more urban population centers.[20] AT&T avers that Aventure's rates are equal to those set forth in the NECA tariff, rather than the rates of the ILEC operating in its service areas, indicating that Aventure used the rural exemption even though it is not a rural CLEC as demonstrated by the fact it served one or more customers in Sioux City, Iowa, which has a population of 50,-000 or more. Thus, because Aventure did not qualify for the rural exemption, its rates were unlawfully high.

According to AT&T, it first became aware of the traffic-pumping scheme when it noticed that the amount of traffic billed by Aventure increased from the levels that had been billed in prior periods. Based on AT&T's experience with traffic-pumping schemes, including the fact that many of these schemes were being carried out in rural areas of Iowa by Iowa LECs, AT&T suspected Aventure was likely engaged in traffic pumping and mileage pumping schemes and sent a letter asking Aventure for additional information regarding its bills and services to AT&T. Aventure's response to AT&T did not adequately explain or justify the billed charges to AT&T, and therefore in approximately October 2006, AT&T chose to exercise its right under the relevant tariffs to dispute Aventure's bills and to withhold further payment of those bills until the dispute is resolved.

AT&T asserts eight causes of action against Aventure. Counts one and three allege traffic pumping and mileage pumping in violation of federal tariffs under § 203(c) of the Act. Counts two and four allege unreasonable practice in violation of § 201(b) of the Act by billing for services not provided based on traffic pumping and mileage pumping. Count five alleges unreasonable practice in violation of § 201(b) of the Act for improperly invoking the rural exemption. Count six alleges fraudulent and negligent misrepresentation. Count seven alleges unjust enrichment.

**19.** Rule 61.26(a)(6) provides:
Rural CLEC shall mean a CLEC that does not serve (i.e., terminate traffic to or originate traffic from) any end users located within either: (i) Any incorporated place of 50,000 inhabitants or more, based on the most recently available population statistics of the Census Bureau or (if) An urbanized defined by the Census Bureau.

**20.** The rural exemption, Rule 61.26(e), in relevant part states:

[A] rural CLEC competing with a non-rural ILEC shall not file a tariff for its interstate exchange access services that prices those services above the rate prescribed in the NECA access tariff, assuming the highest rate band for local switching. In addition to that NECA rate, the rural CLEC may assess a presubscribed interexchange carrier charge if, and only to the extent that, the competing ILEC assesses this charge ....

Count nine is request for a declaratory ruling. AT&T asserts one cause of action against Futurephone for civil conspiracy (count eight).

### 2. Factual Allegations in Aventure's Amended Counterclaims

Aventure alleges that beginning on September 1, 2006, and on the first day of each month thereafter, it billed AT&T for use of Aventure's access services in accordance with the applicable rates set forth in its tariffs filed with the FCC and the IUB, and that as of March 20, 2012, the total amount Aventure billed AT&T for interstate access services was $33,569,203.12, exclusive of any additional access charges and late fees. Aventure contends that AT&T continued to utilize the originating and/or terminating services provided by Aventure while intentionally refusing to pay Aventure's lawfully billed access services charges in violation of §§ 201(b), 202(a), and 203(c) of the Act. Aventure further alleges that Aventure's interstate tariff required interexchange carriers such as AT&T to pay specified rates for Aventure's originating and/or terminating access services for interstate traffic, and that, but for obligations Aventure was prevented from performing that were excused or waived by AT&T's misconduct, Aventure fully performed its obligations under its federal access tariff. Aventure alleges AT&T's refusal to pay its tariffed rates and charges was intentional, willful, and malicious, and proximately caused Aventure's damage; and that Aventure is entitled to compensatory and punitive damages, attorney fees, declaratory judgment, and injunctive relief against AT&T.

Aventure asserts four causes of action against AT&T. Count one alleges a violation of §§ 201(b) and 203(c) of the Act for failure to pay billed access charges; count two alleges breach of tariff for failure to pay for billed access services; count three alleges quantum meruit; and count four alleges unjust enrichment.

### 3. Factual Allegations in Futurephone's Counterclaims [21]

Futurephone alleges that in September 2006, it launched a service to enable people to make economical overseas calls. Specifically, for the cost of a call to a number in an Iowa telephone exchange, Futurephone would, through its Internet portals located in the telephone exchange areas served by the Iowa LECs, enable people to communicate overseas via the Internet at no additional charge.

In order to provide this Internet service, Futurephone obtained telephone numbers, IP addresses, and termination services from the Iowa LECs. Futurephone's process also required the services of AT&T, which provided long distance service to Iowa for tens of millions of customers in the United States.

Futurephone contends that it conducted its business with each of the Iowa LECs as an independent contractor and was a customer of the Iowa LECs for their telecommunications services. Futurephone denies having had any partnership, or any type of agency relationship between itself and any of the Iowa LECs. However, Futurephone admits to having had agreements with the Iowa LECs wherein Futurephone would receive marketing fees regarding traffic routed to it.

Futurephone describes that a typical call to Futurephone's service originated outside of the exchange areas served by the Iowa LECs and that successful transmission of such a call required three telecommunications carriers: an originating LEC, an IXC (in this case, AT&T), and one of the Iowa LECs. The originating LEC would receive the transmission from the

---

**21.** Futurephone filed the same counterclaims in the four related cases.

caller, then "hand of" the call to AT&T at AT&T's local POP. The call would then traverse AT&T's network to the exchange area served by an Iowa LEC, where AT&T would hand the call off to an Iowa LEC at the local POP. The Iowa LEC then provided switched access service to deliver and terminate the call at one of Futurephone's local Internet portals. At that point, Futurephone's Internet service would prompt the caller to enter the country code and overseas telephone number he or she was trying to reach. When the correct number was entered, Futurephone would provide access to the Internet for people to place a new call through one of Futurephone's servers, and that call would be transmitted overseas to its destination via the Internet.

According to Futurephone, the Iowa LECs provided switched access services to AT&T pursuant to then-effective federal tariffs; Aventure's tariff became effective on December 20, 2006. In late October 2006, the Iowa LECs started submitting invoices to AT&T for charges associated with the access services they provided that included the delivery and termination of traffic to Futurephone's Internet portals. According to Futurephone, its services were well received and by late October 2006, it had a substantial number of daily calls to its service.

Beginning in November 2006, IXCs, specifically AT&T, aware of the increased traffic in the Iowa LECs' exchange areas, began disputing and withholding payments on invoices submitted to them for switched access services received from the Iowa LECs, including for the Futurephone traffic. In November 2006, AT&T requested call data records and other information from some LECs concerning their customers in its exchange area, and the destinations of traffic therein and withholding payments for access services.

In December 2006, the Iowa LECs sent letters to the IXCs, requesting that they pay their bills for the switched access services they were receiving for the calls to Futurephone's Internet portals in Iowa. The IXCs refused to pay the charges.

Futurephone notes that in January 2007, AT&T filed this lawsuit against Futurephone and certain LECs, including Aventure, alleging, inter alia, that the LECs had billed AT&T for "exorbitant" switched access fees since October 2006, that the switched access Futurephone traffic for which the Iowa LECs billed AT&T did not terminate at Futurephone's Internet portals, and that therefore AT&T was not and should not be required to pay for access services regarding that traffic. Qwest, Sprint, and MCI subsequently filed similar civil actions against many of the same defendants, including Futurephone, 4:07-cv-00078 (S.D. Iowa), 4:07-cv-00194 (S.D. Iowa), and 5:07-cv-04095 (N.D. Iowa), respectively. Qwest, Sprint, and MCI in their respective civil actions, like AT&T in this case, alleged they were not obligated to pay the Iowa LECs' access charges for the Futurephone traffic.

Futurephone alleges that the civil actions filed by AT&T, Sprint, Qwest, and MCI (the IXCs), are objectively baseless because the IXCs had no reasonable or good faith basis to believe they could realistically expect success on the merits of their civil actions because at the time of filing these actions: (1) the IXCs knew or should have known that the Iowa LECs had valid and "deemed lawful" access termination tariffs that were binding on the LECs and the IXCs as a matter of law; (2) Futurephone was an Internet service provider, not a telecommunications provider, its Internet portals were located in the Iowa LECs exchange areas, and therefore Futurephone was the "called party" and "end-user" respecting the IXC telecommu-

nication services provided by the IXCs; (3) the Iowa LECs provided legally tariffed access termination services for the delivery of the IXCs' telecommunications services to Futurephone's Internet portals in Iowa; (4) the IXCs' refusal to pay the Iowa LEC's legally tariffed access charges for those termination services is unlawful, unjust and unreasonable; (5) Futurephone's arrangements with those Iowa LEC's under which it was to receive marketing fees for traffic routed to Futurephone's Internet portals were lawful and common in the industry, and in fact one or more of the IXCs had previously entered into similar marketing arrangements; and (6) the Iowa LECs' payments of those marketing fees to Futurephone depended on their receipt of lawfully tariffed access termination charges from the IXCs for access services they received for the termination of the IXC voice traffic at Futurephone's Internet portals in Iowa.

According to Futurephone, the IXCs' civil actions were motivated to misuse the litigation process as a weapon to harm Futurephone (with the process of litigation, as a opposed to the outcome of that process), and as a pretext for its unlawful self-help conduct aimed at disrupting Futurephone's lawful business relationships and driving it out of business.

In early 2007, the Iowa LECs terminated service to Futurephone, and Aventure disconnected service from Futurephone's numbers without notice on or about January 29, 2007. On February 1, 2007, other LECs informed Futurephone it would shortly be terminating its services to Futurephone and did so one day later.

Futurephone alleges that because of the IXCs' self-help refusal to pay legally tariffed access termination charges and service terminations, Futurephone was forced to shut down its business and has been unable to provide any service since February 2, 2007. According to Futurephone, as a direct and intended result of those actions by the IXCs, Futurephone's lawful arrangements and relationships with the LECs, under which Futurephone was to receive service and marketing fees for traffic routed contracts through them, have been disrupted and Futurephone has been deprived of significant economic advantages from those relationships. Further, existing and prospective customers of Futurephone services (subscribers of the IXCs) were also denied access to Futurephone's services, which interfered with Futurephone's advantageous business relations with those customers and the marketing fees generated from access charges for their traffic, to which Futurephone was entitled under the business relationships with the Iowa LECs.

During the pertinent time period, the IXCs refused to pay any access charges bills submitted to them by the Iowa LECs for terminating their IXC calls to Futurephone Internet portals in the Iowa LECs' exchange areas. The access services provided by the Iowa LECs consisted of delivering and terminating the IXCs' calls at Futurephone's Internet portals. Futurephone alleges that each IXC was required to pay for those services. Futurephone alleges that under the Commission Rules, Futurephone was and is the called party.

Futurephone contends that telephone calls provided by the IXCs were switched by the Iowa LECs at their end offices and delivered to Futurephone's Internet portals located in the Iowa LECs' exchange areas, which were the termination points for the telecommunications to the Iowa exchanges. That is, the use of the PSTN ended at Futurephone's Internet portals. Futurephone alleges entities such as Futurephone that utilize LEC services to provide others with access to the Internet are deemed end-users of telecommunications services, and with respect to the

telecommunications service delivered to them, Internet access providers like Futurephone are the "called parties" and the provided telecommunications service terminates at their portals.

In its amended counterclaims, ECF No. 116-2/252, Futurephone asserts eight causes of action against AT&T. Count one alleges AT&T violated § 201(a) of the Act by refusing to pay lawfully tariffed access charges for services received. Count two alleges AT&T violated § 201(b) of the Act by engaging in illegal self-help by refusing to pay for services rendered. Count three alleges AT&T violated § 203(c) of the Act by procuring access services at rates not authorized by the LECs' tariffs. Count four alleges AT&T violated § 202(a) of the Act by unlawful discrimination against Futurephone. Count five alleges intentional interference with existing contractual/business relationship and prospective business advantage. Count six alleges quantum meruit. Count seven alleges a violation of Iowa Code § 476.5. Count eight alleges abuse of process.

## V. DISCUSSION

Aventure moves to dismiss counts one, two, six, seven, and nine of AT&T's amended complaint. AT&T moves to dismiss all Futurephone's amended counterclaims. AT&T also moves for judgment on the pleadings on counts one, three, and four of Aventure's counterclaims.

### A. Standards for Motions to Dismiss and for Judgment on the Pleadings

To state a claim for relief, a party must submit "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a party may assert, by motion, the defense of failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To defeat this motion, "a complaint must contain sufficient factual matter, . . . to 'state a claim to relief that

is plausible on its face.'" Ashcroft v. Iqbal 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir.2009) (quoting Iqbal 556 U.S. at 678, 129 S.Ct. 1937). To meet the plausibility standard, "[t]he plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims . . ., rather than facts that are merely consistent with such a right." Stalley v. Catholic Initiatives, 509 F.3d 517, 521 (8th Cir.2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

■ In evaluating the complaint, factual allegations in the complaint are taken as true, and any reasonable inferences that may be drawn are drawn in favor of the non-moving party. Id.; Gallagher v. City of Clayton, 699 F.3d 1013, 1016 (8th Cir. 2012); Braden, 588 F.3d at 594. However, legal conclusions and mere "recitation[s] of the elements of a cause of action" may be discarded. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955); see Braden, 588 F.3d at 594. As part of the "context-specific task [of evaluating a complaint] that requires the reviewing court to draw on its judicial experience and common sense," the complaint should be examined in full, rather than in piecemeal. Braden, 588 F.3d at 594 (quoting Iqbal, 556 U.S. at 679, 129 S.Ct. 1937).

■ Under Rule 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings under Rule 12(c) is evaluated

using the same standard used to evaluate a motion to dismiss under Rule 12(b)(6). Gallagher, 699 F.3d at 1016; Clemons v. Crawford, 585 F.3d 1119, 1124 (8th Cir. 2009); Ashley Cnty., Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir.2009). "A grant of judgment on the pleadings is appropriate 'where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law.'" Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir.2008) (quoting Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir.2002)).

### B. Aventure's Motion to Dismiss AT&T's Counts One, Two, Six, Seven, and Nine

Aventure moves under Rule 12(b) to dismiss five counts in AT&T's amended complaint, alleging those counts fail to state a claim upon which relief may be granted. Counts one and two of AT&T's amended complaint allege Aventure violated §§ 203(c) and 201(b) of the Act; count six alleges Aventure made fraudulent and negligent misrepresentations; count seven is a claim for unjust enrichment; and count nine requests a declaratory ruling.

As an initial matter, AT&T asserts Aventure's motion to dismiss was filed after Aventure filed its answer to AT&T's amended complaint, making the motion untimely under Rule 12(b)(6). However, AT&T concedes that under the circumstances, Aventure's motion may be converted to a motion for judgment on the pleadings, which is governed by the same standard. See, e.g., Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir.1990) (reasoning that a challenge to counts based on failure to state claims upon which relief can be granted can be construed as a

motion for judgment on the pleadings pursuant to Rule 12(c), as both motions are governed by the same standards); accord NanoMech, Inc. v. Suresh, 777 F.3d 1020, 1023 (8th Cir.2015) (finding no error in converting a Rule 12(b)(6) motion to dismiss to a Rule 12(c) motion for judgment on the pleadings, reasoning the pleadings on the motion to dismiss were closed, and thus did not run afoul of Rule 12(c)).

### 1. AT&T's § 201(b) Traffic Pumping Claim

█ Aventure argues that AT&T's claim for violation of § 201(b) for sharing tariffed access charges on long distance calls with providers of conference calling and similar services fails to state a claim upon which relief may be granted and is subject to dismissal under Rule 12(b)(6).[22] According to Aventure, absent an FCC order, rule, or regulation expressly finding certain conduct is unjust and unreasonable, there is no private right of action under the Act. Aventure asserts that a violation of § 201(b) requires a determination by the FCC that an action constitutes an unjust and unreasonable practice. Aventure argues that because AT&T has failed to plead the requisite FCC action, it cannot maintain a claim under § 201. Aventure further asserts that the Connect America Order expressly declined the IXCs' requests to declare revenue sharing to be a violation of § 201(b) and made it clear that carriers who receive tariffed services must pay the tariffed rates.

AT&T rejects Aventure's assertions, arguing Aventure applies the incorrect pleading standard since Communications Act claims are subject to Rule 8 notice pleading and AT&T's claims meet that standard. AT&T notes that Global Cross-

---

**22.** Aventure filed a combined reply brief in support of its motions to dismiss the IXCs' Communication Act claims in this case and the related cases in the Southern District of Iowa: 4:07-cv-00078, 4:07-cv-00194, and 4:08-cv-00008. Therefore, some discussion relates collectively to "the IXCs."

ing Telecommunications, Inc. v. Metrophones Telecommunications, Inc., 550 U.S. 45, 53, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007), cited by Aventure for the proposition that a prior FCC decision must be pled to avoid dismissal of a § 201(b) claim, does not mandate citing a prior FCC decision or order as a pleading requirement. Rather, Global Crossing noted that the *success* of a § 201(b) claim depends on whether the FCC, by rule or decision, could properly hold that a carrier's conduct was unjust and unreasonable.

AT&T also challenges Aventure's interpretation that the Connect America Order found revenue sharing was not unjust or unreasonable. AT&T points out that the Connect America Order repeats the FCC's previous holding in All American, noting "[a]s the Commission has previously stated, '[w]e do not endorse such withholding of payment outside the context of any *applicable* tariffed dispute resolution provisions.' " Connect America Order, 26 FCC Rcd. at 17890 (second alteration in original) (emphasis added) (quoting All American I, 26 FCC Rcd. at 728). AT&T asserts that its § 201(b) claim against Aventure is premised on Aventure assessing AT&T switched access charges on calls that had no end users, no subscription to a service from Aventure's interstate tariff, no end-user premises, and no common line, and thus failed to meet tariff requirements. AT&T posits that the IUB agreed with these premises regarding intrastate traffic. See IUB I, 2009 WL 3052208.

Aventure's reading of the Connect America Order as finding that revenue sharing is lawful contradicts that order. The new access stimulation rules use revenue sharing as a trigger, but neither permit access sharing nor immunize LECs from their duty to refrain from billing IXCs tariff charges when the subject calling does not meet the LEC's tariff requirements. See 47 U.S.C. §§ 201(b),

203(c). Under the Connect America Order, IXCs still have the right to bring actions to address both whether a LEC has complied with the new rule going forward and whether a LEC's traffic stimulation is unjust or unreasonable despite the new rules. The Connect America Order clearly stated that the new rules had no effect on existing complaint actions. Connect America Order, 26 FCC Rcd. at 17889 n. 1182. In the Connect America Order, the FCC merely declined to find revenue sharing was per se unlawful under § 201(b), reasoning that "[a] ban on all revenue sharing arrangements could be overly broad, and no party has suggested a way to overcome this shortcoming." Connect America Order, 26 FCC Rcd. at 17879 (footnote omitted). But the FCC also denied that it had previously "explicitly approved revenue sharing." Id. AT&T reiterates its position that, contrary to Aventure's assertions, the Connect America Order does not go so far as to find revenue sharing to be per se lawful. In fact, argues AT&T, the FCC specifically noted in the Connect America Clarification Order that prior to the new rules, it had "adopted several orders resolving complaints concerning access stimulation under preexisting rules and compliance with the Communications Act," and clarified that the new rules order "complements these previous decisions, and nothing in the [new rules order] should be construed as overturning or superseding [those] previous [FCC] decisions." Connect America Clarification Order, 27 FCC Rcd. 605, 613 (2012).

Aventure's arguments for a Rule 12(b)(6) dismissal are improperly premised on whether AT&T can prevail on its § 201(b) claim, instead of on whether AT&T has stated a claim. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)

("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."). Nor does Global Crossing, as Aventure suggests, demand a heightened pleading requirement for a § 201(b) claim. Rather, the gateway issue before the Supreme Court in Global Crossing was whether § 207, which authorizes persons damaged by a violation of § 201(b) to bring a lawsuit to recover damages in federal court, would authorize payphone operators to bring a federal lawsuit against long-distance communications carriers who refused to compensate the payphone operator for certain calls. Global Crossing, 550 U.S. at 53, 127 S.Ct. 1513. The Court found that it did. Id. The adequacy of pleading a § 201(b) claim was not before the Court in Global Crossing. Furthermore, were there such a pleading requirement, AT&T's amended complaint repeatedly cites the Commission's Farmers decisions, which clearly established that the type of conduct alleged in AT&T's § 201(b) claim was unjust and unreasonable.

Accordingly, AT&T has sufficiently pled a cause of action under § 201(b) to satisfy the plausibility standard and defeat a Rule 12(b)(6) motion to dismiss. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

### 2. AT&T's § 203(c) Traffic Pumping Claim

■ Aventure argues AT&T fails to state a claim for violations of § 203(c). According to Aventure, AT&T's claim— that Aventure violated § 203(c) by charging AT&T for services that do not constitute terminating switched access services—is contrary to the Connect America Order. According to Aventure, the IXCs, including AT&T, confuse their relationships with Aventure, which are governed by Aventure's interstate access tariff and federal law, with Aventure's relationships with Aventure's local end user customers, which are governed by Aventure's agreement with those end users and not by Aventure's tariff or by the FCC. Aventure describes that two distinct *and unrelated* transactions are at play. First, as Aventure asserts, Aventure terminates a call brought to its network by its access tariff customer, such as AT&T, which entitles Aventure to collect access charges from AT&T for the work Aventure performs in completing AT&T's customer's long-distance call. Next, Aventure delivers the call to *its own end user customer*, such as a FCSC, pursuant to the terms of the agreement with that end user. According to Aventure, § 203(c)'s prohibition on rebates applies only to customers that receive service pursuant to the tariff. Therefore, a violation would only occur if Aventure gave a refund or rebate to the IXC that took service pursuant to Aventure's interstate tariff and paid the tariffed access charges. Aventure points to the FCC's repeated position that it does not regulate the relationship between a LEC and its end user customer. See Seventh Report and Order, 16 FCC Rcd. at 9938 ("[W]e continue to abstain entirely from regulating the market in which end-user customers purchase access service"). Aventure's final assertions are that the Connect America Order expressly states that local exchange carriers are permitted to enter into revenue sharing agreements with their end user customers, and that language in the Connect America Order suggests that access revenue sharing is an important feature in the definition of access stimulation.

Aventure's argument that AT&T has not stated a claim under § 203(c) fails. First, Aventure is incorrect that it is still contested whether, under the LEC-FCSCs' agreements, the FCSCs are end users;

both the FCC and the IUB held that under the same FCSC-LEC arrangements at issue in this case, FCSCs are not end users, which put that issue to rest. Second, in N. Valley Recon I, the Commission rejected the contention advanced here by Aventure that the access charge requirements impermissibly regulate the LEC-end user relationship:

> In addition to arguing that the Commission's CLEC access charge rules do not address the facts at issue, Northern Valley contends that the [N. Valley I] *Order's* requirement that tariffed CLEC access charges be for transporting traffic to an end user "conflicts with the Commission's long-standing precedent establishing that it does not regulate the CLEC-end user relationship." According to Northern Valley, the *Order* "demand[s]" that CLECs assess a fee on end users. The *Order* does no such thing. Under the *Order*, Northern Valley may offer its services to individuals and businesses for any fee (or no fee). The *Order* provides only that, if Northern Valley chooses to assess access charges upon IXCs by *tariff*, the individuals or entities to whom Northern Valley provides access must be "end users" (i.e., paying customers).

N. Valley Recons. I, 26 FCC Rcd. at 14525 (second alteration in original) (footnotes omitted).

Third, Aventure again attempts to extend the scope of the Connect America Order to suggest it legitimizes past conduct. Aventure further ignores the FCC's clear directive that nothing in the Connect America Order vitiates or is contrary to previous FCC rulings. Connect America Clarification Order 27 FCC Rcd. at 613 ("Prior to the [Connect America] Order, the Commission adopted several orders resolving complaints concerning access stimulation under preexisting rules and compliance with the Communications Act. We clarify that the [Connect America Order]

complements these previous decisions, and nothing in the [new rules order] should be construed as overturning or superseding [those] previous Commission decisions." (footnote omitted)). The Connect America—Notice of Proposed Rulemaking order positively cited the N. Valley decision, which denied CLEC Northern Valley's motion to dismiss Qwest's § 203(c) claim for lack of standing, noting the Commission's long-standing prohibition on rebates as an important guard against rate discrimination. See Connect America—Notice of Proposed Rulemaking, 26 FCC Rcd. at 4773 & n. 1071 ("We note that the prohibition on rebates has long been an important guard against rate discrimination, and that the Commission has been vigilant in its review under section 203(c). We also note that section 203(c) claims have been asserted by carriers in the context of access stimulation disputes. We seek comment on whether the refund prohibition in section 203(c) of the Act has a prohibitive effect on revenue sharing arrangements between LECs and access stimulating entities, or, if there are aspects of these relationships that fall outside the scope of this statutory provision." (footnotes omitted)). Furthermore, as previously stated, the new rules set forth in the Connect America Order do not immunize LECs from their ongoing duties to provide tariffed services without discrimination among customers.

AT&T has sufficiently pled a cause of action under § 203(c) to satisfy the plausibility standard and defeat a Rule 12(b)(6) motion to dismiss. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

### 3. AT&T's Fraudulent and Negligent Misrepresentation Claim

■ Aventure argues that as a threshold matter, AT&T's fraudulent and negligent misrepresentation claim fails to satisfy Federal Rule of Civil Procedure 9(b) because the elements of fraud have not been pled with particularity. Relying again

on its interpretation of the Connect America Order, Aventure further argues that the claim also fails because it rests on the flawed assumptions that Aventure did not provide AT&T with switched access service and that Aventure's tariffed access rates did not apply to the services AT&T received from Aventure. AT&T resists, arguing it alleges each of Aventure's access bills contained false representations, and thus the claim is pled with sufficient particularity. AT&T further argues Aventure's continued reliance on the Connect America Order for the proposition that its access bills cannot be false as a matter of law is based on its misreading of that order. AT&T also argues a fact finder could easily conclude AT&T properly relied on Aventure's billing representations that it had provided switched access service.

■ Under Iowa law, the elements of a fraudulent misrepresentation claim are: "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, (7) resulting injury and damage." Lloyd v. Drake Univ., 686 N.W.2d 225, 233 (Iowa 2004) (quoting City of McGregor v. Janett, 546 N.W.2d 616, 619 (Iowa 1996)).

At the outset, AT&T's pre-discovery amended complaint detailed the differences between IXCs and LECs, like Aventure; how IXCs use LECs to deliver tariffed services; the definitions of tariffed services; and how LECs bill the IXCs for those services. The amended complaint identified Iowa LECs Aventure; Superior Telephone Cooperative; the Farmers Telephone Company of Riceville, Iowa; Interstate 35 Telephone Company; and Great Lakes Communication Corp., as well as Does 1-10. The amended complaint, referring to the IUB's findings, also detailed that from late 2005 through 2007, Aventure had arrangements with FCSCs to inflate call volume in Aventure's Iowa local exchange area and that during that period,

Aventure served only FCSCs and had no ordinary telecommunications customers. The amended complaint identified FCSCs Futurephone, Free Call Planet LLC; as well as Roes 1-10. AT&T's amended complaint further alleged that for the service it provided to the FCSCs, Aventure would improperly bill AT&T for terminating access service at inflated rates, and then give the FCSCs a kickback after receiving payment from AT&T. The amended complaint described how Aventure's bills contained false information because the bills (1) charged for terminating switched access services on calls to FCSCs, even though Aventure did not provide such service on those calls; (2) included mileage transport charges for calls transported on INS's facilities; and (3) billed at rates based on the rural exemption, which AT&T alleges does not apply to Aventure because it serves at least one customer in an incorporated area with 50,000 or more inhabitants, and therefore, is not a rural CLEC. The amended complaint further alleges Aventure knew or should have known (1) it did not provide terminating switched access services for calls routed to FCSCs, (2) it did not provide transport to portions of calls transported to INS's facilities, (3) it did not qualify for the rural exemption; and that (4) AT&T would justifiably rely on the false information contained in Aventure's switched access bills that AT&T paid. Finally, AT&T alleges it justifiably relied on that information and was damaged as a result.

AT&T's amended complaint alleges in adequate detail the elements of fraudulent misrepresentation to satisfy the pleading requirements of Rule 9. See Fed. R. Civ. P. 9 ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). AT&T's amended complaint addresses the "who, what, when, where,

and how" of the fraudulent scheme, Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir.2011) ("In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." (citation and internal quotation marks omitted)). Moreover, Aventure's argument for dismissal of AT&T's fraudulent misrepresentation claim is based upon the same faulty premise that the Connect America Order endorsed access stimulation schemes. As previously stated, the Connect America Order did not immunize Aventure's conduct.

Based upon the record, AT&T has pled "allegations. [that] are sufficient to state the necessary duty for fraudulent non-disclosure claims, independent of any contractual duty." McLeodUSA Telecomms. Servs., Inc. v. Qwest Corp., 469 F.Supp.2d 677, 708 (N.D.Iowa 2007) (citing Schaller Tel. Co. v. Golden Sky Sys., Inc., 298 F.3d 736, 740 (8th Cir.2002)). Aventure's motion to dismiss AT&T's claim for fraudulent concealment must be denied.

■■■ In Iowa, "if a negligent misrepresentation results in personal or property damage, courts treat it the same as other negligence claims." Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc., 783 N.W.2d 684, 690 (Iowa 2010). "However, when the negligent misrepresentation only interferes with intangible economic interests, courts have developed more restrictive rules of recovery." Pitts v. Farm Bureau Life Ins. Co., 818 N.W.2d 91, 111 (Iowa 2012). Under those rules, a plaintiff must establish the following:

(1) [T]he defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff

reasonably relied on the information in the transaction that the defendant intended the information to influence; (6) and the false information was the proximate cause of damage to the plaintiff. Boliver v. Kester, 886 N.W.2d 107, No. 15–1973, 2016 WL 4384369, at *3 (Iowa Ct. App. Aug. 17, 2016).

To determine if a person is in the business of supplying information to others, the Iowa Supreme Court considers several factors, including (1) whether the relationship is arm's-length and adversarial or advisory; (2) whether the information supplier is manifestly aware of the use to which the information will be put, and supplies it for that purpose; (3) whether the defendant gave the information to the plaintiff gratuitously or incidental to a different service; and (4) the role the defendant was playing when the alleged misrepresentation occurred. Pitts, 818 N.W.2d at 111–12. The court has "found accountants, appraisers, school guidance counselors and investment brokers all fall within this class of potential defendants." Id. at 112. However, the court has "refused to allow a suit for negligent misrepresentation where the defendant was a retailer in the business of selling and servicing merchandise, a seller who made misrepresentations pursuant to the sale of a business, a bank officer negotiating a loan guarantee with a bank customer, or an employer negotiating with an employee for employment." Id.

■■ AT&T does not allege Aventure is in the business of supplying information. Rather, AT&T alleges Aventure made misrepresentations by billing AT&T for switched access services that it did not provide. The Iowa Supreme Court has "distinguished misrepresentations made by persons engaged in the business or profession of supplying guidance to others," which are actionable, "from misrepresentations made during commercial transactions where the parties are dealing at arm's

length," which are not. <u>Freeman v. Ernst & Young</u>, 516 N.W.2d 835, 838 (Iowa 1994). AT&T's relationship with Aventure falls into the latter category. Aventure "was not under the kind of 'duty' that would support a claim of negligent misrepresentation," because Aventure "was simply not 'in the business or profession of supplying information to others.'" <u>McLeodUSA</u>, 469 F.Supp.2d at 696 (quoting <u>The Conveyor Co. v. Sunsource Tech. Servs., Inc.</u>, 398 F.Supp.2d 992, 1014 (N.D.Iowa 2005)).

To the extent AT&T asserts a separate cause of action for negligent misrepresentation, it fails to state a claim upon which relief can be granted, and the claim must be dismissed.

### 4. AT&T's Unjust Enrichment Claim

██ AT&T alleges in support of its claim for unjust enrichment that Aventure, through their wrongful, improper, unjust, fraudulent, and unfair conduct, has reaped substantial and unconscionable profits from AT&T under its tariffs and has received monies from AT&T to which it is not entitled.

Aventure argues that AT&T's unjust enrichment claim fails to state a claim and should be dismissed. Aventure asserts that the "monies" to which AT&T refers are the very few access charges that they actually paid before engaging in self-help, and that AT&T's claim conflicts with the FCC's determination in the <u>Connect America Order</u> that tariffed access charges apply to the type of traffic at issue in this case. Aventure asserts that by expressly rejecting the IXCs' request to adopt arbitrary de minimis rates or to apply a bill-and-keep regime, the FCC in the <u>Connect America Order</u> made it clear that access minutes terminated to the LEC, and the LEC is entitled to access revenues. Aventure also contends that the <u>Connect America Order</u> established that the access service LECs provided to IXCs was both valuable and compensable.

AT&T resists, contending that Aventure's argument is based on the same flawed interpretation of the <u>Connect America Order</u> that it applied to challenge the sufficiency of AT&T's other claims. AT&T reiterates that the <u>Connect America Order</u> expressly stated that it did not overrule its prior rulings in <u>Farmers II</u> and <u>Farmers Recon II</u> or its <u>Northern Valley</u> decisions. For that reason, AT&T concludes Aventure is not entitled to compensation from AT&T on any theory. Moreover, AT&T argues that Aventure was unjustly enriched by payments made on FCSC traffic, therefore, its allegations include the necessary elements of an unjust enrichment claim.

██ The elements of an unjust enrichment claim are the following:

> Recovery based on unjust enrichment can be distilled into three basic elements of recovery. They are: (1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances.

<u>State, Dep't of Human Servs. ex rel. Palmer v. Unisys Corp.</u>, 637 N.W.2d 142, 154–55 (Iowa 2001) (footnotes omitted). AT&T alleges in its amended complaint that since it initially paid Aventure terminating access fees for services that were not terminating access services within the meaning of the tariff, Aventure would be unjustly enriched to retain that benefit.

Based on the record, AT&T has sufficiently pled a claim for unjust enrichment that meets the plausibility standard. <u>See Iqbal</u> 556 U.S. at 678, 129 S.Ct. 1937. Aventure's motion to dismiss AT&T unjust enrichment claim must be denied.

### 5. AT&T's Declaratory Ruling Claim

Aventure's final argument is that the claims upon which AT&T's request for de-

claratory ruling depend fail to state a claim upon which relief may be granted, and that therefore the Court should decline to exercise supplemental jurisdiction over the declaratory ruling request and dismiss it as moot. With the exception of the negligent misrepresentation claim, the Court has not dismissed AT&T's other claims, and therefore denies Aventure's motion to dismiss AT&T's request for declaratory ruling.

### C. AT&T's Motion to Dismiss Futurephone's Counterclaims

AT&T moves to dismiss all of Futurephone's counterclaims. Counts one through four of Futurephone's counterclaims allege AT&T violated provisions of the Act, count five alleges AT&T tortiously interfered with Futurephone's contractual relationships, count six is a quantum meruit claim, count seven alleges AT&T violated Iowa Code § 476.5, and count eight alleges AT&T abused the legal process by filing this lawsuit.

#### 1. Futurephone's Communications Act Counterclaims

■ Counts one through four of Futurephone's counterclaims are premised on AT&T not having paid switched access charges that Futurephone's LEC partners billed to AT&T for tariffed switched access charges on calls destined for telephone numbers the LECs assigned to Futurephone. However, the provisions of the Act AT&T allegedly violated uniformly create duties only between communications providers and their customers or interconnecting carriers, and do not create any such duties between a carrier and its customer's customer, which would be necessary in order for Futurephone to prevail.

The Commission addressed this issue in All American I and held that claims pursu-

ant to the Act are limited to claims by a customer against a carrier, not the other way around.

During the past twenty years, the Commission has repeatedly held that an allegation by a carrier that a customer has failed to pay charges specified in the carrier's tariff fails to state a claim for violation of any provision of the Act, including sections 201(b) and 203(c)—even if the carrier's customer is another carrier. These holdings stem from the fact that the Act generally governs a carrier's obligations to its customers, and not vice versa. Thus, although a customer-carrier's failure to pay another carrier's tariffed charges may give rise to a claim in court for breach of tariff/contract, it does not give rise to a claim at the Commission under section 208 (or in court under section 206) for breach of the Act itself.

All American I, 26 FCC Rcd. at 727 & n. 32 (footnotes omitted) (citing cases).

In sum, all three of the CLECs' claims rest on the assertion that AT&T's failure to pay their tariffed access charges violates section 201(b) and/or section 203(c) of the Act. That assertion is erroneous. *The law is settled that a carrier-customer's failure to pay tariffed access charges does not violate either section 201(b) or section 203(c) of the Act. Accordingly, all three of All-American's claims must be denied for failure to state a claim cognizable under section 208 (or any other provision) of the Act.* Id. at 732 (emphasis added). The FCC's interpretation is entitled to deference. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981–82, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) ("Chevron's [23] premise is that it is for

---

**23.** Chevron USA. Inc. v. Natural Res. Def Council Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

agencies, not courts, to fill statutory gaps.... The better rule is to hold judicial interpretations contained in precedents to the same demanding Chevron step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction .... [W]hether Congress has delegated to an agency the authority to interpret a statute does not depend on the order in which the judicial and administrative constructions occur."). The FCC's All American decisions demonstrate the FCC's reasoning for repeatedly finding the Act does not support claims against carriers in their roles as customers.

Counts two, three, and four of Futurephone's counterclaims allege that AT&T's intentional failure and refusal to pay the LECs' billed charges for access services represent illegal self-help in violation of §§ 201(b), 202(a), and 203(c) of the Act. Count one of Futurephone's counterclaims alleges that AT&T's withholding of payment from the LECs is tantamount to an unreasonable denial of service to Futurephone and its end users, and thus violates § 201(a). These allegations merge with Futurephone's count two, which alleges AT&T violated § 201(b) by engaging in illegal self-help when it refused to pay the LECs for services rendered. As discussed in detail above, see discussion supra Part III.B.2, in All American I, which involved an access stimulation scheme similar to one in the present case, the FCC expressly held that allegations against the IXC for withholding of payment "fail[ed] to state a claim for violation of any provision of the Act." All American I, 26 FCC Rcd. at 724, 727, 731. In addition, the Commission has recognized that an IXC purchasing a terminating LEC's access service does not thereby provide service to the terminating

LEC's customer; rather, the IXC provides long distance service to its own long distance customer that placed the call. See, e.g., YMax, 26 FCC Rcd. at 5753-55 ("[S]witched access is a wholesale service provided to IXCs ... as an input to the end-to-end long distance service they provide to their 1+ and 8YY customers...."). In N. Valley II, 26 FCC Rcd. at 10786-87, the Commission held that a LEC's attempt to deny long distance carriers the ability to withhold payment and dispute charges itself independently contravenes §§ 206 and 208 of the Act, and therefore violates § 201(b).

In All American Recons. I, 28 FCC Rcd. at 3470, the Commission reiterated that the two referral questions were as follows: (1) "Did AT&T violate § 201(b), § 203(c), or any other provision of the ... Act by refusing to pay the billed charges for the calls at issue?"; and (2) "Did AT&T violate any provision of the Communications Act by refusing to pay the billed charges for the calls at issue and not filing a rate complaint with the FCC?" The Commission then reiterated that both questions had been answered, and that "[t]he answer to both of the Court's questions addressed in this Order is 'no.'" Id. The Commission denied the CLECs' claims, restating that "AT&T did not violate sections 201(b), 203(c), or any other provision of the Communications Act by refusing to pay the billed charges for the calls at issue, regardless of whether it filed a rate complaint with the FCC." Id. The All American Recons. I order forecloses any argument that the FCC has not made a final decision on the issue.

Futurephone argues AT&T incorrectly interprets Farmers I and Farmers Recons. I to stand for the proposition that a refusal by an IXC to pay tariffed charges does not violate §§ 201(b) and 203(c) of the Act. Futurephone claims such an interpretation

is contrary to precedent, but refers to FCC decisions that predate the access stimulation cases, some of which are several decades old. In All American II, the Commission emphasized that its prior holding in Jefferson Telephone, 16 FCC Rcd. at 16137, cited here by Futurephone, was very narrow and based upon the specific facts of that case, and that Jefferson Telephone expressed no view whether revenue sharing arrangements could be found to violate the Act on a different record. See All American II, 28 FCC Rcd. at 3492 & n. 141.

In All American I, 26 FCC Rcd. at 730–31, the Commission also distinguished the legal issues in Global Crossing from those in the All American case:

> The CLECs also rely on several Commission orders and [Global Crossing] holding that a carrier's failure to pay per-call compensation to payphone service providers in accordance with the Commission's payphone compensation rules constitutes a violation of section 201(b) of the Act. In the CLECs' view, if a carrier's failure to pay per-call compensation to payphone service providers is a violation of section 201(b), then surely a carrier's failure to pay access charges is such a violation, as well.
>
> The Commission has already explained why the payphone analogy raised by the CLECs fails. The Act requires the Commission to adopt rules ensuring that payphone service providers receive compensation for every completed call originated from their payphones. To implement that statutory directive, the Commission adopted rules requiring certain carriers to pay to originating payphone service providers a fixed amount for each completed payphone call handled by those carriers. In subsequent decisions, the Commission held that a carrier's failure to pay the amount required to be paid by the Commission's payphone compensation rules

constitutes a violation of our payment rules and a violation of section 201(b) of the Act.

> *By stark contrast, the provisions of the Act and our rules regarding access charges apply only to the provider of the service, not to the customer; and they govern only what the provider may charge, not what the customer must pay. Thus, failure to pay does not breach any provisions of the Act or Commission rules.*

Id. (emphasis added) (footnotes omitted). As discussed at length above, the U.S. Court of Appeals for the District of Columbia Circuit affirmed these conclusions in Farmers v. FCC, 668 F.3d at 718–24, see discussion supra Part III.B.1.e.

All American and subsequent FCC decisions are dispositive of not just some, but all of Futurephone's Communications Act claims. Contrary to Futurephone's assertions, the referred question in All American was whether AT&T violated §§ 201(b), 203(c), *or any other provision* of the Act. The FCC has repeatedly answered that question in full. See All American I, 26 FCC Rcd. at 726; All Am. Recons. I, 28 FCC Rcd. at 3470. Furthermore, a violation of §§ 201 or 203 hinges on an analysis of §§ 206 and 208, which define the right of action and the FCC's authority to adjudicate claims that allege a carrier-customer has violated the Act. Futurephone's argument that All American lacks precedential or binding effect is moot because the final order has issued.

For these reasons, AT&T's motion to dismiss Futurephone's Communication Act counterclaims, counts one through four, must be granted.

### 2. Futurephone's Tortious Interference Counterclaim

■ AT&T argues its right to withhold payment of the switched access charges also forecloses Futurephone's tortious in-

terference with an existing contractual relationship claim (count five) because it is similarly based on the faulty premise that AT&T was obligated to pay the charges at issue. AT&T further argues that it could not interfere with Futurephone's relationships with the LECs by exercising its right to withhold payment of charges pursuant to the dispute provisions of the tariffs.

 To prove a claim for tortious interference with an existing business relationship, a party must show: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." Home Show Tours, Inc. v. Quad City Virtual, Inc., 827 F.Supp.2d 924, 945-46 (S.D. Iowa 2011) (quoting Kern v. Palmer Coll. of Chiropractic, 757 N.W.2d 651, 662 (Iowa 2008)). The elements of a claim under Iowa law for tortious interference with *prospective* business relationships are essentially the same, see Blumenthal Inv. Trusts v. City of W. Des Moines, 636 N.W.2d 255, 269 (Iowa 2001), but the element of improper interference is defined differently. In a prospective business relationship claim, "the purpose on the defendant's part to financially injure or destroy the plaintiff is essential," Nesler v. Fisher & Co., 452 N.W.2d 191, 199 (Iowa 1990) (citation and internal quotation marks omitted).

Futurephone's tortious interference claim merely recites the elements of the tort and generally alleges that AT&T's failure to pay the LECs caused the disruption and destruction of Futurephone's existing and prospective business relationships.

The FCC has repeatedly found that cessation of payments to the LEC in these access stimulation cases was not improper. See, e.g., All American I, 26 FCC Rcd. at 726; All Am. Recons. I, 28 FCC Rcd. at 3470. The IUB reached the same conclusion, which was affirmed by the Iowa Court of Appeals.

[T]he [IUB] finds that none of the FCSCs associated with the [LECs] were end users for purposes of the [LECs]' intrastate exchange access tariffs, none of the intrastate toll traffic associated with the FCSCs terminated at an end user's premises, and much of the intrastate toll traffic associated with the FCSCs did not terminate in the [LECs]' certificated local exchange area. For each of these reasons, intrastate access charges did not apply to calls to the FCSCs and should not have been billed to the IXCs for calls to numbers assigned to the FCSCs.

. . . .

With respect to the first form of self-help, the [IUB] finds that unilaterally withholding payment is not a preferred form of dispute resolution in economic disputes between carriers unless it is clearly contemplated under the applicable dispute resolution provisions, which it was not in this case. However, based on the rulings the [IUB] has made regarding the tariff compliance issues, specifically that terminating intrastate access charges were improperly assessed to the IXCs in this case, no money within the [IUB]'s jurisdiction is owed by [Qwest] or Sprint to Reasnor or to any other [LEC] and there is no need for any remedy in this case.

In Re: Qwest Commc'ns Corp., Complainant, FC–07–2, 2009 WL 3052208 (Sept. 21, 2009). Qwest Commc'ns v. Superior Tel. Coop. (IUB I), Docket No. FCU–07–2, 2009 WL 3052208 (Iowa Util. Bd. Sept. 21, 2009), recons. granted in part, (IUB Recons. I), 2009 WL 4571832 (Iowa Util. Bd. Dec. 3, 2009), further recons. denied, 2011 WL 459685, (IUB Recons. II) (Iowa Util. Bd. Feb. 4, 2011), aff'd sub nom. Farmers & Merchs. Mut. Tel. Co. of Wayland v.

IUB, 829 N.W.2d 190 (Iowa Ct. App. 2013) (unpublished table decision).

Accordingly, Futurephone's counterclaim for tortious interference fails as a matter of law because Futurephone cannot show that AT&T acted improperly by not paying the LECs' invoices for tariffed service the LECs did not provide.

### 4. Futurephone's Quantum Meruit Counterclaim

 For the same reasons, AT&T argues Futurephone's quantum meruit claim (count six) fails because AT&T could not as a matter of law be unjustly enriched by exercising its rights conferred by the governing tariffs.

 The elements for a quantum meruit claim under Iowa law are: "(1) plaintiff performed under circumstances reasonably indicating the performance was for the benefit of defendant and not another person; (2) plaintiff performed under circumstances reasonably indicating payment was expected; and (3) the services provided by the plaintiff were beneficial to the defendant." Iowa Network Servs., Inc. v. Qwest Corp., 385 F.Supp.2d 850, 910 (S.D.Iowa 2005), aff'd, 466 F.3d 1091 (8th Cir.2006).

Futurephone's quantum meruit claim asserts AT&T (1) has "been provided with valuable switched access services for the termination of its long-distance customer calls *and Futurephone has assisted* in the provision of those services"; (2) has "accepted, used and enjoyed these access termination services *for which Futurephone has assisted* and incurred costs and has refused to pay for such services"; (3) should have foreseen "that *Futurephone expected to be paid for assisting* in the call termination services provided to [AT&T]" and thus "understood that those services were provided to [AT&T], and not some other entity or person, and were not ren-

dered gratuitously, but with the expectation of compensation from [AT&T]"; and (4) "would be unjustly enriched if [it] were permitted to receive the benefit of these call termination services without paying the reasonable value thereof" Futurephone Am. Countercl. ¶¶ 93-96, ECF No. 123 (emphasis added).

This type of alternative claim—that if the tariffs do not apply, LECs can recover for services rendered under equitable principles—was referred to the FCC and addressed in the Northern Valley cases. In N. Valley II, 26 FCC Rcd. at 10782, the FCC held that ILECs can only recover through tariffs and CLECs can only recover through either tariffs or negotiated contracts:

> Since 1997, CLECs have been allowed to assess interstate switched exchange access service charges upon IXCs [long distance carriers] either by filing tariffs with the Commission or by negotiating contracts with the affected IXCs. (In contrast, incumbent local exchange carriers ("TLECs") may assess interstate switched exchange access charges only by filing federal tariffs.).

Id.; see also N. Valley I, 26 FCC Rcd. at 8335 ("In contrast to ILECs, CLECs may impose interstate access charges either through tariffs or contracts negotiated with IXCs."). Likewise, if the service in question is not switched access under FCC rules because, for example, there was no end user customer who received the calls, the FCC has held that LECs can only recover from long distance carriers though a negotiated contract. N. Valley I, 26 FCC Rcd. at 8338 (citing In re: CLEC Access Charge Reform (Eighth Report and Order), 19 FCC Rcd. 9108, 9114 (2004)). These cases thus reiterate the FCC's analysis and holding in Sprint PCS [24] and the Eighth Report and Order.

---

**24.** In Re Sprint PCS & AT&T, 17 FCC Rcd.

13192, 13198 (2002) ("There being no author-

■ The FCC noted that the Act requires the filing of access tariffs that contain applicable rates, terms, and conditions. See N. Valley I, 26 FCC Rcd. at 8334 (citing 47 U.S.C. § 203(a)); In re: Tariff Filing Requirements for Interstate Common Carriers, 7 FCC Rcd. 8072, 8072–73 (1992); In re: Hyperion Telecomms., Inc., 12 FCC Rcd. 8596, 8596–8601 (1997)); see also YMax, 26 FCC Rcd. at 5748 ("Consistent with these statutory provisions, a carrier may lawfully assess tariffed charges only for those services specifically described in its applicable tariff."). Thus, the only ways a CLEC can charge an IXC, like AT&T, are under the express terms of its tariff (which must also comport with federal law) or through an express, negotiated contract.

■ Although CLECs have the option of negotiating contracts, once a CLEC files a tariff, a CLEC may not then negotiate separate contracts for interstate access. See All American I, 26 FCC Rcd. at 730 n.47 ("[P]arties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed." (quoting Seventh Report and Order, 16 FCC Rcd. at 9934 n. 71)); see also XChange Telecom Corp. v. Sprint Spectrum L.P., No. 1:14–cv–54 (GLS/CFH), 2014 WL 4637042, at *5 (N.D.N.Y. Sept. 16, 2014) ("The 'filed rate doctrine,' then, 'forbids a regulated entity [from] charg[ing] rates for its services other than those properly filed with the appropriate federal regulatory authority.'" (alterations in original) (quoting Marcus v. AT&T Corp., 138 F.3d 46, 58 (2d Cir.1998) (quoting Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)))). In other words, "[u]nder the filed-rate doctrine, federal law preempts claims concerning the price at which service is to be offered, and ... claims concerning the services that are offered." Access Telecom, Inc. v. AT&T Telecomms. Corp., 197 F.3d 694, 711 (5th Cir.1999) (citing AT&T v. Cent. Office Tel., Inc., 524 U.S. 214, 222–23, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998)); see also Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1097 (8th Cir.2006) ("Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." (alteration in original) (emphasis added) (quoting Evanns v. AT&T Corp., 229 F.3d 837, 840 (9th Cir.2000))); Freedom Ring Commc'ns, LLC v. AT&T Corp., 229 F.Supp.2d 67, 70 (D.N.H.2002) ("[LEC] BayRing also argues that the filed rate doctrine has been 'fundamentally changed' by recent FCC rulings, which apparently allow certain communications carriers to enter negotiated agreements with other carriers in lieu of filing tariffs. Regardless of whether the application of the filed rate doctrine is altered in such circumstances, an issue which [the court] need not discuss here, BayRing simply does not allege that a nontariff based, negotiated agreement exists in this case. To the contrary, BayRing expressly states that the rates, terms, and conditions of its filed tariffs govern the contractual relationship between BayRing and AT&T."); Advamtel, LLC v. AT&T Corp., 118 F.Supp.2d 680, 688 n.24 (E.D.Va.2000) ("Plaintiffs' reliance on FCC discussions of permissive detariffing as permitting off-tariff contracts fails .... Permissive detariffing permits carriers to file tariffs and thus be bound by the rate established therein or, alternatively, to ne-

---

ity under the Commission's rules or a tariff for Sprint PCS unilaterally to impose access charges on AT&T, Sprint PCS is entitled to

collect access charges in this case only to the extent that a contract imposes a payment obligation on AT&T.").

gotiate separate agreements in lieu of, or rather than, filing tariffs.").

The FCC has held that a CLEC who has a filed tariff cannot collect interstate access charges other than by meeting the terms of their filed tariffs, and CLECs who have not filed a tariff can only charge IXCs by negotiating contracts for the delivery of calls to FCSCs. There are no other bases for obtaining compensation on switched access services. Moreover, if the service at issue is not switched access service—because it does not comport with FCC rules—the only way LECs can recover from an IXC is through a negotiated contract.

In this case, Futurephone's quantum meruit counterclaim alleges the very same access services for which the LECs billed AT&T *under its tariff.* Since Aventure alleged that it filed an interstate access services tariff, the only way to recover from AT&T was via tariff. This precludes the LECs from claiming unjust enrichment or quantum meruit. Futurephone has no greater right to recover from AT&T for its alleged failure to pay the LECs than those rights the LECs can maintain. The LECs' failure-to-pay claims have been repeatedly rejected by the FCC. See, e.g., N. Valley II, 26 FCC Rcd. at 10782; N. Valley I, 26 FCC Rcd. at 8335; see also, e.g., N. Valley Commc'ns, LLC. v. Qwest Commc'ns Corp., 659 F.Supp.2d 1062, 1067 (D.S.D. 2009).

The district courts that referred questions to the FCC asked: (1) whether the traffic to FCSCs qualified under the LEC's tariff, *and* (2) if it did not, whether the LEC was nonetheless entitled to compensation by some other vehicle. The N. Valley decisions spoke directly to both questions. Moreover, in the FCC's 2015 All American Damages Order, see discussion supra Part III.B.2.e, the Commission rejected the CLECs' contention that an IXC, in that case AT&T, would be unjustly en-

riched by receiving an award of damages, remarking that the CLECs "failed to establish the necessary elements for unjust enrichment, because they did not provide a service to, or confer a benefit on, AT&T." All Am. Damages Order, 30 FCC Rcd. at 8962. It is, therefore, axiomatic that Futurephone claims based upon AT&T alleged failure to pay necessarily fail.

Furthermore, Futurephone's claim for quantum meruit does not meet the plausibility standard because the facts alleged do not support an inference that Futurephone had any relationship with AT&T. See Iqbal 556 U.S. at 678, 129 S.Ct. 1937. Futurephone merely asserts it *assisted* the LECs in providing a valuable service, incurred costs as *a result of that assistance,* expected to be paid *for that assistance,* and that AT&T would be unjustly enriched without paying a reasonable value *to the LECs* for those services. Futurephone does not allege a relationship with AT&T, but only that it assisted the LECs in *their* relationships with AT&T. While there is no doubt Futurephone expected payment for its assistance, the structure of its arrangements with the LECs makes clear it expected to receive its payment from the LECs and not from AT&T. Futurephone fails to plead the necessary elements of a quantum meruit claim, and therefore the claim fails on that basis as well. See Iowa Network Servs., 385 F.Supp.2d at 910.

Based on the foregoing, AT&T's motion to dismiss Futurephone's quantum meruit claim must be granted.

### 5. Futurephone's Iowa Code § 476.5 Counterclaim

■ AT&T alleges Futurephone's counterclaim for violation of Iowa Code § 476.5 (count seven) fails to state a claim upon which relief may be granted. AT&T argues § 476.5 has no application to the calls at issue because they are international telecommunications governed by feder-

al, not state, law. AT&T argues, in the alternative, Futurephone's § 476.5 claim fails because § 476.5 applies to public utilities providing service under their tariffs, not to the customers of public utilities. Futurephone resists, arguing AT&T violated § 476.5 by refusing to pay switched access services to the LECs under their intrastate tariffs and Iowa law appears to recognize the prohibition against long-distance carrier's self-help. Therefore, Futurephone contends, "[i]t would stand to reason that such common carriers should not be immune from Iowa Code § 476.5." Futurephone Resist. Br. 27, ECF No. 179.

Iowa Code § 476.5 provides:

No public utility subject to rate regulation shall directly or indirectly charge a greater or less compensation for its services than that prescribed in its tariffs, and no such public utility shall make or grant any unreasonable preferences or advantages as to rates or services to any person or subject any person to any unreasonable prejudice or disadvantage.

Regarding statutory violations giving rise to private causes of action, the Iowa Supreme Court recently reiterated,

"Not all statutory violations give rise to a private cause of action. A private statutory cause of action exists 'only when the statute, explicitly or implicitly, provides for such a cause of action.' " Mueller[v. Wellmark, Inc.], 818 N.W.2d [244,] 254 [ (Iowa 2012) ] (quoting Sanford v. Manternach, 601 N.W.2d 360, 371 (Iowa 1999)). "A private right of action is the right of an individual to bring suit to remedy or prevent an injury that results from another party's actual or threatened violation of a legal requirement." Shumate v. Drake Univ., 846 N.W.2d 503, 507 (Iowa 2014) (quoting Wisniewski v. Rodale, Inc., 510 F.3d 294, 296 (3d Cir.2007) (footnote omitted)). A private, statutory cause of action only exists "if the legislature intended 'to create not

just a private right but also a private remedy.' " Id. (quoting Alexander v. Sandoval, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)).

Estate of McFarlin v. State, 881 N.W.2d 51, 56 (Iowa 2016). When a statute does not provide an explicit private right to sue, the court applies a four-factor test established by the United States Supreme Court in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and adopted, as modified, by the Iowa Supreme Court in Seeman v. Liberty Mutual Insurance Co., 322 N.W.2d 35, 41–43 (Iowa 1982). To determine whether an implied private right of action exists, the court asks

(1) whether "the plaintiff [is] a member of the class for whose special benefit the statute was enacted"; (2) "[l]egislative intent, either explicit or implicit, to create or deny a remedy"; (3) whether "a private cause of action [is] consistent with the underlying purpose" of the statute; and (4) whether "the implication of a private cause of action [will] intrude into an area over which the federal government has exclusive jurisdiction or which has been delegated exclusively to a state administrative agency."

Estate of McFarlin, 881 N.W.2d at 57 (alterations in original) (quoting Shumate, 846 N.W.2d at 507 (quoting Seeman, 322 N.W.2d at 41–43)).

Iowa Code Chapter 476 is aptly titled "Public Utility Regulation," as it sets forth a detailed regulatory regime. See, e.g., City of Coralville v. Iowa Utils. Bd., 750 N.W.2d 523, 531 (Iowa 2008) ("Chapter 476 and the regulations implementing it provide a uniform system for filing and approval of tariffs setting rates based on costs of the individual public utility."). The Iowa Supreme Court has "repeatedly declined to find an implied private right to sue under general regulatory statutes."

Estate of McFarlin, 881 N.W.2d at 58 (citing Iowa Supreme Court decisions that identify various regulatory provisions of the Iowa Code as being devoid of any hint of a private remedy).

Futurephone cites "no regulatory statutes comparable to [§ 476.5] that [the Iowa Supreme Court] ha[s] interpreted to provide a private right of action." Id. Nor is this Court able "to glean any legislative intent . . . to create a private right to sue." Id. As the Iowa Supreme Court has repeatedly pronounced, "[w]e believe that, had the legislature intended to create a private right of action . . . . [,] it would have said so clearly." Id. (second alteration in original) (quoting Marcus v. Young, 538 N.W.2d 285, 290 (Iowa 1995) (quoting Unertl v. Bezanson, 414 N.W.2d 321, 326 (Iowa 1987)). C.f. Unertl, 414 N.W.2d at 326 ("An examination of the contents of chapter 536A confirms that it was intended as a regulatory measure, authorizing supervision and enforcement of its provisions by the auditor. It is devoid of any suggestion of a private remedy. We believe that, had the legislature intended to create a private right of action against a corporation directly by a creditor, and thus to create an exception to the general rule discussed above, it would have said so clearly."). Futurephone has failed to satisfy the second factor of the Seeman test, and because a plaintiff "must satisfy all four factors and fail[s] under the second," the Court "need not address the other three." Estate of McFarlin, 881 N.W.2d at 58 (citing Kolbe v. State, 625 N.W.2d 721, 727 (Iowa 2001)).

Moreover, like the FCC, the IUB found that in the revenue sharing arrangements between the Iowa LECs and the FCSCs: (1) the FCSCs did not constitute end users; (2) the LECs did not provide local exchange service to the FCSCs; and (3) the LECs violated terms of their access tariffs by charging the IXCs for terminat-ing switched access for traffic that was not subject to those charges. Findings of Fact, IUB I, 2009 WL 3052208. The IUB concluded that the Iowa LECs did comply by the terms and conditions of their respective tariffs and that the LECs, not the IXCs, violated § 476.5. Thus, even if § 476.5 did provide private cause of action, Futurephone's claim against AT&T for violation of § 476.5 fails as the IUB found no such violation by the IXCs for the same conduct asserted here by Futurephone.

Futurephone's counterclaim for violation of Iowa Code § 476.5 does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Barton v. Taber, 820 F.3d 958, 964 (8th Cir.2016) (quoting Iqbal 556 U.S. at 677–78, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955)). Based on the foregoing, AT&T's Motion to Dismiss Futurephone's counterclaim for violation of Iowa Code § 476.5 must be granted.

### 6. Futurephone's Abuse of Process Counterclaim

██ AT&T's final argument is that Futurephone's counterclaim for abuse of process (count eight) had no merit when initially filed in October 2008 and has since been rendered frivolous by the decisions of the IUB and the FCC. AT&T asserts the decisions of those agencies repeatedly found AT&T and other IXCs were not liable for, and were entitled to withhold payment of, access charges associated with traffic pumping schemes. Futurephone counters that AT&T cannot contend that Futurephone insufficiently pled an abuse of process claim, nor can it deny that Futurephone alleges the elements of sham litigation. Futurephone repeats its contention that AT&T's motion to dismiss Futurephone's claims is premised upon AT&T's misreading Farmers Recons. I and the IUB Order as standing for the

proposition that a refusal by an IXC to pay tariffed charges does not violate §§ 201(b) and 203(c) of the Act or Iowa law, respectively. Futurephone again argues that such an interpretation is contrary to FCC precedent that providers like Futurephone are end users and customers under the LECs' interstate access tariffs, and that IXCs like AT&T cannot lawfully refuse to pay access charges for delivery of that traffic.

"The tort of abuse of process is 'the use of legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it was not designed.'" Phelps v. Powers, 5 F.Supp.3d 1036, 1041 (S.D.Iowa 2013) (quoting Fuller v. Local Union No. 10, United Bhd. of Carpenters & Joiners of Am., 567 N.W.2d 419, 421 (Iowa 1997) (quoting Palmer v. Tandem Mgmt. Servs., Inc., 505 N.W.2d 813, 817 (Iowa 1993))). Under Iowa law, an abuse of process claim has three elements: "(1) the use of a legal process, (2) its use in an improper or unauthorized manner, and (3) resulting damages." Thomas v. Marion Cty., 652 N.W.2d 183, 186 (Iowa 2002). The Iowa Supreme Court and federal courts applying Iowa law have noted that "abuse of process claims routinely fail under the high burden [the court] require[s] for the second element." Id.; see Reis v. Walker, 491 F.3d 868, 870 (8th Cir.2007) ("The second element, which is 'difficult to establish,' requires at a minimum proof that the defendant 'used the legal process *primarily* for an impermissible purpose or illegal motive.'" (quoting Johnson v. Farm Bureau Mut. Ins. Co., 533 N.W.2d 203, 209 (Iowa 1995)); Phelps, 5 F.Supp.3d at 1041 ("The second element of [an abuse of process] cause of action proves an insurmountable obstacle in many cases, including the present one."); C & J Mgmt. Corp. v. Anderson, 559 F.Supp.2d 977, 981 (S.D.Iowa 2008) (same). "Typically, that means a motive to obtain some advantage collateral to the allegedly abusive process. Thus, abuse of process cases usually involve 'some form of extortion.'" Reis, 491 F.3d at 870 (quoting Schmidt v. Wilkinson, 340 N.W.2d 282, 284 (Iowa 1983) (quoting Restatement (Second) of Torts § 682 cmt. b)).

Paragraph 104 of Futurephone's counterclaim alleges that each of AT&T's claims against Futurephone purporting to challenge AT&T's obligations to pay under the tariff for Futurephone's traffic that terminated at the LECs were (1) objectively baseless and brought without an intent to achieve, or any reasonable prospect of achieving, success on the merits; (2) brought to, instead, misuse the litigation process as a weapon to harm Futurephone with the process of litigation as opposed to the outcome of the process; (3) a pretext for AT&T's unlawful self-help conduct that was aimed at driving Futurephone out of business; and (4) intended, and did, use the legal process primarily, if not exclusively, for impermissible, improper, and unlawful reasons.

In October 2008, when Futurephone filed its abuse of process counterclaim against AT&T, the FCC had already issued the Farmers I Recons. decision. Thus, Futurephone's allegations to support why AT&T's claims were for an improper purpose—that LECs provided tariffed access service to IXCs like AT&T, that FCSCs like Futurephone were end users, and that an IXC's refusal to pay the LECs was unlawful—were already under scrutiny by the FCC and the IUB. Therefore, at the time Futurephone filed its counterclaim accusing *AT&T* of filing objectively baseless counterclaims of which *AT&T* could have no reasonable or good faith basis to realistically expect success on the merits, Futurephone knew that the FCC and the IUB were considering the very grounds upon which AT&T's claims were premised. Nevertheless, even if this supportive legal authority did not exist,

AT&T's filing those claims would not rise to the level of an abuse of process. Futurephone has failed to sufficiently allege that AT&T had any ulterior purpose in naming Futurephone in this case. See, e.g. Phelps, 5 F.Supp.3d at 1041–42.

Futurephone's abuse of process claim does nothing more than challenge the sufficiency of AT&T's claims.[25] To survive a motion to dismiss, an abuse of process claim must do more than that. See, e.g., Reis, 491 F.3d at 870 ("[C]ommencing a lawsuit or adding a claim to gain leverage for a settlement, or in the expectation of a settlement, is not an abuse of that process."); Jensen v. Barlas, 438 F.Supp.2d 988, 1003 (N.D.Iowa 2006) (holding "assertions that the counterclaims were asserted primarily to harass and humiliate [the plaintiff were] insufficient, as a matter of law, to sustain her abuse-of-process claim"); Palmer, 505 N.W.2d at 817 (holding that "there is no abuse of process when the action is filed to intimidate and embarrass a defendant knowing there is no entitlement to recover the full amount of damages sought" and that "[p]roof of an improper motive by the person filing the lawsuit for even a malicious purpose does not satisfy th[at] element").

The Court finds that Futurephone's abuse of process claim has failed to allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Phelps, 5 F.Supp.3d at 1040 (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). The facts forming the basis of Futurephone's counterclaim utterly fail to demonstrate that AT&T used the process of filing a claim for civil conspiracy against Futurephone, in any way, let alone pri-

marily, for an improper purpose. See Reis, 491 F.3d at 870. Accordingly, Futurephone's abuse of process claim must be dismissed.

### D. AT&T's Motion for Judgment on the Pleadings [26]

AT&T moves for judgment on the pleadings on Aventure's Communications Act, unjust enrichment, and quantum meruit/implied contract claims.

#### 1. Aventure's Communications Act Claim

AT&T argues Aventure's Communications Act claim is premised on AT&T not having paid switched access charges Aventure billed to AT&T for tariffed switched access charges on calls destined for telephone numbers Aventure assigned to FCSCs, including Futurephone. AT&T asserts that these charges are not covered by the tariff, as the tariff specifically defines long distance carriers who deliver calls to the LEC pursuant to access tariffs—such as AT&T—as Aventure's "customers." Aventure's claim alleges that AT&T was obligated to pay these invoices in its role as Aventure's "customer," and thus AT&T violated the Communications Act by disputing Aventure's invoices and refusing to pay.

As previously discussed, the Commission addressed this issue in All American I and held that claims pursuant to the Act are limited to claims by a customer against the carrier who provided it with service, not the other way around. See All American I, 26 FCC Rcd. at 727 & n. 32. The FCC went on to state that LECs' claims that rest on the assertion that an IXC acting as

---

**25.** Futurephone has not filed any dispositive motions against any of AT&T's claims.

**26.** AT&T asserts its motion for judgment on the pleadings also provides additional authority in support of its motion to dismiss Future-

phone's counterclaims. Having granted AT&T's motion to dismiss Futurephone's counterclaims, see discussion supra Part V.C, the Court only considers AT&T's motion for judgment on the pleadings as against Aventure's counterclaims.

a carrier-customer violated §§ 201(b) and 203(c) by failing to pay tariffed access charges does not state a claim under any provision of the Act. Id. at 732 (emphasis added). AT&T again argues that the FCC's interpretation requires deference. Nat'l Cable & Telecomms., 545 U.S. at 981–82, 125 S.Ct. 2688. The All American decisions reason that the FCC has repeatedly found that the Act does not support claims against carriers in their roles as customers.

Count one of Aventure's amended counterclaims alleges that AT&T's intentional failure and refusal to pay Aventure's billed charges for access services represent illegal self help in violation of §§ 201(b), 202(a), and 203(c) of the Communications Act. As stated, All American I expressly held that allegations of an IXC's withholding of payment of tariffed charges "fails to state a claim for violation of any provision of the Act." All American, 26 FCC Rcd. at 724, 726, 731. In addition, the Commission has recognized that an IXC purchasing a terminating LEC's access service does not thereby provide service to the terminating LEC's customer; rather, the IXC provides long distance service to its own long distance customer that placed the call. See, e.g., YMax, 26 FCC Rcd. at 5753–55. In N. Valley II, 26 FCC Rcd. at 10786–87, the Commission held that a LEC's attempt to deny long distance carriers the ability to withhold payment and dispute charges itself independently contravenes §§ 206 and 208 of the Act, and therefore violates § 201(b). Aventure's argument that AT&T's decision to withhold payment violated the Act is incorrect. In fact, any attempt by Aventure to deny AT&T's ability to withhold payment would itself contravene the Act. Aventure's claim based on AT&T withholding payment simply cannot stand.

Aventure's contention that the Court should not rely on All American I because that decision was subject to a petition for reconsideration is now moot. The Commission denied reconsideration in All American I, restating that "AT&T did not violate sections 201(b), 203(c), or any other provision of the Communications Act by refusing to pay the billed charges for the calls at issue, regardless of whether it filed a rate complaint with the FCC." All Am. Recons. I, 28 FCC Rcd. at 3470. The final order in the All American case forecloses Aventure's argument that the FCC has not made a final decision on the issue.

Aventure asserts that AT&T's argument that LECs cannot assert Communications Act claims against an IXC when the IXC is acting as an unregulated customer of LEC services. Aventure also argues there is no legal substance to the assertion that under the regulatory structure imposed by the FCC, LECs can only collect access charges from IXCs via a tariff or a negotiated contract. Citing authority that is several decades old, Aventure argues AT&T's interpretation of All American as standing for the proposition that a refusal by an IXC to pay tariffed charges does not violate §§ 201(b) and 203(c) of the Communications Act is contrary to precedent. Aventure quotes a large section of the Supreme Court's decision in Global Crossing, 550 U.S. at 55–56, 127 S.Ct. 1513 (discussing long distance carriers' requirement to pay compensation to pay-phone owners), and argues that the Supreme Court therein refuted the long distance carrier's assertion that § 201(a) and (b) concerned only practices that harm carrier customers, not carrier suppliers, as not being what those sections, nor history, showed. Aventure concludes, therefore, either AT&T's interpretation of All American is incorrect, or the All American order is itself in error.

In reply, AT&T rejects Aventure's assertion that All American is contrary to legal precedent, noting that the precedent

cited is distinguishable, it is not binding on the FCC, and the Commission specifically distinguished the cases Aventure cites. AT&T further argues that the cases Aventure cites simply state that customers are obligated under the Communications Act to pay the tariff rates of tariffed services received, which is different than asserting, as Aventure does here, that § 206 provides a private right of action. AT&T also notes that the issues Aventure raises before this Court were addressed in All American I, wherein the Commission specifically distinguished the legal issues in Global Crossing from those present in All American I, 26 FCC Rcd. at 730–31.

Despite this adverse authority, Aventure argues that All American was responding to referral questions as to whether the IXCs' refusal to pay violated §§ 201 and 203; therefore, claims under other provisions of the Act were not expressly addressed by All American and AT&T cannot extend that holding to provide the bases for dismissal of the other Communications Act claims.

All American is dispositive on Aventure's Communications Act claim. Contrary to Aventure's assertions, the referred question in All American was whether AT&T violated §§ 201(b), 203(c), *or any other provision* of the Communications Act, and the FCC answered that question in full: "AT&T did not violate sections 201(b), 203(c), or any other provision of the Communications Act by refusing to pay the billed charges for the calls at issue, regardless of whether it filed a rate complaint with the FCC. Accordingly, the CLECs' claims are denied." All American I, 26 FCC Rcd. at 726; All Am. Recons. I, 28 FCC Rcd. at 3470. Furthermore, a violation of §§ 201 or 203 hinges on an analysis of §§ 206 and 208, which define the cause of action and the FCC's authority to adjudicate claims that a carrier has somehow allegedly violated the

Communications Act itself. In addition, All American distinguished the present traffic pumping cases wherein the LECs argue the long distance carriers were barred from withholding payment from those cases in which carriers and LECs were jointly providing service.

Again, Aventure's argument that All American lacks precedential or binding effect is now moot because the final order has issued. As discussed at length above, see discussion *supra* Part III.B.2, Aventure's arguments have been foreclosed by final Commission decisions. Aventure cannot maintain a cause of action against AT&T under the Act. AT&T's Motion for Judgment on the Pleadings as to Aventure's Communication Act claim must be granted.

### 2. Aventure's Unjust Enrichment/Quantum Meruit Counterclaims

AT&T also moves for judgment on the pleadings against Aventure's claims for implied contract (or quantum meruit) and for unjust enrichment. As stated in regard to dismissal of Futurephone quantum meruit claim, the FCC addressed this issue in the Northern Valley cases and held that ILECs can only recover through tariffs and CLECs can only recover for access services through tariffs or negotiated contracts. See N. Valley II, 26 FCC Rcd. at 10782; see also N. Valley I, 26 FCC Rcd. at 8335. Likewise if the service in question is not switched access under FCC rules because, for example, there was no end user customer who received the calls, the FCC has held that LECs can only recover from IXCs though negotiated contract. N. Valley I, 26 FCC Rcd. at 8338.

The FCC has stated that the Act requires the filing of access tariffs that contain applicable rates, terms, and conditions. See N. Valley I, 26 FCC Rcd. at 8338 (citing 47 U.S.C. § 203(a)). Although CLECs like Aventure have the option of

negotiating contracts, once it filed a tariff, negotiating contracts was no longer an option for interstate access. See All American I, 26 FCC Rcd. at 730 n. 47 ("[P]arties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed")); see also XChange Telecom, 2014 WL 4637042, at *5; Access Telecom 197 F.3d at 711 (citing Cent. Office Tel., 524 U.S. at 222–23, 118 S.Ct. 1956); Iowa Network Servs, 466 F.3d at 1097; Freedom Ring Cornmc'ns, 229 F.Supp.2d at 70; Advamtel, LLC v. AT&T Corp., 118 F.Supp.2d at 688.

The FCC has held that CLECs who have a filed tariff cannot collect interstate access charges other than by meeting the terms of their filed tariffs, and CLECs who have not filed a tariff can only charge IXCs by negotiating contracts for the delivery of calls to FCSCs. There are no other bases for obtaining compensation on switched access services. Moreover, if the service at issue is not switched access service—because it does not comport with FCC rules defining switched access service—the only way in which LECs can recover from long distance carriers is through negotiated contract. In this case, the unjust enrichment and quantum meruit claims[27] allege the very same access services for which Aventure billed AT&T *under its tariff*. Since Aventure alleges that it has filed interstate access services tariffs, the only way Aventure can recover from AT&T is via tariff This precludes Aventure from chiming unjust enrichment or quantum meruit.

Like Futurephone, Aventure also attempts to distinguish the All American and N. Valley decisions, arguing that in those

cases, while the FCC addressed specific tariff language and required the LEC to change tariff language and to refile its tariff, the FCC did not address state law quasi-contract or other equitable claims. Aventure further contends that not only do the N. Valley decisions not establish that LECs can never pursue equitable relief in federal court, but such an interpretation is flatly inconsistent with FCC and federal court precedent and that where there is no tariff, federal courts have found equitable relief is available.

Any doubt regarding the LECs ability to recovery for services provided to IXCs in the access stimulation cases that remained after the N. Valley decisions has been removed by the FCC's All Am. Damages Order, 30 FCC Rcd. at 8958. As proposed by the Commission in All American II (the Liability Order), AT&T filed a supplemental complaint for damages it incurred by paying inflated billed access charges in connection with a traffic pumping scheme. The Commission awarded AT&T damages of $252,496.37, reasoning that because the CLEC "[d]efendants may charge only for services they actually provide, it would be unjust to allow them to retain the amounts AT&T paid." Id.

Regarding the availability of equitable remedies to the CLEC Defendants, the Commission reasoned:

[The CLEC] Defendants contend that AT&T's supplemental complaint should be dismissed because AT&T would be unjustly enriched if the Commission were to award damages. But [the CLEC] Defendants have demonstrated neither that they may plead equitable defenses in a Section 208 complaint pro-

---

27. Under Iowa law, quantum meruit is a contract law claim for implied-in-fact contracts, requiring proof of assent and all other elements of a contract, while unjust enrichment lies in equity and instead requires the ele-

ments of a benefit received unjustly at the expense of another. See Iowa Network Servs., 385 F.Supp.2d at 909–10 (citing Iowa Waste Sys., Inc. v. Buchanan Cty., 617 N.W.2d 23, 29–31 (Iowa Ct.App.2000)).

ceeding, nor that they may seek equitable relief relating to matters subject to regulation. *Even assuming they could make these arguments, [the CLEC] Defendants have failed to establish the necessary elements for unjust enrichment, because they did not provide a service to, or confer a benefit on, AT&T.* [The CLEC] Defendants contend in this damages proceeding that, as billing/sales agents of Beehive, they have the right to be compensated [by AT&T] for the role they played in causing the Beehive service to be provided to AT&T. Their assertion is unsupported by the record, however.

Id. at 8962–63 (emphasis added) (footnotes and internal quotation marks omitted). In addressing the CLEC Defendants' alternative damages theories, the Commission noted:

The *Liability Order* did not create a "regulatory gap" entitling [the CLEC] Defendants to pursue alternate damage theories. As [the CLEC] Defendants acknowledge, they are entitled to compensation for access services only through a valid tariff or a contract negotiated with AT&T. The *Liability Order* found that [the CLEC] Defendants violated Sections 203 and 201(b) of the Act by billing AT&T in the absence of a valid tariff, and [the CLEC] Defendants did not otherwise have a negotiated agreement with AT&T. [The CLEC] Defendants cannot avoid the Commission's regulation of competitive interstate switched access services by violating the very rules the Commission created to govern those services.

Id. at 8963 n. 50 (citations and internal quotation marks omitted).

Considering the impact the All Am. Damages Order would have on the district court, the Commission noted that the district court had not entered a final order on the issue, and that nothing precluded the district court from seeking guidance from the Commission on AT&T's damages claims. Id. at 8960.

The question at the very core of the traffic pumping cases before the FCC has been whether, if the tariff access charges do not apply, the LECs are nonetheless entitled to *some* compensation. The FCC has answered the question; the answer is no.

Aventure's quantum meruit/implied contract and unjust enrichment claims fail as a matter of law based on All Am. Damages Order, 30 FCC Rcd. at 8958, and the authorities the FCC cited therein. AT&T's Motion for Judgment on the Pleadings as to the unjust enrichment and quantum meruit counterclaims must be granted.

## VI. CONCLUSION

For the reasons stated:

1. AT&T's Motion to Dismiss Futurephone's Counterclaims, ECF No. 162, must be **granted**. Counts one through eight of Futurephone's counterclaims are **dismissed**. The dismissal of Futurephone's counterclaims makes **moot** AT&T's Motion for Summary Judgment against Futurephone's Counterclaims, ECF No. 246.

2. AT&T's Motion for Judgment on Pleadings against Aventure's Counterclaims, ECF No. 197, must be **granted**. Counts one, three, and four of Aventure's Amended Counterclaims are **dismissed**.

3. Aventure's Motion to Dismiss counts one, two, seven, and nine of AT&T's amended complaint, ECF No. 222, must be **denied**. Aventure's Motion to Dismiss count six of AT&T's amended complaint that alleges a claim for negligent misrepresentation must be **granted**. Aventure's Motion to Dismiss count six of AT&T's amended

complaint that alleges a claim for fraudulent misrepresentation must be **denied.**

**IT IS SO ORDERED.**